# Exhibit A

# SUPREME COURT
# OF THE UNITED STATES

---

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

WILLIAM P. BARR, ATTORNEY GENERAL, )

ET AL.,                            )

        Petitioners,          )

          v.                 ) No. 19-631

AMERICAN ASSOCIATION OF POLITICAL  )

CONSULTANTS, INC., ET AL.,         )

        Respondents.          )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 75

Place:  Washington, D.C.

Date:   May 6, 2020

---

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

1

```
 1      IN THE SUPREME COURT OF THE UNITED STATES
 2    - - - - - - - - - - - - - - - - - - -
 3    WILLIAM P. BARR, ATTORNEY GENERAL, )
 4    ET AL.,                            )
 5                 Petitioners,          )
 6                 v.                    ) No. 19-631
 7    AMERICAN ASSOCIATION OF POLITICAL  )
 8    CONSULTANTS, INC., ET AL.,         )
 9                 Respondents.          )
10    - - - - - - - - - - - - - - - - - - -
11
12                 Washington, D.C.
13              Wednesday, May 6, 2020
14
15         The above-entitled matter came on for oral
16    argument before the Supreme Court of the United States
17    at 11:42 a.m.
18
19    APPEARANCES:
20    MALCOLM L. STEWART, Deputy Solicitor General,
21         Department of Justice, Washington, D.C.;
22         on behalf of the Petitioners.
23    ROMAN MARTINEZ, Esquire, Washington, D.C.;
24         on behalf of the Respondents.
25
```

1                    C O N T E N T S

2    ORAL ARGUMENT OF:                        PAGE:

3    MALCOLM L. STEWART, ESQ.

4        On behalf of the Petitioners          3

5    ORAL ARGUMENT OF:

6    ROMAN MARTINEZ, ESQ.

7        On behalf of the Respondents         35

8    REBUTTAL ARGUMENT OF:

9    MALCOLM L. STEWART, ESQ.

10       On behalf of the Petitioners         72

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                              (11:42 a.m.)
 3           CHIEF JUSTICE ROBERTS:  We'll hear
 4    argument next in Case 19-631, William Barr,
 5    Attorney General versus the American Association
 6    of Political Consultants.
 7                Before we get started, I would like to
 8    remind everyone to turn their cell phones off.
 9                Mr. Stewart.
10           ORAL ARGUMENT OF MALCOLM L. STEWART
11               ON BEHALF OF THE PETITIONERS
12           MR. STEWART:  Thank you, Mr. Chief
13    Justice, and may it please the Court:
14                In 1991, Congress enacted the TCPA's
15    basic restriction on the placement of automated
16    calls to cell phones.  In the years that
17    followed, lower courts consistently upheld the
18    constitutionality of that provision as a
19    content-neutral restriction on the use of
20    calling technologies that consumers found
21    particularly intrusive and annoying.
22                Congress's enactment of the
23    government-debt exception in 2015 did not
24    introduce any constitutional infirmity into the
25    statutory scheme.  That exception is limited to
```

1    a narrow category of calls that intrude less

2    severely on consumer privacy than does the

3    typical automated call and that serve an

4    important countervailing interest in protecting

5    the federal fisc.

6           There's been a good deal of back and

7    forth in the briefs about whether Respondents'

8    challenge is properly viewed as one to the

9    exception or to the general automated-call

10   restriction.  And I think, in circumstances like

11   this, there's not a right way and a wrong way,

12   not a right or wrong challenge to bring.

13   There's simply two conceptually distinct

14   analytical -- analytical ways of challenging a

15   law that includes a basic restriction subject to

16   exceptions.

17          Here, we think that both challenges

18   could have been brought but that both would

19   fail.  But I'd like to focus us first on the

20   challenge that Respondent is asserting in its

21   brief.  These are the -- this is the challenge

22   that Respondents are asking the Court to focus

23   on.

24          And that is the challenge to the

25   underlying automated-call restriction.  And

1    Respondents' basic theory is that the
2    government-debt exception, taken in combination
3    with other aspects of the statutory scheme,
4    prevents the automated-call restriction from
5    performing its intended consumer protection
6    function, renders it insufficiently efficacious
7    to be upheld under the First Amendment.
8            And we think that's wrong.  If you
9    look at the statute, the only other statutory
10   exceptions to the automated-call restriction are
11   those for emergency calls and calls with -- made
12   with the prior express consent of the recipient.
13           And Respondents have not contended
14   that either of those is -- raises a First
15   Amendment problem or casts doubt on the efficacy
16   of the underlying restriction.
17           CHIEF JUSTICE ROBERTS:  Mr. Stewart,
18   your --
19           MR. STEWART:  So that --
20           CHIEF JUSTICE ROBERTS:  -- your -- one
21   of your basic points to avoid strict scrutiny
22   under the First Amendment is that you're not
23   really looking at the content of the
24   communication in this case, but, rather, it's
25   more properly viewed as part of an economic

1    relationship.

2           I don't see how that gets you out of

3    the content category.  You still have to look

4    carefully at what's being said before you can

5    decide whether the phone call is covered by the

6    provision or not.  I think that's the clear

7    holding of our decision in the Reed case.

8           MR. STEWART:  Well, I think that as --

9    let me -- let me address Reed first and

10   foremost.  At the outset of the Court's analysis

11   in Reed, after the statement of the case, the

12   Court described content-based laws as "those

13   that target speech based on its communicative

14   content."

15          And if we're focusing now on the

16   automated-call restriction, the provision of the

17   statute that Respondents say is the focus of

18   their constitutional challenge, it's impossible

19   to say that that restriction targets

20   Respondents' calls based on their communicative

21   content.

22          The -- the situation was very

23   different in Reed.  In Reed, the town had 23

24   different categories of signs in its sign code,

25   a multitude of different treatments of the

1    different categories.  One of them was temporary

2    directional signs, and that was the category of

3    signs that the plaintiffs in the case wanted to

4    put up.  And you could tell exclusively from the

5    content of the sign what -- which category it

6    fell into and -- and what restrictions applied.

7    And in that circumstance, it was natural for the

8    plaintiffs to argue and the Court to hold that

9    they had been targeted based on the

10   communicative -- communicative content of their

11   signs.

12            Here, Respondents haven't been

13   targeted in any -- in any meaningful sense.

14   Their political communications are subject to

15   the same restrictions that apply to the vast,

16   vast majority of automated calls.

17            CHIEF JUSTICE ROBERTS:  Counsel, I'd

18   like --

19            MR. STEWART:  The fact that they're

20   here --

21            CHIEF JUSTICE ROBERTS:  -- I'd like to

22   jump ahead a little bit and get to the severance

23   question.  You say that if this exception for

24   government debt is found to be problematic, you

25   should just sever that and keep the rest of the

1    statute.

2            But, when we sever provisions, it's

3    because they are illegal.  Here, there's nothing

4    illegal about the government-debt exception.  It

5    just, when combined with the rest of the

6    statute, makes the whole statute vulnerable.

7            I wonder why in that situation the

8    whole statute shouldn't fall?

9            MR. STEWART:  I guess the two things I

10   would say are, first, it's important to look at

11   the temporal sequence that produced the current

12   state of affairs; that is, the basic restriction

13   was enacted in 1991 and the government-debt

14   exception was enacted in a separate public law

15   in 2015.  And --

16           CHIEF JUSTICE ROBERTS:  Okay.  I've

17   got -- I've got that.  What's your second point?

18           MR. STEWART:  The second point is that

19   the ultimate question of severability is one of

20   congressional intent, what result would Congress

21   have preferred.  And for purposes of determining

22   what Congress would likely have preferred, it

23   seems really like the tail wagging the dog to

24   say that we will treat Congress's desire to free

25   collectors of government-backed debts from these

```
 1    restrictions, whether -- as taking preeminence
 2    over Congress's desire to protect all consumers
 3    from all other automated calls.
 4             We think Congress --
 5             CHIEF JUSTICE ROBERTS:  Thank you --
 6             MR. STEWART:  -- would clearly have --
 7             CHIEF JUSTICE:  -- thank you, counsel.
 8             Justice Thomas?
 9             JUSTICE THOMAS:  Thank you, Chief
10    Justice.
11             Mr. Stewart, it would seem a bit odd,
12    as you suggest, that we sever the exception,
13    but, here, it doesn't seem -- this remedy
14    doesn't seem to give anything to Respondent.  It
15    doesn't add any more speech for that for the
16    Respondent.  And it seems to be taking speech
17    actually away from someone who's not in this
18    case.
19             MR. STEWART:  I mean, that -- that may
20    be true, but the Court's task in determining the
21    appropriate remedy is to kind of follow
22    established principles of severability, to look
23    to indicia of Congress's likely intent.
24             And if the result is that the
25    plaintiff at the end of the day doesn't get the
```

1    practical result that it was looking for, that's
2    not a reason to kind of re-jigger the
3    constitution -- the severability analysis.  I
4    mean, it -- it often is the case that a
5    plaintiff can achieve a practical victory only
6    by prevailing on both of two legal questions.
7              And sometimes it is a question both of
8    the merits of the claim and of the appropriate
9    remedy.  And if a court holds that, yes, you
10   were right, you've established the existence of
11   a violation, the statute read properly simply
12   doesn't authorize the remedy you seek, that
13   that's one of the chances that the plaintiff
14   takes when it pursues a claim that depends on
15   prevailing on two separate legal propositions.
16   The plaintiff persuaded the court as to one
17   legal proposition, didn't persuade the court as
18   to a second proposition that was really
19   essential to getting the practical result it
20   wanted -- that's not an unusual situation in the
21   law.
22             JUSTICE THOMAS:  Well, I'd like to
23   shift gears and -- and focus, just ask the
24   question about your strict scrutiny analysis.
25             You seem to focus on the interest that

1    the individual has in privacy of the cell phone.

2    But it would seem to me that that privacy

3    interest is actually not nearly as great as you

4    would -- as a person would have in the landline

5    phone at home or in even someone knocking on

6    their front door.

7              MR. STEWART:  Well, I think it --

8    it -- at the time that the statute was enacted,

9    cell phones were obviously a lot less prevalent.

10   They may have been used on -- on rare occasions,

11   and -- and most people didn't own them.

12              I think now cell phones are, as we

13   explained in the reply brief, are ubiquitous.

14   They are an integral part of daily life for most

15   individuals.  And so, really, the privacy

16   interest is -- is greater than in the

17   residential landline.

18              Yes, if the phone rings at your home

19   and you happen to be there, it may be an

20   intrusion.  But most people or virtually all

21   people when they are at home will have their

22   cell phones with them.  So unwanted calls to

23   cell phones will still pose the same threat to

24   residential privacy that unwanted calls to

25   landlines would.

1          But, in addition, people for the most
2     part carry their cell phones with them at all
3     times.  And so the effect of automated calls to
4     cell phones is not just potentially to disturb
5     residential privacy, it's potentially to disturb
6     them when they're at work, when they're on
7     social occasions, when for whatever reason they
8     might want to be open to calls from friends or
9     calls from family members but won't -- don't
10    want to be distracted by --
11          CHIEF JUSTICE ROBERTS:  Thank you,
12    counsel.
13          Justice Ginsburg?
14          JUSTICE GINSBURG:  Counsel, I don't
15    see how you can escape a content-based
16    distinction.  If the content is a debt owed to
17    the government, that's the content of the
18    message, you owe the government for a student
19    loan or whatever, then the call is okay.
20          But, if the message is, please
21    contribute to our political organization, it's
22    banned.  So it's based on what the message is.
23    Pay the government what you owe the government,
24    or contribute to our political organization.
25          MR. STEWART:  I think, as -- as we've

1    said in our briefs, it's -- it is true that

2    often a court in determining whether the

3    government-debt exception applied would look in

4    part to the content of the call.

5            But you wouldn't be looking

6    exclusively to the content of the call.  For

7    instance, determination whether the particular

8    debt that was sought to be collected was, in

9    fact, owed to or guaranteed by the federal

10   government would have nothing to do with the

11   call's content.  It would depend on the

12   financial relationship between the debtor and

13   the federal government.

14           And it is characteristic in the legal

15   culture that Congress would enact statutes that

16   regulate communications made in particular

17   fields of economic activity.  And so you have

18   laws that regulate what can be said or what

19   disclosures have to be made in connection with

20   the sale of securities.

21           And they're subject to First Amendment

22   challenge.  Plaintiffs can argue that particular

23   restrictions go too far.  But nobody thinks of

24   laws like that as being especially suspect

25   because they are limited to the field of

1      securities, even though, to determine whether a

2      particular communication was covered, a court

3      would need to look in part at the content of the

4      communication.

5           JUSTICE GINSBURG:  Switching to the

6      severance, we're told that if we strike only the

7      government debt exemption, that will leave the

8      political groups with no incentive at all to

9      assert their First Amendment claim.  They're

10     going to lose at the end of the day.

11          So why should they bother challenging

12     -- why -- why should they bother with a First

13     Amendment claim when it will be unsuccessful at

14     the severance stage?

15          MR. STEWART:  Well, a couple of

16     responses to that.  The first is, as -- as I was

17     indicating earlier, that the plaintiffs here did

18     argue and they were entitled to argue that the

19     appropriate remedy, if there was a

20     constitutional violation, was to strike down the

21     whole restriction.

22          But they didn't persuade the Court of

23     Appeals on that question.  And if the

24     application of ordinary severance principles

25     would confirm that result, then the Court's duty

1    is to follow those principles even though it
2    leaves this plaintiff without a remedy.
3                The other thing, as we discussed --
4                CHIEF JUSTICE ROBERTS:  Counsel.
5                Justice -- Justice Breyer?
6                JUSTICE BREYER:  Well, what your last
7    statement, and Justice Ginsburg leads me to ask
8    a somewhat philosophical question, which you
9    need not answer if you don't want to, but my
10   question is, what is content discrimination?
11               All human life is carried on through
12   speech.  All government regulation is carried on
13   through speech.  Every single statutes book is
14   filled with all kinds of content discrimination.
15               The SEC and every agency deals with
16   nothing but what do their rules apply to, where
17   are the exceptions, et cetera.  And so I'd
18   always thought that that was in Justice
19   Brandeis's third category, economic regulation,
20   as far as the First Amendment is concerned, or
21   at least most of it was.
22               So how in your view do you distinguish
23   between what is in that third category, look to
24   see if it's reasonable, what is in the first
25   category, never uphold it almost no matter what?

1    How -- how?  What's your way of doing it?

2         MR. STEWART:  I don't think we have

3    any succinct test that would capture all cases,

4    but I would point the Court or remind the Court

5    of certain guideposts that it set up.

6         One is, if you can tell exclusively

7    from the content of a message whether a

8    particular law applies, then that's very likely

9    or almost certain to be content-based.

10        The second is, as I was referring to

11   earlier, the Court in Reed referred to

12   content-based laws as those that target space --

13   speech based on its communicative content.  And,

14   here, even if you thought that the

15   government-debt exception was content-based, it

16   wouldn't follow that the automated-call

17   restriction is content-based.

18        The automated-call restriction doesn't

19   target speech because of its content, it treats

20   the vast majority of speech the same, and it

21   simply exempts from regulation a very small

22   category of speech.

23        And then the third thing I would say

24   is, whatever the right answer is, it can't be

25   that whenever speech -- the mere fact that a

1     particular law is limited to speech that is used

2     in a particular economic activity, that

3     limitation cannot by itself be sufficient to

4     render the law content-based or at least to

5     subject it to strict -- strict scrutiny because

6     that would -- that principle would cast doubt on

7     a vast array of laws that Congress and state

8     legislatures have enacted that regulate the

9     spheres of economic activity.

10          JUSTICE BREYER:  Thank you.  Thank you

11     very much.

12          CHIEF JUSTICE ROBERTS:  Justice Alito?

13          JUSTICE ALITO:  Mr. Stewart, the

14     so-called severability issue in this case is

15     really fascinating.  I understand you don't

16     think we need to get to that, but assuming for

17     the sake of argument that we do get to that

18     question, what is your best precedent for the

19     application of a severability analysis in a case

20     like this, where, arguably, a regulation of

21     speech is unconstitutional only because it

22     contains a content-based or a viewpoint-based

23     exception?

24          MR. STEWART:  I don't think either

25     side has a precedent that was specifically in

1    the First Amendment area, where the Court

2    discussed whether severability principles should

3    apply and, if so, how do they apply.

4           I think our best precedents are cases

5    like Morales-Santana and Ross.  Yes, those were

6    equal protection cases, but they said, in

7    deciding whether an exception should be severed

8    or the underlying rule should be struck down, we

9    look at things like the temporal sequence in

10   which the laws were enacted, whether the

11   exception was enacted later in the day, the

12   degree of Congress's commitment to the basic

13   rule, and I think those are good analogies here.

14           Where the gravamen of the First

15   Amendment claim is that this person's speech is

16   being treated differently from another person's

17   speech --

18           JUSTICE ALITO:  Well, what's your --

19           MR. STEWART:  -- obviously, the --

20           JUSTICE ALITO:  -- what is your

21   response to this counterargument?  In an equal

22   protection case, what the complaining party is

23   objecting to is unequal treatment.  So whether

24   the remedy levels up or levels down, the

25   complaining party gets what it wants, namely,

1    equal treatment, whereas, in a free speech case,

2    what the complaining party is objecting to is a

3    restriction on its speech.

4          And if we apply the severability

5    analysis in that situation, the complaining

6    party does not get what it wants, which is the

7    ability to speak without restriction.

8          MR. STEWART:  I think with respect,

9    that -- that conflates what the complaining

10   party wants with what is it -- with what it is

11   entitled to.  And, for instance, in

12   Morales-Santana, there's no question that what

13   the complaining party wanted was citizenship.

14         It wanted to be able to invoke on be

15   -- the plaintiff wanted to be able to invoke on

16   behalf of his father the constitutional right to

17   equal treatment for unwed fathers and unwed

18   mothers.  And, yes, the gravamen of his claim

19   is, I have a legal entitlement to equal

20   treatment.

21         But what, as a practical matter, the

22   plaintiff wanted was citizenship, and he didn't

23   get it as a result of the Court's severability

24   holding.  The Court said, we apply established

25   principles of severability in order to determine

1    what we think Congress would have intended, and

2    the consequence is that even though you have

3    established a right -- a violation of the right

4    to equal treatment, you are not entitled to the

5    practical result that you are seeking.

6            CHIEF JUSTICE ROBERTS:  Thank you,

7    counsel.

8            Justice Sotomayor?

9            JUSTICE SOTOMAYOR:  Counsel, the --

10   the difficulty in my mind with this case has

11   been just touched upon by Justice Alito.

12           Assume that I do think -- or assume

13   not that I think -- but assume that this law is

14   content-based.  I don't see in the record any

15   evidence by you of how small this exception is.

16           The other side says that most of the

17   complaints to the FTC are because of debt

18   collection.  But there are no statistics about

19   how big or small debt collection is with respect

20   to robo- -- robot -- robo-calls generally or

21   with respect to consumer collection.

22           And even if you could show me that

23   they were a small part of the intrusions on

24   people, they certainly are a big emotional

25   complaint because they generate the most ire by

 1    citizens.  But putting that aside, you haven't

 2    shown me why government-backed debt calls are

 3    any different than commercial calls, private

 4    commercial calls for debt.

 5          In both situations, the debtor would

 6    expect a call about debts they owe.  That's an

 7    interest that the government's claimed, but, you

 8    know, so what?  Both debtors.  So there is a

 9    discrimination aspect to this case that does

10    raise the equal protection ground.

11          But putting all of that aside, given

12    that the burden is on you under strict scrutiny

13    to show that you've narrowly tailored a law, if

14    this is content-based, and with all the failings

15    I've pointed to, how do you win on validating

16    this Act?

17          MR. STEWART:  Let me say two or three

18    things about this.  First, I think it would be

19    impossible to make an empirical showing about

20    kind of the smallness of the exemption relative

21    to the whole, because what you would want to

22    compare the government debt calls to is not to

23    other calls that are actually being made in the

24    world, because a lot of the calls that would

25    otherwise be made are not being made precisely

1    because they're barred by the TCPA.

2           What you would want to be asking is,

3    how small is this comparison in comparison --

4    how small is this class in comparison to all of

5    the other automated calls that might be made if

6    the TCPA were not in force?

7           Second, with respect to potential

8    discrimination between collectors of

9    government-backed debts and collectors of other

10   debts, the distinction that we've pointed to is

11   that the collection of government-backed debts

12   implicates the distinct federal interest in

13   protecting the federal fisc, and it's not

14   unusual for Congress to prefer federal debt

15   collection efforts.

16          For example, if Congress says the

17   federal government can collect debts owed to it

18   by offset on a tax return -- a tax refund or

19   Social Security benefits, the private predators

20   can't do that, or if the federal government has

21   greater capacity to garnish wages, that there's

22   nothing problematic about that, that the last

23   thing we would say is collectors of private

24   debts could petition the FCC for an exception.

25   They could say, there's no good reason to treat

1    us differently and, therefore, you, the FCC,

2    should exercise your statutory authority to

3    create an exception for all debt collection

4    calls as to which the recipient is not charged.

5         And then the FCC would either grant or

6    deny that.  If it was denied, there could be

7    judicial review.  So there could be a more

8    targeted challenge that was premised on the

9    differentiation between government-backed debts

10   and others, but that's very different from --

11        CHIEF JUSTICE ROBERTS:  Thank you,

12   counsel.

13        Justice Kagan?

14        JUSTICE KAGAN:  Good afternoon,

15   Mr. Stewart.  Could we go back to the -- what

16   you started with?  You said that there was no

17   right way to think about how to analyze this

18   question, that we could either apply

19   constitutional analysis to the automated-call

20   restriction or we could apply it to the

21   exemption for government debt.

22        I'm wondering whether you could say a

23   little bit more about that, because we have to

24   pick some way, and on the one hand, the

25   restriction is the only thing -- the

1    automated-call restriction is the only thing

2    prohibiting speech, but on the other hand, the

3    exemption is the only thing that creates the

4    constitutional issue in this case.

5         So which end of the statute should we

6    look at?

7         MR. STEWART:  Well, let me preface my

8    answer by -- by pointing to a hypothetical

9    that's noted in the Respondents' brief that we

10   think is a good illustration of when it would be

11   appropriate to focus on an exception.

12        At page 22, Respondents hypothesize a

13   statute that has a categorical ban on all

14   automated calls except for automated calls to a

15   residential landline that endorse the reelection

16   of Donald Trump and that are approved by the

17   Trump campaign.

18        Now we think an exception like that

19   for calls made to endorse a single political

20   candidate would surely violate the First

21   Amendment.  It would be not only content-based

22   but viewpoint-based, and there would be no good

23   justification for it in terms of the basic

24   rationale for the restriction.

25        And even if the Court concluded that

1    this was a very small percentage of calls, the

2    exception didn't cast doubt on the credibility

3    of Congress's overall privacy protection

4    objectives, even if it didn't sufficiently --

5    significantly interfere with the achievement of

6    those objectives, the Court would surely say

7    that the -- the exception was invalid.

8              JUSTICE KAGAN:  So is this statute --

9              MR. STEWART:  And in that circumstance

10   --

11             JUSTICE KAGAN:  -- is this statute

12   like that statute?

13             MR. STEWART:  I don't think it's like

14   that statute.  I mean, the -- the last thing I'd

15   want --

16             JUSTICE KAGAN:  I mean, it's obviously

17   not in the sense that it's not the -- the -- the

18   exemption is not viewpoint-based to the extent

19   that that statute is.  But, you know, some --

20   you've heard some arguments that the exemption

21   is content-based, so why not treat it the same

22   way?

23             MR. STEWART:  I mean, I think, at the

24   very -- at the very most, you would treat the

25   exemption in the same way that you would treat

1    it if a restriction were imposed based on the

2    same criteria.  And if there were certain

3    restrictions placed on -- on the collection of

4    government-backed debt and only on the

5    collection of government-backed debt, you

6    wouldn't apply strict scrutiny to such a law for

7    the same reasons I've discussed with respect to

8    the -- the securities laws, other hypothetical

9    laws that could restrict communications in a

10   particular area of commerce.

11         Now Respondents have understandably

12   focused their attention on the automated-call

13   restriction, in -- in part because of the

14   severability question.  If they could persuade

15   the -- the Court that the exception was the

16   invalid provision and it was struck down, they

17   wouldn't really get what they want.

18         But they have to establish distinct

19   prerequisites to show that they have a valid

20   constitutional challenge to the automated-call

21   restriction.  One might be if the exception

22   taken in combination were -- with other features

23   of the statute, just made it seem as though

24   Congress wasn't serious about protecting

25   privacy.  But the exception really can't --

1          CHIEF JUSTICE ROBERTS:  Thank you,

2     counsel.

3          Justice Gorsuch?

4          JUSTICE GORSUCH:  Good morning,

5     counsel.  Some of my colleagues have already

6     noted the irony of a First Amendment challenge

7     leading to the suppression of more speech as a

8     remedy.  I -- I guess I wanted to explore that

9     just a little bit further.

10          As I understand it, you -- you've

11     taken a position that there's no right way to do

12     severance here, but should we -- should we take

13     cognizance of the fact that striking down the

14     government debt provision was not relief that

15     the plaintiffs sought in this case?  And we

16     normally take some cognizance of the adversarial

17     process and the plaintiff's request for relief.

18     We -- we've chided plaintiffs earlier in this

19     term for not -- not including all the relief

20     they might have wanted -- wanted in -- in their

21     complaint.

22          And what do we do about the fact as

23     well that the plaintiffs would seemingly have no

24     standing to challenge an exception for

25     government debt collection activities?  So they

1   didn't seek the relief and they don't have

2   standing for this relief.  Should -- should

3   those things tell us anything?

4            MR. STEWART:  I mean, I think that you

5   could do it that way and the court of appeals

6   could have done it that way.  That is, the

7   principal argument that the Respondents have

8   made all along is that the government-debt

9   exception, combined with other features of the

10  statutory and regulatory scheme, really call

11  into question Congress's commitment to the

12  protection of privacy or prevent a statute from

13  achieving that objective.

14           And the court of appeals clearly

15  didn't think that that was right.  And the court

16  of appeals could -- could just have said:

17  That's the only claim you made, I reject it, and

18  whether or not you could have pursued a valid

19  challenge to the exception itself, you haven't

20  sought to pursue one, and, therefore, I'm not

21  going to -- to consider it.

22           I think our -- given that the court of

23  appeals ruled as it did, we have tried to -- to

24  confront that argument on the merits.

25           With respect to the standing question,

1    what the Respondents have always sought as

2    relief invalidated of -- invalidation of the

3    automated-call restriction.  And they clearly

4    have standing to seek that.

5            And if the Court holds that, yes,

6    they're right to their First Amendment

7    violation, but they are wrong about the remedy,

8    that would not be a problem of standing.  That

9    would just be a problem on the -- the merits of

10   their claim or at least the merits of their

11   claim with respect to the appropriate remedy.

12           JUSTICE GORSUCH:  Let me come at it

13   from yet another angle, and that's the

14   separation of powers.

15           The government's remedy proposed here

16   is essentially that we should suppose or -- or

17   reimagine that Congress would have preferred a

18   regime in which more speech is suppressed than

19   one in which less is suppressed.

20           On -- on what authority do we have the

21   right to make that kind of judgment as opposed

22   to simply enforcing the First Amendment, finding

23   a violation, and -- and -- and liberating the

24   speech that's -- that's been wrongly suppressed?

25           MR. STEWART:  Let me say two or three

1    different things about that.  The first are,

2    either invalidation of the exception or

3    invalidation of the restriction would produce a

4    constitutional version of the TCPA.  So, from

5    the standpoint of compliance with the First

6    Amendment, neither is to be preferred.

7              The second thing is, courts face that

8    same question when you're doing severability

9    analysis in the equal protection context, where

10   the result of severance may be that particular

11   --

12             JUSTICE GORSUCH:  If I might --

13             MR. STEWART:  -- individuals might --

14             JUSTICE GORSUCH:  -- stop you -- if I

15   might stop you there, I'm sorry, but I -- I --

16   the equal protection analogy, suppose that

17   doesn't work for me because equal protection

18   is -- is a guarantee of a quality, not of a --

19   of a substance, so you can level up or level

20   down and satisfy equal protection.

21             But the First Amendment is about a

22   guarantee of speech, so it has content in a

23   different way.  So suppose that argument.

24             MR. STEWART:  Let me say that --

25             JUSTICE GORSUCH:  Then what do you

1   have?

2          MR. STEWART:  -- let me say I think

3   what we have is the temporal sequence here where

4   we had one public law in 1991 that enacted the

5   basic autodial restriction and then a second

6   public law that was enacted in 2015.  And if

7   you -- if there is a constitutional infirmity,

8   if you ask which public law introduced that

9   constitutional infirmity, it would have to be

10   the 2015 public law.

11          CHIEF JUSTICE ROBERTS:  Thank you,

12   counsel.  Thank you, counsel.

13          Justice Kavanaugh?

14          JUSTICE KAVANAUGH:  Thank you, Mr.

15   Chief Justice.

16          Good afternoon, Mr. Stewart.  I think

17   the government-debt exception is almost

18   certainly content-based, at least for me.  And I

19   just wanted as a matter of housekeeping, you

20   don't argue that it could satisfy strict

21   scrutiny, correct?

22          MR. STEWART:  That's correct.  We've

23   argued that the automated-call restriction could

24   satisfy --

25          JUSTICE KAVANAUGH:  Yes.

1              MR. STEWART:  -- strict scrutiny but

2    not the content-based exception.

3              JUSTICE KAVANAUGH:  Okay.  So those

4    two things together make this for me at least a

5    case about severability and leveling up or

6    leveling down.  And you were just on this with

7    Justice Gorsuch, but it would help me if you

8    could kind of tick through your strong points

9    about severability again.

10             MR. STEWART:  I think the -- the two

11   strongest points -- and I'll link the second to

12   Communications Act severability clause.  The --

13   the two strongest points are we think there

14   would be a tail wagging the dog quality to

15   striking down the whole restriction, one that

16   has been in place for nearly 30 years, that has

17   been popular with consumers, that has protected

18   a vast array of people, simply to preserve the

19   ability of government debt collectors to use one

20   more means of communication.

21             The second is the temporal sequence.

22   If we ask which law was it that introduced any

23   constitutional invalidity, it would have to be

24   the 2015 law, not the 1991 law.  And so it would

25   be natural if you were otherwise in equipoise to

1    say that's the law that would be struck down.

2    And -- and then there --

3            JUSTICE KAVANAUGH:  So a key --

4            MR. STEWART:  -- there is a

5    severability --

6            JUSTICE KAVANAUGH:  Go ahead.

7            MR. STEWART:  I was going to say,

8    there is a severability clause that says if any

9    provision of the Communications Act, of which

10   the TCPA is -- is a part, is held to be invalid,

11   the remedy won't extend beyond striking down

12   that provision.

13           And for purposes of determining which

14   is the invalid provision, I'd refer back to my

15   point about temporal sequence.  It is a 2015 law

16   that introduced any constitutional infirmity.

17           JUSTICE KAVANAUGH:  So a key point I

18   think you just underscored there is that the

19   premise of your severability argument, essential

20   premise, is that the underlying ban is

21   thoroughly constitutional.

22           MR. STEWART:  Or at least that the

23   underlying ban was constitutional before 2015.

24           JUSTICE KAVANAUGH:  Yeah, that's --

25   without the exception.  I meant to say without

1    the exception, the underlying ban is perfectly

2    constitutional.

3              MR. STEWART:  Yes.

4              JUSTICE KAVANAUGH:  Okay.  And how

5    much should we take into account on the what

6    would Congress have intended analyses like we

7    see in the states attorney general's brief about

8    consumer beliefs about the -- these calls, that

9    the common consumer complaint about robocalls.

10   Does that go at all into our analysis --

11             MR. STEWART:  I mean, I think --

12             JUSTICE KAVANAUGH:  -- of what

13   Congress would have intended?

14             MR. STEWART:  -- I -- I think

15   certainly this was not unnoticed legislation.

16   It's not legislation that fixed a technical

17   problem.  I'm talking about the original TCPA

18   now, that this is legislation that was intended

19   to address a problem that Congress thought was

20   immense, that affected vast numbers of

21   consumers, and obviously the amicus briefs

22   describe complaints that are being made now

23   about robocalls even with the TCPA's

24   restrictions in place.  And so --

25             CHIEF JUSTICE ROBERTS:  Thank you,

1    counsel.  Would you take a minute to wrap up,

2    Mr. Stewart?

3              MR. STEWART:  Thank you.  Thank you,

4    Mr. Chief Justice.

5              The -- the last thing I'd say is I'd

6    refer back to the point that I was making at the

7    beginning, where given that Respondent is asking

8    the Court to focus on the restriction and not

9    the exception, it's appropriate to ask whether

10   the restriction is content-based, as the Court

11   in Reed understood that term.

12             And the Court in Reed described

13   content-based laws as laws that target speech

14   based on its communicative content.

15   Respondents' speech was not targeted based on

16   its content.  It was treated the same way as the

17   vast majority of messages that people could use

18   automated calls to transmit.

19             Thank you, Your Honor.

20             CHIEF JUSTICE ROBERTS:  Thank you,

21   counsel.

22             Mr. Martinez.

23            ORAL ARGUMENT OF ROMAN MARTINEZ

24              ON BEHALF OF THE RESPONDENTS

25             MR. MARTINEZ:  Mr. Chief Justice, and

1    may it please the Court:

2            My clients are political organizations

3    that want to engage in political speech at the

4    core of the First Amendment.  The TCPA bars them

5    from using some of the most effective tools for

6    communication now available:  automated text

7    messages and calls to cell phones.

8            At the same time, the statute's

9    exceptions let government-approved speakers use

10   these same technologies to deliver

11   government-approved messages that subvert the

12   same privacy interests supposedly requiring a

13   ban on all other calls.

14           This content-based scheme arbitrarily

15   favors commercial speech over core political

16   speech.  It violates the First Amendment and

17   should be struck down.

18           The call ban is extremely broad.

19   Although the TCPA's primary purpose was to

20   address telemarketing calls, the cell phone ban

21   sweeps further and outlaws political and other

22   non-commercial calls, even when citizens are

23   open to receiving them.

24           The government says Congress needed a

25   restriction that broad in order to protect

1    privacy.  The statute's history disproves that.

2    Congress and the FCC exempted non-commercial

3    calls from the residential call ban after

4    concluding that they do not adversely affect the

5    privacy rights protected by the TCPA.

6          There's no good privacy-based reason

7    for treating these exact same calls differently

8    when made to cell phones.  The government-debt

9    exception confirms that Congress did not view

10   the privacy interests here as compelling.

11         That exception exposes 60 million

12   Americans to unlimited calls to collect more

13   than 4.2 trillion dollars in debt.  Those are

14   the kinds of calls consumers hate the most.

15         If Congress really thought privacy was

16   paramount, it would not have allowed those

17   calls.  Because the speech ban is too broad and

18   unjustified, the restriction, not the exception,

19   must be struck down.  That's what the Court has

20   always done in First Amendment cases and rightly

21   so.

22         Federal courts cannot fix First

23   Amendment violations by making more speech

24   illegal.  This Court should reject the remedial

25   approach that eliminates incentives to challenge

1    unconstitutional speech bans and gives my

2    clients no relief, even though they won their

3    First Amendment claim.

4            CHIEF JUSTICE ROBERTS:  Mr. Martinez,

5    I'd like you to focus on the argument based on

6    our decision in Williams-Yulee, which is that

7    when Congress takes steps that help cure a

8    constitutional problem, they don't have to do

9    everything at once.

10           You object to the fact that some

11   speech is allowed, but the -- the allowance

12   doesn't reach more broadly.  And what we said in

13   Williams-Yulee, again, is so long as Congress is

14   moving in -- in what the Court regarded as the

15   right direction, they don't have to do

16   everything at the same time.

17           So the fact that you say we should

18   allow more speech here, here, and here, again,

19   it doesn't mean that it has to be done at the

20   same time as the first step was taken as it was

21   here.

22           MR. MARTINEZ:  Right, Your Honor.  And

23   I think what -- what the Williams-Yulee inquiry

24   is really getting at is whether the exception

25   undermines the credibility of the government's

1     interests that it's been asserting.

2              And I think in this case, the 2015

3     exception really does undermine that because

4     it's not getting at like -- it's -- it's not

5     trying to exempt the least intrusive of privacy

6     speech available.

7              It -- it's actually exempting the kind

8     of speech that the FCC itself has acknowledged

9     is the most intrusive kind of speech.  And those

10    are the -- the -- the debt calls.  And so

11    Williams-Yulee, I think, is talking about a

12    situation in which the government or Congress is

13    trying -- or the legislature is trying to

14    accommodate kind of the -- the -- this -- the --

15    the -- the speech that -- that is least

16    problematic from the purpose -- from the

17    standpoint of the interest that's being

18    asserted.  But here Congress has done the

19    opposite.  It's exempted the speech that's most

20    problematic.

21             And I think that -- that really makes

22    this a different case from Williams-Yulee and

23    brings us squarely within the -- the concern

24    that Williams-Yulee had, which is that when

25    Congress enacts broad exemptions, like the one

1    here, it might actually be a sign, it might be

2    evidence of the fact that the -- the interest

3    that the government has asserted for speech

4    restriction really isn't that strong.

5            CHIEF JUSTICE ROBERTS:  Your --

6            MR. MARTINEZ:  And I think that was

7    debate --

8            CHIEF JUSTICE ROBERTS:  Your -- your

9    friend on the other side on the severance

10   question makes a very strong point, that

11   Congress had this law for 25 years and then they

12   added this, you know, pretty discrete exception

13   that created the problem we have today.

14           It seems pretty obvious that the way

15   they would solve it is get rid of this

16   exception.  It's an extremely popular law.

17   Nobody wants to get robo-calls on their cell

18   phone.

19           The idea that Congress would embrace

20   that result simply to save this government debt

21   collection, they'd have to be very anxious to be

22   more unpopular than they otherwise would be.

23           MR. MARTINEZ:  Well -- well, two --

24   two points on that, Your Honor.  First of all, I

25   think that the fundamental problem here is the

1    invalidity of the restriction.  And I think that
2    the -- even before you get to any severability
3    inquiry about intent, we have to be very careful
4    and specific about what is unconstitutional
5    about the statute.
6            And I think what the 2015 exemption
7    shows, as well as the -- the much more favorable
8    treatment to political and non-commercial speech
9    when it comes to calls to home phones, what
10   those show is that the privacy interest here
11   really isn't compelling and that the -- the
12   restriction is what falls.  So you don't need to
13   look at severability.
14           CHIEF JUSTICE ROBERTS:  Thank you --
15           MR. MARTINEZ:  But even as to the
16   intent --
17           CHIEF JUSTICE ROBERTS:  -- counsel.
18           Justice Thomas?
19           JUSTICE THOMAS:  Thank you,
20   Mr. Martinez.
21           The -- the problem that I have is you
22   -- you just said that the -- the issue, that the
23   real problem here is the restriction.  But the
24   evidence -- the focus here is on the exception,
25   the restrict -- and if you solve the exception

1    problem, it doesn't solve your restriction

2    problem, particularly if you sever that.

3              And that's the sort of the asymmetry

4    that's coming out.  The problem is one thing,

5    that is, that the restriction, but the

6    constitutional problem is really the exception.

7              But then the -- so why don't you --

8    I'd like you to explain why -- what you just

9    said, why the restriction is the constitutional

10   problem as opposed to the exception.

11             MR. MARTINEZ:  Right.  And let me

12   start with the -- with -- with the two things

13   that I think the exception does.  Number 1, is

14   it in -- introduces a content-based distinction.

15             JUSTICE THOMAS:  Yes.

16             MR. MARTINEZ:  And it defines the

17   scope of the restriction, and therefore triggers

18   strict scrutiny.

19             But, Number 2, and more importantly

20   for purposes of our constitutional theory, what

21   the exception does is it reveals the underlying

22   frailty, the underlying insufficiency of the

23   justification for the restriction.

24             And why does it do that?  It does it

25   because you have Congress saying because we want

1    to get more money, we are willing to trade off

2    privacy for revenue.  And so Congress is coming

3    in and making a judgment that money is more

4    important than privacy.

5            JUSTICE THOMAS:  So what --

6            MR. MARTINEZ:  And I think --

7            JUSTICE THOMAS:  -- would your

8    argument be if the exception did not exist?

9            MR. MARTINEZ:  If the exception did

10   not exist and we were looking at the law today,

11   I think -- I think our argument would be weaker,

12   but I think we would still be able to show that

13   the restriction would be unjustified.

14           And I think the --

15           JUSTICE THOMAS:  But what would the --

16           MR. MARTINEZ:  Main thing we would --

17           JUSTICE THOMAS:  -- content-based -- I

18   mean, what would the analysis be?

19           MR. MARTINEZ:  The -- the analysis, it

20   would -- the statute would no longer be

21   content-based, so we'd be applying intermediate

22   scrutiny, but I think in the context of applying

23   intermediate scrutiny, we would look at the fact

24   that calls to residential phones, where -- you

25   know, call -- calls to the home, where privacy

1  matters the most, these same types of political

2  and non-commercial calls that my client wants to

3  make are perfectly allowed.

4        And so Congress and the FCC have made

5  a judgment -- and this is clear if you look at

6  the -- the 1992 order from the FCC.  Congress

7  and the FCC have made a judgment that

8  non-commercial and non-telemarketing calls do

9  not adversely affect the privacy rights that the

10  TCPA protects.  And they made that clear by --

11  by essentially allowing those calls at -- you

12  know, at all times of day to home phones.

13        So if -- if you have that indicator of

14  congressional intent that they're not really

15  worried about political calls and non-commercial

16  calls, and they're not worried about that as an

17  intrusion of privacy, then there's no rational

18  reason to treat cell phones differently.  And

19  Congress certainly didn't make that judgment.

20        Of course, in this case, we have not

21  only the differential treatment of residential

22  calls, but we also have the evidence provided by

23  the 2015 exception, which shows that they're

24  willing to trade off privacy for money, even

25  though everyone would agree that money is not --

1    collecting more money is not a compelling

2    interest.  And so you have Congress --

3              CHIEF JUSTICE ROBERTS:  Thank you,

4    counsel.

5              Justice Ginsburg?

6              JUSTICE GINSBURG:  Your challenge is

7    predicated on the government-debt exemption.  I

8    thought that the statute as originally enacted

9    would -- the -- the statute as it was originally

10   enacted did have an exception for calls made by

11   the government itself or government agencies.

12   Isn't that true?

13             MR. MARTINEZ:  It's true that the

14   definition of -- of person, or at least as

15   interpreted by the FCC, is that the -- the

16   statute does not apply to -- to the government

17   itself.

18             JUSTICE GINSBURG:  And -- and no one

19   challenged that exemption for 20-odd years.  One

20   characterization is that this is really a manner

21   of restriction.  That is, it doesn't prohibit

22   calling, it doesn't prohibit conveying a

23   message; it just prohibits using a certain

24   automated technology to call.  So it's a manner

25   of communication.  It's not a -- a restriction

1   on the message.

2          MR. MARTINEZ:  Well -- well, Your --

3   Your Honor, with respect, I do think it's --

4   it's fair to say that this is a restriction on a

5   certain manner of making calls, but the types of

6   calls that are either made legal or illegal --

7   you know, the dividing line between what's

8   allowed and what's not allowed turns on the

9   content of the calls.

10          I think that if -- if -- if you were

11   facing a statute that said, you know, for

12   example, you are not allowed to advocate for

13   Libertarians using e-mail or using phone calls

14   or using handbills, all of those would be manner

15   restrictions, but I think that -- that we would

16   all recognize that those are content-based

17   restrictions that would trigger strict scrutiny

18   and -- and would inevitably fail.

19          JUSTICE GINSBURG:  On your

20   severability, we know that what Congress wanted

21   to stop were out-of-the-blue calls, calls that

22   you had no reason to anticipate.  And calls

23   about debts owed to the government can be

24   regarded as less invasive in that respect, that

25   they're not out of the blue; they are simply a

1    reminder of an obligation that the debtor

2    undertook.

3          MR. MARTINEZ:  I -- Your Honor, I --

4    with respect, I don't think that that's the

5    original justification for -- for this

6    particular provision.  And I -- and I would

7    point to two things.

8          First of all is the fact that the kind

9    of out-of-the-blue calls that my clients might

10   want to make, you know, political calls, those

11   are calls that were perfectly allowed and were

12   perfectly acceptable to the home when Congress

13   and the FCC acted in the early '90s.

14         And at that time, of course, home

15   phones were -- you know, over 90 percent of the

16   phones in America were home phones.  That's

17   where the privacy interests were at their apex.

18         And nonetheless, Congress and the FCC

19   recognized that the kinds of calls my clients

20   want to make don't tread on privacy interests

21   enough to -- to -- to warrant that kind of -- of

22   -- of restriction.  And I think what that just

23   shows is that, again, the privacy interest being

24   asserted here isn't really strong enough, even

25   if you look at what the FCC said about this, and

```
 1    I would look at the 1992 NPRM, especially at --
 2    at pages -- at pages 8773 -- sorry, at page
 3    2737, and then the 1992 order at 8773, because
 4    there the FCC said that non-commercial,
 5    non-telemarketing calls can be exempted without
 6    undermining the TCPA.
 7              If that's true --
 8              CHIEF JUSTICE ROBERTS:  Thank you --
 9              MR. MARTINEZ:  -- then there's no
10    reason --
11              CHIEF JUSTICE ROBERTS:  -- counsel.
12              Justice -- Justice Breyer?  Justice
13    Breyer?
14              (No response.)
15              CHIEF JUSTICE ROBERTS:  Justice Alito?
16              JUSTICE ALITO:  Mr. Martinez, I'm
17    interested in your analysis of the severability
18    question, and I wonder if you could say whether
19    your position depends on either the breadth of
20    an exception or exceptions or the manifestation
21    of congressional intent.
22              So let me give you an example, a
23    fanciful example that tries to reduce both of
24    those things, perhaps to their lowest limit.
25              Suppose there was a total ban on
```

1    automated calls to cell phones or to all phones,

2    but there was one tiny exception for, let's say,

3    calls between noon and 1 p.m. on the 4th of July

4    that contained this simple message:  Happy

5    birthday, America.

6         And let's say that the statute

7    allowing this contains a provision that says

8    that if the inclusion of this exception renders

9    the statute unconstitutional, the statute itself

10   shall remain in force and the exception shall be

11   stricken.

12        So would you say even in that

13   situation the whole statute would have to fall?

14        MR. MARTINEZ:  Your Honor, let me --

15   let me try to address that in each of the two

16   pieces because I think it's a -- it's a nuanced

17   question and deserves a nuanced answer.

18        First of all, with respect to the

19   narrowness of that particular ban, I think that

20   the fact that that particular restriction or

21   exception is so narrow, I think that probably,

22   you know, looking at the totality of the

23   circumstances, we would look at that and we

24   would think the existence of this one tiny

25   exception and the fact that this really isn't

1   going to invade privacy that much, I think that

2   would probably be a reason to conclude that the

3   restriction is not unconstitutional.  And if

4   that's true, then, of course, the severability

5   analysis wouldn't be necessary.

6         If you take your -- the other part of

7   your hypothetical, though, if -- if -- as I

8   understand it, if the statute had a provision in

9   it that essentially said if -- if the

10   restriction fails you should nonetheless sever

11   the exception and reinstate the restriction, I

12   don't think that that would be appropriate

13   because I think that the reason that the

14   restriction would fail in that circumstance is

15   that it's insufficiently justified, and getting

16   rid of that exception doesn't solve that

17   problem.

18         The exception, you know, again,

19   assuming that the exception was big enough to

20   actually create a problem of constitutional

21   deficiency with the statute, the exception is

22   evidence of why the restriction is unjustified.

23         And so getting rid -- rid of that

24   doesn't solve the problem with the -- with the

25   restriction.

1          JUSTICE ALITO:  That does seem to

2    thwart a pretty clear manifestation of

3    congressional intent, but you think that's

4    irrelevant in this situation?

5          MR. MARTINEZ:  Well, I think in a

6    circumstance, Your Honor, I don't think this is

7    -- I don't think the government disagrees with

8    us on this.  If you look at pages 17 to 18 of

9    their reply brief, they essentially agree that

10   if the problem with the statute is the

11   restriction, then -- then the restriction has to

12   fall.

13          Now I think there's another way to

14   look at the case and -- and, you know, I think

15   my -- my friend on the other side has sort of

16   tried to frame it this way.

17          If you thought that the only problem

18   with the statute was not the justification for

19   the restriction but, rather, the fact that

20   there's differential treatment, we think that

21   you still as a First Amendment matter for a

22   number of the reasons already mentioned, that

23   you would still need to get rid of the

24   restriction.

25          But, even if you didn't agree with us

1    on that, I think there's -- our fallback

2    position would be the position the Third Circuit

3    took in the Rappa case, which is that you'd need

4    very specific evidence of congressional intent.

5    And I guess in that case in your hypothetical,

6    if your hypothetical expressly addressed this

7    situation, then maybe in that case the -- the

8    exception would be severed.

9            But, again, that -- that is not the

10   case here because, here, the underlying

11   restriction is what's unconstitutional.

12           CHIEF JUSTICE ROBERTS:  Thank you,

13   counsel.

14           Justice Sotomayor?

15           JUSTICE SOTOMAYOR:  Mr. Martinez, are

16   you taking the position that all restrictions of

17   robocalls are unconstitutional or that just a

18   broad -- a broad restriction like this one is

19   unconstitutional?  Because there's some types of

20   speech that should not be covered.

21           MR. MARTINEZ:  Well, I think, Your

22   Honor, in this case, obviously, we're dealing

23   with -- with the statute at hand.  I think

24   that -- that there are some restrictions on

25   robocalls that I think -- that probably would

1    satisfy the -- the -- the appropriate level of

2    scrutiny.

3              And just to take one example, the --

4    the way that the -- the ban on calls works in --

5    to home phones right now, it's essentially a --

6    a ban on commercial telemarketing call --

7    robocalls to the home.  And that's the kind of

8    -- that -- that is the heart of what the TCPA

9    was getting at.

10             And that's what Congress and the FCC

11   said, you know, this is really the core privacy

12   that we're trying to protect.  I think that --

13             JUSTICE SOTOMAYOR:  Well --

14             MR. MARTINEZ:  -- kind of statute is

15   much --

16             JUSTICE SOTOMAYOR:  -- Mr. Martinez --

17   and I agree with you.  And I -- I can think of

18   others, if any -- any schemes to get money, any

19   -- because there's so many scams from robocalls,

20   but putting all of that aside, assuming that

21   there is a part of the restriction that could

22   survive strict scrutiny under your claim, why

23   shouldn't we limit any remedy, striking down

24   this provision, simply to permit the types of

25   calls that your clients make?

```
 1              MR. MARTINEZ:  Well, Your Honor --
 2              JUSTICE SOTOMAYOR:  Why should we be
 3    --
 4              MR. MARTINEZ:  -- your --
 5              JUSTICE SOTOMAYOR:  -- why should we
 6    be striking down the entire statute?  Now you
 7    would have to prove -- and I don't know that the
 8    Court has done this below -- that restricting
 9    political speech is not -- is -- is -- is not
10    narrowly tailored, and I don't know that that's
11    been done in this case, but if the issue is the
12    remedy, shouldn't we let the circuit below
13    decide that question?
14              MR. MARTINEZ:  Your Honor, two points
15    on that.  First of all, we -- we brought this as
16    a facial challenge.  We, of course, would
17    welcome the kind of relief that you -- you've
18    hypothesized, although we do -- we do think that
19    the appropriate relief here really is to strike
20    down the restriction in its entirety.
21              And one of the reasons for that is the
22    point that you raised with Mr. Stewart earlier,
23    which is the -- the entire absence of any
24    evidence or justification for this particular
25    ban for -- for any of it, all of it or -- or
```

1    pieces of it, that the government has completely
2    failed to put forward.

3           I mean, this -- this statute is
4    subject to strict scrutiny, and this Court has
5    said over and over again that the government is
6    the one that bears the burden of satisfying
7    strict scrutiny.

8           They address strict scrutiny in, I
9    think, a single sentence of the -- with respect
10   to the exception -- restriction, a single
11   sentence in their opening brief, a single
12   substantive sentence in their reply brief, and
13   nothing else.  They're trying to turn strict
14   scrutiny into a rubber stamp.

15          And I think the best thing to do in
16   these circumstances is hold the government to
17   its burden of proof, invalidate the restriction,
18   and then Congress can come back and act and
19   legislate in a -- in a way that's rational in
20   light of the Court's decision.

21          CHIEF JUSTICE ROBERTS:  Thank you,
22   counsel.

23          Justice Breyer?

24          JUSTICE BREYER:  Yeah, thank you.  I'm
25   sorry.  The telephone started to ring, and it

1    cut me off the call.  And I don't think it was a

2    robocall.

3            (Laughter.)

4            JUSTICE BREYER:  And we got it

5    straightened out.

6            Okay.  My question is this:  Forget

7    the political part of this.  Assume it's out of

8    it.  So now what worries me is, if you call this

9    strict -- calling for strict scrutiny, I guess

10   the government's justification, which is that

11   government debt is owed to us all as taxpayers,

12   private debt is not, so treat it specially.

13           Well, there are many situations, food

14   and drug agencies, agricultural agencies,

15   governing selling, the FTC, the SEC, where they

16   will have regulations and the regulations will

17   have a broad category, and Item X falls within

18   it, lamps may fall within categories that

19   require you to put electricity regulation on how

20   many amps does it use or whatever.

21           But then you discover a sub-category

22   of the one you just put in and you say leave out

23   the sub-category for some reason.  Now, if

24   courts start criticizing that for strict

25   scrutiny, well, very few will survive.

1          But the normal way of looking at it

2     is, is it a reasonable thing, Justice Brandeis's

3     third category.  Very well.  Why does this case

4     fall into strict scrutiny once I get the

5     politics out but not Justice Brandeis's

6     regulation?

7          MR. MARTINEZ:  Your Honor, a couple

8     points on that.  I think this case falls into

9     strict scrutiny because it satisfies the test

10    for what constitutes a content-based restriction

11    that was set forth in Reed, and as I note, Your

12    Honor will remember --

13         JUSTICE BREYER:  You realize that what

14    I'm doing is I -- I dissented and I'm wondering

15    whether to stick to that approach or not.  So

16    Reed will not convince me, it's a good a

17    majority but I didn't think good enough.  Okay?

18         MR. MARTINEZ:  Well, I would -- I

19    would hope that stare decisis would be a factor

20    even if you disagreed with me.

21         JUSTICE BREYER:  Yes.  Okay, okay.

22    But that isn't what I'm trying to get at.  I'm

23    trying to clarify my own thinking on it.

24         MR. MARTINEZ:  Fair enough, Your

25    Honor.  Well, I think -- I don't think you

1   should be concerned about the -- the -- the
2   prospect of other laws that are economic
3   regulations sort of being impacted by this at
4   all because I think in the --
5            JUSTICE BREYER:  Yes, that's what I
6   want the answer to, exactly why.
7            MR. MARTINEZ:  Right.  In those cases,
8   those kinds of -- of restrictions that -- that
9   sort of get tangled up with speech in the
10  context of those kind of regulations, those
11  would be, at most, commercial regulations of
12  speech, which wouldn't be subject to strict
13  scrutiny, regardless of whether or not
14  they're -- they're considered content-based.
15           So, for example, the government lists
16  a number of statutes in its brief that it says,
17  you know, the sky's going to fall and all those
18  statutes are going to be unconstitutional if we
19  win.  That's just simply not true.  At most,
20  those statutes are -- are -- would be
21  regulations of commercial speech at most and, if
22  so, they would trigger intermediate scrutiny
23  under this Court's settled doctrine.
24           JUSTICE BREYER:  And isn't --
25           CHIEF JUSTICE ROBERTS:  Justice Kagan?

```
 1                    JUSTICE BREYER:  Thanks.
 2                    CHIEF JUSTICE ROBERTS:  Justice Kagan?
 3                    JUSTICE KAGAN:  Good afternoon, Mr.
 4          Martinez.
 5                    MR. MARTINEZ:  Good afternoon.
 6                    JUSTICE KAGAN:  I'll give you a
 7          hypothetical.  Suppose this statute is written
 8          in a slightly different way and it exempted any
 9          calls between the holder of a government debt
10          and the debtor.  Would strict scrutiny apply?
11                    MR. MARTINEZ:  Your Honor, I think
12          that in -- in that circumstance, the -- the --
13          the regulation would not turn on the content of
14          the calls, and so I don't think strict scrutiny
15          would apply for that reason.
16                    JUSTICE KAGAN:  Right.  In other
17          words, it would turn on the relationship.  And
18          so I guess the question is what -- what's the
19          difference?  I mean, that's what Congress was
20          trying to get at, and maybe they didn't know all
21          of our arcane First Amendment rules, but that
22          regulation basically covers a particular kind of
23          economic activity, the collection of government
24          debts.  And this regulation covers the same kind
25          of economic activity, the collection of
```

```
 1    government debts.
 2          There are two ways of getting at the
 3    same thing.  Both are directed at the economic
 4    activity of the people involved.  Why should
 5    there be any difference?
 6          MR. MARTINEZ:  Well, with respect, and
 7    perhaps I misunderstood the hypothetical,
 8    Justice Kagan, but I thought in your
 9    hypothetical that the -- as long as the
10    relationship element was satisfied, the call
11    could be on any subject whatsoever.  For -- so,
12    in other words --
13          JUSTICE KAGAN:  Oh, yeah.  Well, we
14    know that holders of government debt call
15    debtors, you know, to collect debts.  That's
16    what they call them for.  They're not calling
17    them to discuss political issues.
18          MR. MARTINEZ:  Well, with respect,
19    Justice Kagan, I'm -- I'm not sure that's right,
20    and the FCC has expressly addressed this
21    situation in their August 2016 order at page
22    9087, where the FCC has contemplated -- it --
23    it's discussing and addressing the content of
24    the calls at issue being made by -- by
25    collectors of government-backed debt, and it
```

 1    contemplates that -- that the subject matter of

 2    the call might range beyond the collection of

 3    government-backed debt.  Maybe they're going to

 4    be marketing some other product.  Maybe they're

 5    going to be saying, hey, call your Congressman

 6    and change these laws that apply to banks.

 7             And what the FCC has said is that when

 8    the subject matter of the call ranges to such

 9    topics, then the call is transformed and it's --

10    it's a call that would have been allowed and

11    it's no longer allowed.  And so I think that --

12    I think that the chronicling of the call --

13             JUSTICE KAGAN:  Well, I guess a

14    technical issue --

15             MR. MARTINEZ:  -- is different here.

16             JUSTICE KAGAN:  Excuse me.  I guess a

17    technical issue, Mr. Martinez, but I guess what

18    I'm saying is that there are two ways where

19    Congress is trying to get at the same thing,

20    which is the calls between debt holders and

21    debtors almost always about the debt.

22             But, you know, why should we care?

23    You know, even if Congress didn't write this in

24    exactly the right way, why is it that we should

25    care so much as to put strict scrutiny into

1    place?  This doesn't raise any real concerns

2    about government censorship, about the

3    suppression of ideas, about a distorted

4    marketplace of ideas.  What -- why is this an

5    appropriate time to put strict scrutiny into

6    place, given that what the government -- what

7    the -- what the legislation is trying to get at

8    is an economic relationship and the things that

9    flow from that relationship?

10            MR. MARTINEZ:  Your Honor, I think

11    that the -- that the robust test for

12    content-based speech restrictions this Court

13    adopted in Reed is important because it protects

14    liberty.  It makes it harder for Congress to

15    enact broad speech bans that affect everyone

16    while at the same time assuming it can then just

17    carve out special exemptions for favored groups.

18            And I think the way to police that

19    problem is by -- by making sure that Congress

20    has to be very careful before it enacts the

21    broadband and make it clear to them that they

22    can't just do that and then, for example, as in

23    this case, delegate authority to a government

24    agency to hand out specialized exceptions for

25    whatever well-heeled party turns up and claims

     1    an exemption.

     2              And so I think that that is one of

     3    the --

     4              CHIEF JUSTICE ROBERTS:  Thank you,

     5    counsel.

     6              Justice -- Justice Gorsuch?

     7              JUSTICE GORSUCH:  Counsel, I'd like to

     8    just turn back to the -- the intuitive appeal of

     9    the government's severability argument.

    10              If, as I think you've -- you've

    11    conceded, that the -- the statute before the

    12    government-debt exception would not have been

    13    content-based and might have been permissible

    14    under the First Amendment, Congress then comes

    15    in and adds the government-debt exception, and

    16    that changes the equation.

    17              The intuitive argument based on that

    18    sequence of events is, well, just get rid of the

    19    government-debt exception and we go back to the

    20    status quo ante where everything was fine.  Why

    21    -- why should we reject that intuition?

    22              MR. MARTINEZ:  I think there's --

    23    there's a philosophical reason and a historical

    24    reason.  The philosophical reason is essentially

    25    that in the First Amendment context, courts

1      should not be making more speech illegal

2      because, if -- if courts take a certain type of

3      speech that Congress expressly chose to -- to

4      allow, and then courts make the decision to --

5      to prohibit that speech, they're essentially

6      stepping into the legislature's shoes and making

7      very sensitive policy tradeoffs that -- that

8      indisputably cut against First Amendment

9      interests, and they shouldn't be the ones to do

10     that.  Philosophically as well, you need to make

11     sure that people have incentives to challenge

12     unconstitutional laws.

13            I think, as a historical matter,

14     though, it's -- I think it's important to

15     recognize that the original justification for

16     the ban on cell phone calls here was essentially

17     that those kind of calls to cell phones would

18     inflict charges on called parties.  And that's

19     the reason that the ban was in place, you know,

20     originally and that's -- that's why it may have

21     been justified earlier.

22            But, in today's world, those call

23     plans essentially don't exist or -- or are --

24     overwhelmingly people are not charged when they

25     receive calls to their cell phone.  And so the

1    -- the historical facts are different now.  And

2    because of the fact that everyone has cell

3    phones, the government has an especially strong

4    interest now, from a revenue perspective, of

5    making those debt calls.

6          If you take all that and wrap it up

7    together, I don't think there's a good

8    historical basis or empirical basis for

9    concluding that, in fact, we know with certainty

10   or the kind of certainty we should have in the

11   First Amendment context that Congress would have

12   wanted to -- to -- to reenact this statute if it

13   wasn't allowed to make the calls to collect

14   government-backed debts.

15         JUSTICE GORSUCH:  Let me see if I --

16   if I've got at least that second point, my hands

17   around it.  The argument is that maybe the first

18   Congress that enacted the original statute

19   thought that all -- all robocalls should be

20   prohibited, with some exceptions that you're not

21   -- you have no complaint with.

22         The second Congress, acting in a

23   different time, had a different judgment about

24   which calls should be permitted, and that

25   included this government-debt exception.  And we

1   don't know whether the second Congress enacting

2   the revised statute would prefer a situation in

3   which all calls are prohibited or all calls are

4   allowed.  Does that -- does that sum it up?

5           MR. MARTINEZ:  I think that sums it

6   up, with one small caveat, which is that we are

7   talking now on the assumption that this -- there

8   -- that there is a severability analysis that's

9   required here that turns on intent.

10          I do think our -- our primary position

11  is that the nature of the First Amendment and

12  the nature of the constitutional flaw in this

13  statute, which is that -- the flaw with the

14  restriction, we think that that means that

15  essentially, under -- under everyone's

16  understanding of -- of severability principles,

17  the restriction must be struck down.

18          CHIEF JUSTICE ROBERTS:  Thank you,

19  counsel.

20          JUSTICE GORSUCH:  And then --

21          CHIEF JUSTICE ROBERTS:  I'm sorry,

22  Justice Gorsuch?

23          JUSTICE GORSUCH:  No, I'm fine.  Thank

24  you, Chief.

25          CHIEF JUSTICE ROBERTS:  Justice

```
 1    Kavanaugh?
 2              JUSTICE KAVANAUGH:  Thank you, Chief
 3    Justice.
 4              Good afternoon, Mr. Martinez.  On
 5    severability --
 6              MR. MARTINEZ:  Good afternoon.
 7              JUSTICE KAVANAUGH:  -- we have no
 8    precedent either way on severability, as I
 9    understand it, when the First Amendment problem
10    is created by an exception to a ban on speech,
11    rather than the First Amendment problem being
12    created by the underlying ban without the
13    exception.  So I don't think we have any
14    precedent either way.
15              And the question, as you've pointed
16    out and Mr. Stewart's pointed out, is level up
17    or level down as the remedy.
18              The key first question -- and I asked
19    Mr. Stewart about this; I want to make sure I
20    have you on this -- is the underlying
21    restriction here, the underlying restriction on
22    cell phone robocalls, constitutional without the
23    government-debt exception?  So I want you to
24    focus exactly on that question.
25              MR. MARTINEZ:  Yes.  We -- we think
```

1    that -- that given all the evidence we know now

2    about what Congress's interests are and how

3    strongly they believe or don't believe in the

4    privacy interests, we believe that the

5    restriction is unconstitutional.

6           And I think the two prime --

7           JUSTICE KAVANAUGH:  Let me just -- let

8    me make sure I have you exactly right.  The

9    underlying restriction, if there had never been

10   a government-debt exception -- let me phrase it

11   that way.  If there had never been a

12   government-debt exception, is the underlying

13   restriction unconstitutional?

14          MR. MARTINEZ:  We would say yes based

15   primarily on the differential treatment of the

16   residential call bans.  But I just want to say

17   one thing on that, Justice Kavanaugh, because if

18   you -- you want me to hypothesize that -- that

19   the -- that the 2015 law had never been passed.

20          JUSTICE KAVANAUGH:  Correct.

21          MR. MARTINEZ:  I think that the 2015

22   law, if you think about that law as evidence --

23   as evidence of what Congress thought about

24   privacy, the fact that it wasn't passed doesn't

25   mean that deep down Congress believed in privacy

1   more than we later -- you know, than was later

2   revealed.

3           And so I think it's important to

4   recognize that, in our argument, the role of the

5   2015 exception is not merely to introduce the

6   textual content-based distinction, but it's also

7   to reveal the underlying lack of justification,

8   which was always there.  And, again --

9           JUSTICE KAVANAUGH:  Well, I'm not -- I

10  guess on that point I would pick up on what the

11  Chief Justice said and -- and the states' amicus

12  brief.  And if you just take a peek, just a

13  peek, at the real world here, this is one of the

14  more popular laws on the books because people

15  don't like cell phone robocalls.

16          That seems just common sense.  Do you

17  want to argue against that common sense?

18          MR. MARTINEZ:  I think aspects of the

19  law are popular.  I think, you know, the head of

20  the FCC has called this law the -- "the poster

21  child for lawsuit abuse."  And the reason for

22  that is, and this is indirectly implicated in

23  this case, there's a whole bunch of other

24  problems with the law as well.

25          So I think this law has its supporters

1    and its detractors, but I don't think you should

2    worry about Congress's ability to protect

3    people.  Even if we win this case, Congress is

4    going to have plenty of options that are fully

5    constitutional in order to protect people from

6    -- from unwanted calls.

7                It can focus on the telemarketing

8    calls.  It can focus -- it can expand the

9    remedies available under the Do Not Call list,

10   which essentially allow consumers to --

11               JUSTICE KAVANAUGH:  Well, even if --

12               MR. MARTINEZ:  -- to opt --

13               JUSTICE KAVANAUGH:  Even if you --

14               MR. MARTINEZ:  -- out.

15               JUSTICE KAVANAUGH:  Even -- sorry.

16   Even if you lose this case, Congress can of

17   course scale back when you view as overbroad

18   restrictions, but if you lose this case,

19   Congress will still have in place a restriction

20   that's been on the books for 30 years and that

21   has been perceived as constitutional, and that

22   is very popular.

23               MR. MARTINEZ:  Well -- well, I -- I --

24   I -- I -- I guess what I would say is that I

25   think the right way to think about this is to

1    apply the doctrinal tools that you always apply

2    in First Amendment cases, even in cases where

3    the speech involved is not popular.

4             I mean, the First Amendment is there

5    not just to protect speech that people like but

6    to protect speech --

7             JUSTICE KAVANAUGH:  Yeah.

8             MR. MARTINEZ:  -- that people might

9    fight offensive or annoying.  And -- and --

10            CHIEF JUSTICE ROBERTS:  Thank you,

11    counsel.

12            Mr. Martinez, would you like to take a

13    minute to wrap up?

14            MR. MARTINEZ:  Thank you, Your Honor.

15            The -- the core purpose of the First

16    Amendment is to protect the free exchange of

17    political speech, even when people might find

18    that speech to be a nuisance.  That's what this

19    Court recognized in the Martin case when it said

20    that the First Amendment rights protect people

21    from -- from making intrusive door-to-door

22    solicitations.  That's protected activity.  The

23    calls at issue here are protected activity as

24    well.

25            We ask you to do what you always do in

1    First Amendment cases, strike down the

2    unconstitutional restriction on speech.  Thank

3    you, Your Honors.

4         CHIEF JUSTICE ROBERTS:  Thank you,

5    counsel.

6         Mr. Stewart, you have rebuttal?

7         REBUTTAL ARGUMENT OF MALCOLM L. STEWART

8         ON BEHALF OF THE PETITIONERS

9         MR. STEWART:  Thank you, Mr. Chief

10   Justice.

11        I took Mr. Martinez to acknowledge

12   that if -- if this were a restriction on speech

13   undertaken to collect a government-backed debt,

14   it would be subject at most to intermediate

15   scrutiny because it would be commercial speech

16   and would be subject to distinct First Amendment

17   treatment on that basis.

18        And the -- the position of the other

19   side is this provision should be reviewed more

20   skeptically, should be subject to more

21   certiorari review because its effect is to take

22   particular speech out from under regulation,

23   rather than to regulate it.

24        And that's contrary to the -- the

25   usual understanding that the First Amendment

1   exists to foster speech.  It's contrary to the

2   Court's reference in Reed to laws that target

3   speech because of its communicative content.

4          Why would the Court review more

5   skeptically the law that looked at the same

6   basis as a rationale for exempting speech rather

7   than to regulate?

8          The second thing is Mr. Martinez said

9   many times that Congress and the FCC have

10   exempted non-commercial calls from the

11   automated-call restriction.  And I think that

12   really overlooks the respective responsibilities

13   of Congress and the FCC.

14          Congress has broadly regulated at

15   least calls using a prerecorded voice or an

16   artificial voice to residential landlines just

17   as it has calls to cell phones.  Both of the

18   underlying bans encompass non-commercial calls.

19          Congress has vested the FCC with

20   broad, though not identical, authority to exempt

21   particular categories of calls from the

22   residential and the cell phone ban respectively

23   and you can look at page 5A and 6A of the

24   appendix to the government's merits brief to see

25   that the -- the exemption authority is -- is

1    basically comparable.

2           The discrepancy under current law

3    results from the fact that the FCC has exercised

4    its exemption authority much more robustly with

5    respect to residential landlines than it has

6    with respect to cell phones.  That can't create

7    a facial constitutional infirmity in the statute

8    itself.  If people think that the FCC should

9    adopt comparable exemptions for non-commercial

10   calls to cell phones, they can file a petition

11   to that effect.

12          The -- the last thing I'd say in

13   respect is -- goes to the colloquy between Mr.

14   Martinez and Justice Kagan, where Mr. Martinez

15   said, yes, if they had framed it not in terms of

16   the content of the call but in terms of all

17   calls from the holder of a government-backed

18   debt to the -- to the debtor that that would be

19   subject to more relaxed scrutiny.  And that

20   would simply be -- an approach that

21   distinguished on that basis would simply

22   encourage Congress to enact laws with more of a

23   broad brush.

24          It would discourage Congress from

25   trying to fine-tune laws, and -- and that

1    discouragement would only be exacerbated if we

2    took the Respondent's approach to severability

3    striking down the whole law.

4                    Thank you, Mr. Chief Justice.

5                    CHIEF JUSTICE ROBERTS:  Thank you,

6    counsel.  The case is submitted.

7                    (Whereupon, at 12:55 p.m., the case

8    was submitted.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Official - Subject to Final Review

**1**

**1** [2] 42:13 49:3
**11:42** [2] 1:17 3:2
**12:55** [1] 75:7
**17** [1] 51:8
**18** [1] 51:8
**19-631** [1] 3:4
**1991** [4] 3:14 8:13 31:4 32:24
**1992** [3] 44:6 48:1,3

**2**

**2** [1] 42:19
**20-odd** [1] 45:19
**2015** [3] 3:23 8:15 31:6,10 32:24
33:15,23 39:2 41:6 44:23 68:19,
21 69:5
**2016** [1] 60:21
**2020** [1] 1:13
**22** [1] 24:12
**23** [1] 6:23
**25** [1] 40:11
**2737** [1] 48:3

**3**

**3** [1] 2:4
**30** [2] 32:16 70:20
**35** [1] 2:7

**4**

**4.2** [1] 37:13
**4th** [1] 49:3

**5**

**5A** [1] 73:23

**6**

**6** [1] 1:13
**60** [1] 37:11
**6A** [1] 73:23

**7**

**72** [1] 2:10

**8**

**8773** [2] 48:2,3

**9**

**90** [1] 47:15
**9087** [1] 60:22
**90s** [1] 47:13

**A**

**a.m** [2] 1:17 3:2
**ability** [3] 19:7 32:19 70:2
**able** [3] 19:14,15 43:12
**above-entitled** [1] 1:15
**absence** [1] 54:23
**abuse** [1] 69:21
**acceptable** [1] 47:12
**accommodate** [1] 39:14
**account** [1] 34:5
**achieve** [1] 10:5
**achievement** [1] 25:5
**achieving** [1] 28:13
**acknowledge** [1] 72:11
**acknowledged** [1] 39:8

**Act** [4] 21:16 32:12 33:9 55:18
**acted** [1] 47:13
**acting** [1] 65:22
**activities** [1] 27:25
**activity** [6] 13:17 17:2,9 59:23,25
60:4 71:22,23
**actually** [6] 9:17 11:3 21:23 39:7
40:1 50:20
**add** [1] 9:15
**added** [1] 40:12
**addition** [1] 12:1
**address** [5] 6:9 34:19 36:20 49:15
55:8
**addressed** [2] 52:6 60:20
**addressing** [1] 60:23
**adds** [1] 63:15
**adopt** [1] 74:9
**adopted** [1] 62:13
**adversarial** [1] 27:16
**adversely** [2] 37:4 44:9
**advocate** [1] 46:12
**affairs** [1] 8:12
**affect** [3] 37:4 44:9 62:15
**affected** [1] 34:20
**afternoon** [6] 23:14 31:16 59:3,5
67:4,6
**agencies** [3] 45:11 56:14,14
**agency** [2] 15:15 62:24
**agree** [4] 44:25 51:9,25 53:17
**agricultural** [1] 56:14
**ahead** [2] 7:22 33:6
**AL** [2] 1:4,8
**Alito** [8] 17:12,13 18:18,20 20:11
48:15,16 51:1
**allow** [3] 38:18 64:4 70:10
**allowance** [1] 38:11
**allowed** [11] 37:16 38:11 44:3 46:
8,8,12 47:11 61:10,11 65:13 66:4
**allowing** [1] 44:11 49:7
**almost** [4] 15:25 16:9 31:17 61:21
**already** [2] 27:5 51:22
**Although** [2] 36:19 54:18
**Amendment** [36] 5:7,15,22 13:21
14:9,13 15:20 18:1,15 24:21 27:6
29:6,22 30:6,21 36:4,16 37:20,23
38:3 51:21 59:21 63:14,25 64:8
65:11 66:11 67:9,11 71:2,4,16,20
72:1,16,25
**America** [2] 47:16 49:5
**AMERICAN** [2] 1:7 3:5
**Americans** [1] 37:12
**amicus** [2] 34:21 69:11
**amps** [1] 56:20
**analogies** [1] 18:13
**analogy** [1] 30:16
**analyses** [1] 34:6
**analysis** [3] 6:10 10:3,24 17:19
19:5 23:19 30:9 34:10 43:18,19
48:17 50:5 66:8
**analytical** [2] 4:14,14
**analyze** [1] 23:17
**angle** [1] 29:13
**annoying** [3] 2:21 71:9
**another** [3] 18:16 29:13 51:13

**answer** [5] 15:9 16:24 24:8 49:17
58:6
**ante** [1] 63:20
**anticipate** [1] 46:22
**anxious** [1] 40:21
**apex** [1] 47:17
**appeal** [1] 63:8
**Appeals** [5] 14:23 28:5,14,16,23
**APPEARANCES** [1] 1:19
**appendix** [1] 73:24
**application** [2] 14:24 17:19
**applied** [2] 7:6 13:3
**applies** [1] 16:8
**apply** [15] 7:15 15:16 18:3,3 19:4,
24 23:18,20 26:6 45:16 59:10,15
61:6 71:1,1
**applying** [2] 43:21,22
**approach** [4] 37:25 57:15 74:20
75:2
**appropriate** [9] 9:21 10:8 14:19
24:11 29:11 35:9 50:12 53:1 54:
19 62:5
**approved** [1] 24:16
**arbitrarily** [1] 36:14
**arcane** [1] 59:21
**area** [2] 18:1 26:10
**arguably** [1] 17:20
**argue** [6] 7:8 13:22 14:18,18 31:20
69:17
**argued** [1] 31:23
**argument** [20] 1:16 2:2,5,8 3:4,10
17:17 28:7,24 30:23 33:19 35:23
38:5 43:8,11 63:9,17 65:17 69:4
72:7
**arguments** [1] 25:20
**around** [1] 65:17
**array** [2] 17:7 32:18
**artificial** [1] 73:16
**aside** [3] 21:1,11 53:20
**aspect** [1] 21:9
**aspects** [2] 5:3 69:18
**assert** [1] 14:9
**asserted** [3] 39:18 40:3 47:24
**asserting** [2] 4:20 39:1
**ASSOCIATION** [2] 1:7 3:5
**Assume** [4] 20:12,12,13 56:7
**assuming** [4] 17:16 50:19 53:20
62:16
**assumption** [1] 66:7
**asymmetry** [1] 42:3
**attention** [1] 26:12
**ATTORNEY** [3] 1:3 3:5 34:7
**August** [1] 60:21
**authority** [6] 23:2 29:20 62:23 73:
20,25 74:4
**authorize** [1] 10:12
**autodial** [1] 31:5
**automated** [12] 3:15 4:3 7:16 9:3
12:3 22:5 24:14,14 35:18 36:6 45:
24 49:1
**automated-call** [14] 4:9,25 5:4,10
6:16 16:16,18 23:19 24:1 26:12,
20 29:3 31:23 73:11
**available** [3] 36:6 39:6 70:9

**avoid** [1] 5:21
**away** [1] 9:17

**B**

**back** [8] 4:6 23:15 33:14 35:6 55:
18 63:8,19 70:17
**ban** [19] 24:13 33:20,23 34:1 36:13,
18,20 37:3,17 48:25 49:9 53:4,6
54:25 64:16,19 67:10,12 73:22
**banks** [1] 61:6
**banned** [1] 12:22
**bans** [4] 38:1 62:15 68:16 73:18
**BARR** [2] 1:3 3:4
**barred** [1] 22:1
**bars** [1] 36:4
**based** [6] 6:13,20 7:9 12:22 16:13
26:1 35:14,15 38:5 63:17 68:14
**basic** [8] 3:15 4:15 5:1,21 8:12 18:
12 24:23 31:5
**basically** [2] 59:22 74:1
**basis** [6] 65:8,8 72:17 73:6 74:21
**bears** [1] 55:6
**beginning** [1] 35:7
**behalf** [9] 1:22,24 2:4,7,10 3:11 19:
16 35:24 72:8
**beliefs** [1] 34:8
**believe** [3] 68:3,3,4
**believed** [1] 68:25
**below** [2] 54:8,12
**benefits** [1] 22:19
**best** [3] 17:18 18:4 55:15
**between** [9] 13:12 15:23 22:8 23:
9 46:7 49:3 59:9 61:20 74:13
**beyond** [2] 33:11 61:2
**big** [3] 20:19,24 50:19
**birthday** [1] 49:5
**bit** [4] 7:22 9:11 23:23 27:9
**blue** [1] 46:25
**book** [1] 15:13
**books** [2] 69:14 70:20
**both** [9] 4:17,18 10:6,7 21:5,8 48:
23 60:3 73:17
**bother** [2] 14:11,12
**Brandeis's** [3] 15:19 57:2,5
**breadth** [1] 48:19
**Breyer** [13] 15:5,6 17:10 48:12,13
55:23,24 56:4 57:13,21 58:5,24
59:1
**brief** [10] 4:21 11:13 24:9 34:7 51:
9 55:11,12 58:16 69:12 73:24
**briefs** [3] 41:7 13:1 34:21
**bring** [1] 4:12
**brings** [1] 39:23
**broad** [10] 36:18,25 37:17 39:25
52:18,18 56:17 62:15 73:20 74:23
**broadband** [1] 62:21
**broadly** [2] 38:12 73:14
**brought** [2] 4:18 54:15
**brush** [1] 74:23
**bunch** [1] 69:23
**burden** [3] 21:12 55:6,17

**C**

**call** [27] 4:3 6:5 12:19 13:4,6 21:6

Official - Subject to Final Review

**28:**10 **36:**18 **37:**3 **43:**25 **45:**24 **53:** 6 **56:**1,8 **60:**10,14,16 **61:**2,5,8,9,10, 12 **64:**22 **68:**16 **70:**9 **74:**16
**call's** [1] **13:**11
**called** [2] **64:**18 **69:**20
**calling** [4] **3:**20 **45:**22 **56:**9 **60:**16
**calls** [84] **3:**16 **4:**1 **5:**11,11 **6:**20 **7:** 16 **9:**3 **11:**22,24 **12:**3,8,9 **21:**2,3,4, 22,23,24 **22:**5 **23:**4 **24:**14,14,19 **25:**1 **34:**8 **35:**18 **36:**7,13,20,22 **37:** 3,7,12,14,17 **39:**10 **41:**9 **43:**24,25 **44:**2,8,11,15,16,22 **45:**10 **46:**5,6,9, 13,21,21,22 **47:**9,10,11,19 **48:**5 **49:** 1,3 **53:**4,25 **59:**9,14 **60:**24 **61:**20 **64:**16,17,25 **65:**5,13,24 **66:**3,3 **70:** 6,8 **71:**23 **73:**10,15,17,18,21 **74:**10, 17
**came** [1] **1:**15
**campaign** [1] **24:**17
**candidate** [1] **24:**20
**cannot** [2] **17:**3 **37:**22
**capacity** [1] **22:**21
**capture** [1] **16:**3
**care** [2] **61:**22,25
**careful** [2] **41:**3 **62:**20
**carefully** [1] **6:**4
**carried** [2] **15:**11,12
**carry** [1] **12:**2
**carve** [1] **62:**17
**Case** [36] **3:**4 **5:**24 **6:**7,11 **7:**3 **9:**18 **10:**4 **17:**14,19 **18:**22 **19:**1 **20:**10 **21:**9 **24:**4 **27:**15 **32:**5 **39:**2,22 **44:** 20 **51:**14 **52:**3,5,7,10,22 **54:**11 **57:** 3,8 **62:**23 **69:**23 **70:**3,16,18 **71:**19 **75:**6,7
**cases** [8] **16:**3 **18:**4,6 **37:**20 **58:**7 **71:**2,2 **72:**1
**cast** [2] **17:**6 **25:**2
**casts** [1] **5:**15
**categorical** [1] **24:**13
**categories** [4] **6:**24 **7:**1 **56:**18 **73:** 21
**category** [10] **4:**1 **6:**3 **7:**2,5 **15:**19, 23,25 **16:**22 **56:**17 **57:**3
**caveat** [1] **66:**6
**cell** [25] **3:**8,16 **11:**1,9,12,22,23 **12:** 2,4 **36:**7,20 **37:**8 **40:**17 **44:**18 **49:**1 **64:**16,17,25 **65:**2 **67:**22 **69:**15 **73:** 17,22 **74:**6,10
**censorship** [1] **62:**2
**certain** [6] **16:**5,9 **26:**2 **45:**23 **46:**5 **64:**2
**certainly** [4] **20:**24 **31:**18 **34:**15 **44:** 19
**certainty** [1] **65:**9,10
**certiorari** [1] **72:**21
**cetera** [1] **15:**17
**challenge** [16] **4:**8,12,20,21,24 **6:** 18 **13:**22 **23:**8 **26:**20 **27:**6,24 **28:** 19 **37:**25 **45:**6 **54:**16 **64:**11
**challenged** [1] **45:**19
**challenges** [1] **4:**17
**challenging** [2] **4:**14 **14:**11
**chances** [1] **10:**13

**change** [1] **61:**6
**changes** [1] **63:**16
**characteristic** [1] **13:**14
**characterization** [1] **45:**20
**charged** [2] **23:**4 **64:**24
**charges** [1] **64:**18
**chided** [1] **27:**18
**CHIEF** [47] **3:**3,12 **5:**17,20 **7:**17,21 **8:**16 **9:**5,7,9 **12:**11 **15:**4 **17:**12 **20:** 6 **23:**11 **27:**1 **31:**11,15 **34:**25 **35:**4, 20,25 **38:**4 **40:**5,8 **41:**14,17 **45:**3 **48:**8,11,15 **52:**12 **55:**21 **58:**25 **59:** 2 **63:**4 **66:**18,21,24,25 **67:**2 **69:**11 **71:**10 **72:**4,9 **75:**4,5
**child** [1] **69:**21
**chose** [1] **64:**3
**chronicling** [1] **61:**12
**Circuit** [2] **52:**2 **54:**12
**circumstance** [5] **7:**7 **25:**9 **50:**14 **51:**6 **59:**12
**circumstances** [3] **4:**10 **49:**23 **55:** 16
**citizens** [2] **21:**1 **36:**22
**citizenship** [2] **19:**13,22
**claim** [11] **10:**8,14 **14:**9,13 **18:**15 **19:**18 **28:**17 **29:**10,11 **38:**3 **53:**22
**claimed** [1] **21:**7
**claims** [1] **62:**25
**clarify** [1] **57:**23
**class** [1] **22:**4
**clause** [2] **32:**12 **33:**8
**clear** [5] **6:**6 **44:**5,10 **51:**2 **62:**21
**clearly** [3] **9:**6 **28:**14 **29:**3
**client** [1] **44:**2
**clients** [5] **36:**2 **38:**2 **47:**9,19 **53:**25
**code** [1] **6:**24
**cognizance** [2] **27:**13,16
**colleagues** [1] **27:**5
**collect** [5] **22:**17 **37:**12 **60:**15 **65:** 13 **72:**13
**collected** [1] **13:**8
**collecting** [1] **45:**1
**collection** [13] **20:**18,19,21 **22:**11, 15 **23:**2 **26:**3,5 **27:**25 **40:**21 **59:**23, 25 **61:**2
**collectors** [6] **8:**25 **22:**8,9,23 **32:** 19 **60:**25
**colloquy** [1] **74:**13
**combination** [2] **5:**2 **26:**22
**combined** [2] **8:**5 **28:**9
**come** [2] **29:**12 **55:**18
**comes** [2] **41:**9 **63:**14
**coming** [2] **42:**4 **43:**2
**commerce** [1] **26:**10
**commercial** [7] **21:**3,4 **36:**15 **53:**6 **58:**11,21 **72:**15
**commitment** [2] **18:**12 **28:**11
**common** [3] **34:**9 **69:**16,17
**communication** [6] **5:**24 **14:**2,4 **32:**20 **36:**6 **45:**25
**communications** [5] **7:**14 **13:**16 **26:**9 **32:**12 **33:**9
**communicative** [7] **6:**13,20 **7:**10, 10 **16:**13 **35:**14 **73:**3

**comparable** [2] **74:**1,9
**compare** [1] **21:**22
**comparison** [3] **22:**3,3,4
**compelling** [3] **37:**10 **41:**11 **45:**1
**complaining** [6] **18:**22,25 **19:**2,5, 9,13
**complaint** [4] **20:**25 **27:**21 **34:**9 **65:** 21
**complaints** [2] **20:**17 **34:**22
**completely** [1] **55:**1
**compliance** [1] **30:**5
**conceded** [1] **63:**11
**conceptually** [1] **4:**13
**concern** [1] **39:**23
**concerned** [2] **15:**20 **58:**1
**concerns** [1] **62:**1
**conclude** [1] **50:**2
**concluded** [1] **24:**25
**concluding** [2] **37:**4 **65:**9
**confirm** [1] **14:**25
**confirms** [1] **37:**9
**conflates** [1] **19:**9
**confront** [1] **28:**24
**Congress** [58] **3:**14 **8:**20,22 **9:**4 **13:** 15 **17:**7 **20:**1 **22:**14,16 **26:**24 **29:** 17 **34:**6,13,19 **36:**24 **37:**2,9,15 **38:** 7,13 **39:**12,18,25 **40:**11,19 **42:**25 **43:**2 **44:**4,6,19 **45:**2 **46:**20 **47:**12, 18 **53:**10 **55:**18 **59:**19 **61:**19,23 **62:** 14,19 **63:**14 **64:**3 **65:**11,18,22 **66:** 1 **68:**23,25 **70:**3,16,19 **73:**9,13,14, 19 **74:**22,24
**Congress's** [9] **3:**22 **8:**24 **9:**2,23 **18:**12 **25:**3 **28:**11 **68:**2 **70:**2
**congressional** [5] **8:**20 **44:**14 **48:** 21 **51:**3 **52:**4
**Congressman** [1] **61:**5
**connection** [1] **13:**19
**consent** [1] **5:**12
**consequence** [1] **20:**2
**consider** [1] **28:**21
**considered** [1] **58:**14
**consistently** [1] **3:**17
**constitutes** [1] **57:**10
**constitution** [1] **10:**3
**constitutional** [25] **3:**24 **6:**18 **14:** 20 **19:**16 **23:**19 **24:**4 **26:**20 **30:**4 **31:**7,9 **32:**23 **33:**16,21,23 **34:**2 **38:** 8 **42:**6,9,20 **50:**20 **66:**12 **67:**22 **70:** 5,21 **74:**7
**constitutionality** [1] **3:**18
**CONSULTANTS** [2] **1:**8 **3:**6
**consumer** [5] **4:**2 **5:**5 **20:**21 **34:**8, 9
**consumers** [6] **3:**20 **9:**2 **32:**17 **34:** 21 **37:**14 **70:**10
**contained** [1] **49:**4
**contains** [2] **17:**22 **49:**7
**contemplated** [1] **60:**22
**contemplates** [1] **61:**1
**contended** [1] **5:**1
**content** [25] **5:**23 **6:**3,14,21 **7:**5,10 **12:**16,17 **13:**4,6,11 **14:**3 **15:**10,14 **16:**7,13,19 **30:**22 **35:**14,16 **46:**9

**59:**13 **60:**23 **73:**3 **74:**16
**content-based** [26] **6:**12 **12:**15 **16:** 9,12,15,17 **17:**4,22 **20:**14 **21:**14 **24:**21 **25:**21 **31:**18 **32:**2 **35:**10,13 **36:**14 **42:**14 **43:**17,21 **46:**16 **57:**10 **58:**14 **62:**12 **63:**13 **69:**6
**content-neutral** [1] **3:**19
**context** [5] **30:**9 **43:**22 **58:**10 **63:** 25 **65:**11
**contrary** [2] **72:**24 **73:**1
**contribute** [2] **12:**21,24
**conveying** [1] **45:**22
**convince** [1] **57:**16
**core** [4] **36:**4,15 **53:**11 **71:**15
**correct** [3] **31:**21,22 **68:**20
**Counsel** [25] **7:**17 **9:**7 **12:**12,14 **15:** 4 **20:**7,9 **23:**12 **27:**2,5 **31:**12,12 **35:** 1,21 **41:**17 **45:**4 **48:**11 **52:**13 **55:** 22 **63:**5,7 **66:**19 **71:**11 **72:**5 **75:**6
**counterargument** [1] **18:**21
**countervailing** [1] **4:**4
**couple** [2] **14:**15 **57:**7
**course** [5] **44:**20 **47:**14 **50:**4 **54:**16 **70:**17
**COURT** [37] **1:**1,16 **3:**13 **4:**22 **6:**12 **7:**8 **10:**9,16,17 **13:**2 **14:**2,22 **16:**4, 4,11 **18:**1 **19:**24 **24:**25 **26:**15 **28:**5,14,15,22 **29:**5 **35:**8,10,12 **36:** 1 **37:**19,24 **38:**14 **54:**8 **55:**4 **62:**12 **71:**19 **73:**4
**Court's** [7] **6:**10 **9:**20 **14:**25 **19:**3 **55:**20 **58:**23 **73:**2
**courts** [3] **3:**17 **30:**7 **37:**22 **56:**24 **63:**25 **64:**2,4
**covered** [3] **6:**5 **14:**2 **52:**20
**covers** [2] **59:**22,24
**create** [3] **23:**3 **50:**20 **74:**6
**created** [3] **40:**13 **67:**10,12
**creates** [1] **24:**3
**credibility** [2] **25:**2 **38:**25
**criteria** [1] **26:**2
**criticizing** [1] **56:**24
**culture** [1] **13:**15
**cure** [1] **38:**7
**current** [2] **8:**11 **74:**2
**cut** [2] **56:**1 **64:**8

---

### D

**D.C** [3] **1:**12,21,23
**daily** [1] **11:**14
**day** [4] **9:**25 **14:**10 **18:**11 **44:**12
**deal** [1] **4:**6
**dealing** [1] **52:**22
**deals** [1] **15:**15
**debate** [1] **40:**7
**debt** [31] **7:**24 **12:**16 **13:**8 **14:**7 **20:** 17,19 **21:**2,4,22 **22:**14 **23:**3,21 **26:** 4,5 **27:**14,25 **32:**19 **37:**13 **39:**10 **40:**20 **56:**11,12 **59:**9 **60:**14,25 **61:** 3,20,21 **65:**5 **72:**13 **74:**18
**debtor** [5] **13:**12 **21:**5 **47:**1 **59:**10 **74:**18
**debtors** [3] **21:**8 **60:**15 **61:**21
**debts** [3] **8:**25 **21:**6 **22:**9,10,11,17,

Heritage Reporting Corporation

24 23:9 46:23 59:24 60:1,15 65:14
decide [2] 6:5 54:13
deciding [1] 18:7
decision [4] 6:7 38:6 55:20 64:4
decisis [1] 57:19
deep [1] 68:25
deficiency [1] 50:21
defines [1] 42:16
definition [1] 45:14
degree [1] 18:12
delegate [1] 62:23
deliver [1] 36:10
denied [1] 23:6
deny [1] 23:6
Department [1] 1:21
depend [1] 13:11
depends [2] 10:14 48:19
Deputy [1] 1:20
describe [1] 34:22
described [2] 6:12 35:12
deserves [1] 49:17
desire [2] 8:24 9:2
determination [1] 13:7
determine [2] 14:1 19:25
determining [4] 8:21 9:20 13:2 33:13
detractors [1] 70:1
difference [2] 59:19 60:5
different [14] 6:23,24,25 7:1 21:3 23:10 30:1,23 39:22 59:8 61:15 65:1,23,23
differential [3] 44:21 51:20 68:15
differentiation [1] 23:9
differently [4] 18:16 23:1 37:7 44:18
difficulty [1] 20:10
directed [1] 60:3
direction [1] 38:15
directional [1] 7:2
disagreed [1] 57:20
disagrees [1] 51:7
disclosures [1] 13:19
discourage [1] 74:24
discouragement [1] 75:1
discover [1] 56:21
discrepancy [1] 74:2
discrete [1] 40:12
discrimination [4] 15:10,14 21:9 22:8
discuss [1] 60:17
discussed [3] 15:3 18:2 26:7
discussing [1] 60:23
disproves [1] 37:1
dissented [1] 57:14
distinct [4] 4:13 22:12 26:18 72:16
distinction [4] 12:16 22:10 42:14 69:6
distinguish [1] 15:22
distinguished [1] 74:21
distorted [1] 62:3
distracted [1] 12:10
disturb [2] 12:4,5

dividing [1] 46:7
doctrinal [1] 71:1
doctrine [1] 58:23
dog [2] 8:23 32:14
doing [3] 16:1 30:8 57:14
dollars [1] 37:13
Donald [1] 24:16
done [6] 28:6 37:20 38:19 39:18 54:8,11
door [1] 11:6
door-to-door [1] 71:21
doubt [3] 5:15 17:6 25:2
down [20] 14:20 18:8,24 26:16 27:13 30:20 32:6,15 33:1,11 36:17 37:19 53:23 54:6,20 66:17 67:17 68:25 72:1 75:3
drug [1] 56:14
duty [1] 14:25

E

e-mail [1] 46:13
each [1] 49:15
earlier [5] 14:17 16:11 27:18 54:22 64:21
early [1] 47:13
economic [10] 5:25 13:17 15:19 17:2,9 58:2 59:23,25 60:3 62:8
effect [3] 12:3 72:21 74:11
effective [1] 36:5
efficacious [1] 5:6
efficacy [1] 5:15
efforts [1] 22:15
either [9] 5:14 17:24 23:5,18 30:2 46:6 48:19 67:8,14
electricity [1] 56:19
element [1] 60:10
eliminates [1] 37:25
embrace [1] 40:19
emergency [1] 5:11
emotional [1] 20:24
empirical [2] 21:19 65:8
enact [3] 13:15 62:15 74:22
enacted [2] 3:14 8:13,14 11:8 17:8 18:10,11 31:4,6 45:8,10 65:18
enacting [1] 66:1
enactment [1] 3:22
enacts [2] 39:25 62:20
encompass [1] 73:18
encourage [1] 74:22
end [3] 9:25 14:10 24:5
endorse [2] 24:15,19
enforcing [1] 29:22
engage [1] 36:3
enough [5] 47:21,24 50:19 57:17,24
entire [2] 54:6,23
entirety [1] 54:20
entitled [3] 14:18 19:11 20:4
entitlement [1] 19:19
equal [11] 18:6,21 19:1,17,19 20:4 21:10 30:9,16,17,20
equation [1] 63:16
equipoise [1] 32:25
escape [1] 12:15

especially [3] 13:24 48:1 65:3
ESQ [3] 2:3,6,9
Esquire [1] 1:23
essential [2] 10:19 33:19
essentially [11] 29:16 44:11 50:9 51:9 53:5 63:24 64:5,16,23 66:15 70:10
establish [1] 26:18
established [9] 9:22 10:10 19:24 20:3
ET [3] 1:4,8 15:17
even [26] 11:5 14:1 15:1 16:14 20:2,22 24:25 25:4 34:23 36:22 38:2 41:2,15 44:24 47:24 49:12 51:25 57:20 61:23 70:3,11,13,15,16 71:2,17
events [1] 63:18
everyone [4] 3:8 44:25 62:15 65:2
everyone's [1] 66:15
everything [3] 38:9,16 63:20
evidence [10] 20:15 40:2 41:24 44:22 50:22 52:4 54:24 68:1,22,23
exacerbated [1] 75:1
exact [1] 37:7
exactly [4] 58:6 61:24 67:24 68:8
example [9] 22:16 46:12 48:22,23 53:3 58:15 62:22
except [1] 24:14
exception [72] 3:23,25 4:9 5:2 7:23 8:4,14 9:12 13:3 16:15 17:23 18:7,11 20:15 22:24 23:3 24:11,18 25:2,7 26:15,21,25 27:24 28:9,19 30:2 31:17 32:2 33:25 34:1 35:9 37:9,11,18 38:24 39:3 40:12,16 41:24,25 42:6,10,13,21 43:8,9 44:23 45:10 48:20 49:2,8,10,21,25 50:11,16,18,19,21 52:8 55:10 63:12,15,19 65:25 67:10,13,23 68:10,12 69:5
exceptions [4] 4:16 5:10 15:17 36:9 48:20 62:24 65:20
exchange [1] 71:16
exclusively [3] 7:4 13:6 16:6
Excuse [1] 61:16
exempt [2] 39:5 73:20
exempted [5] 37:2 39:19 48:5 59:8 73:10
exempting [2] 39:7 73:6
exemption [13] 14:7 21:20 23:21 24:3 25:18,20,25 41:6 45:7,19 63:1 73:25 74:4
exemptions [3] 39:25 62:17 74:9
exempts [1] 16:21
exercise [1] 23:2
exercised [1] 74:3
exist [3] 43:8,10 64:23
existence [2] 10:10 49:24
exists [1] 73:1
expand [1] 70:8
expect [1] 21:6
explain [1] 42:8
explained [1] 11:13
explore [1] 27:8
exposes [1] 37:11

express [1] 5:12
expressly [3] 52:6 60:20 64:3
extend [1] 33:11
extent [1] 25:18
extremely [2] 36:18 40:16

F

face [1] 30:7
facial [2] 54:16 74:7
facing [1] 46:11
fact [7] 7:19 13:9 16:25 27:13,22 38:10,17 40:2 43:23 47:8 49:20,25 51:19 65:2,9 68:24 74:3
factor [1] 57:19
facts [1] 65:1
fail [4] 4:19 46:18 50:14
failed [1] 55:2
failings [1] 21:14
fails [1] 50:10
fair [2] 46:4 57:24
fall [6] 8:8 49:13 51:12 56:18 57:4 58:17
fallback [1] 52:1
falls [3] 41:12 56:17 57:8
family [1] 12:9
fanciful [1] 48:23
far [2] 13:23 15:20
fascinating [1] 17:15
father [1] 19:16
fathers [1] 19:17
favorable [1] 41:7
favored [1] 62:17
favors [1] 36:15
FCC [23] 22:24 23:1,5 37:2 39:8 44:4,6,7 45:15 47:13,18,25 48:4 53:10 60:20,22 61:7 69:20 73:9,13,19 74:3,8
features [2] 26:22 28:9
federal [9] 4:5 13:9,13 22:12,13,14,17,20 37:22
fell [1] 7:6
few [1] 56:25
field [1] 13:25
fields [1] 13:17
fight [1] 71:9
file [1] 74:10
filled [1] 15:14
financial [1] 13:12
find [1] 71:17
finding [1] 29:22
fine [2] 63:20 66:23
fine-tune [1] 74:25
first [50] 4:19 5:7,14,22 6:9 8:10 13:21 14:9,12,16 15:20,24 18:1,14 21:18 24:20 27:6 29:6,22 30:1,5,21 36:4,16 37:20,22 38:3,20 40:24 47:8 49:18 51:21 54:15 59:21 63:14,25 64:8 65:11,17 66:11 67:9,11,18 71:2,4,15,20 72:1,16,25
fisc [2] 4:5 22:13
fix [1] 37:22
fixed [1] 34:16
flaw [2] 66:12,13
flow [1] 62:9

focus [12] 4:19,22 6:17 10:23,25
  24:11 35:8 38:5 41:24 67:24 70:7,
  8
focused [1] 26:12
focusing [1] 6:15
follow [3] 9:21 15:1 16:16
followed [1] 3:17
food [1] 56:13
force [2] 22:6 49:10
foremost [1] 6:10
Forget [1] 56:6
forth [2] 4:7 57:11
forward [1] 55:2
foster [1] 73:1
found [2] 3:20 7:24
frailty [1] 42:22
frame [1] 51:16
framed [1] 74:15
free [3] 8:24 19:1 71:16
friend [2] 40:9 51:15
friends [1] 12:8
front [1] 11:6
FTC [2] 20:17 56:15
fully [1] 70:4
function [1] 5:6
fundamental [1] 40:25
further [2] 27:9 36:21

G

garnish [1] 22:21
gears [1] 10:23
GENERAL [4] 1:3,20 3:5 4:9
general's [1] 34:7
generally [1] 20:20
generate [1] 20:25
gets [2] 6:2 18:25
getting [7] 10:19 38:24 39:4 50:15,
  23 53:9 60:2
Ginsburg [8] 12:13,14 14:5 15:7
  45:5,6,18 46:19
give [3] 9:14 48:22 59:6
given [5] 21:11 28:22 35:7 62:6 68:
  1
gives [1] 38:1
Gorsuch [13] 27:3,4 29:12 30:12,
  14,25 32:7 63:6,7 65:15 66:20,22,
  23
got [4] 8:17,17 56:4 65:16
governing [1] 56:15
government [38] 7:24 12:17,18,23,
  23 13:10,13,14 14:7 15:12 21:22 22:
  17,20 23:21 27:14,25 32:19 36:24
  39:12 40:3,20 45:11,11,16 46:23
  51:7 55:1,5,16 56:11 58:15 59:9,
  23 60:1,14 62:2,6,23 65:3
government's [6] 21:7 29:15 38:
  25 56:10 63:9 73:24
government-approved [2] 36:9,
  11
government-backed [12] 8:25
  21:2 22:9,11 23:9 26:4,5 60:25 61:
  3 65:14 72:13 74:17
government-debt [17] 3:23 5:2 8:
  4,13 13:3 16:15 28:8 31:17 37:8

45:7 63:12,15,19 65:25 67:23 68:
  10,12
grant [1] 23:5
gravamen [2] 18:14 19:18
great [1] 11:3
greater [2] 11:16 22:21
ground [1] 21:10
groups [2] 14:8 62:17
guarantee [2] 30:18,22
guaranteed [1] 13:9
guess [10] 8:9 27:8 52:5 56:9 59:
  18 61:13,16,17 69:10 70:24
guideposts [1] 16:5

H

hand [4] 23:24 24:2 52:23 62:24
handbills [1] 46:14
hands [1] 65:16
happen [1] 11:19
Happy [1] 49:4
harder [1] 62:14
hate [1] 37:14
head [1] 69:19
hear [1] 3:3
heard [1] 25:20
heart [1] 53:8
held [1] 33:10
help [2] 32:7 38:7
historical [4] 63:23 64:13 65:1,8
history [1] 37:1
hold [1] 7:8 55:16
holder [2] 59:9 74:17
holders [2] 60:14 61:20
holding [2] 6:7 19:24
holds [2] 10:9 29:5
home [11] 11:5,18,21 41:9 43:25
  44:12 47:12,14,16 53:5,7
Honor [16] 35:19 38:22 40:24 46:3
  47:3 49:14 51:6 52:22 54:1,14 57:
  7,12,25 59:11 62:10 71:14
Honors [1] 72:3
hope [1] 57:19
housekeeping [1] 31:19
human [1] 15:11
hypothesize [2] 24:12 68:18
hypothesized [1] 54:18
hypothetical [8] 24:8 26:8 50:7
  52:5,6 59:7 60:7,9

I

idea [1] 40:19
ideas [2] 62:3,4
identical [1] 73:20
illegal [5] 8:3,4 37:24 46:6 64:1
illustration [1] 24:10
immense [1] 34:20
impacted [1] 58:3
implicated [1] 69:22
implicates [1] 22:12
important [6] 4:8 10:43:4 62:13
  64:14 69:3
importantly [1] 42:19
imposed [1] 26:1
impossible [2] 6:18 21:19

INC [1] 1:8
incentive [1] 14:8
incentives [2] 37:25 64:11
included [1] 65:25
includes [1] 4:15
including [1] 27:19
inclusion [1] 49:8
indicating [1] 14:17
indicator [1] 44:13
indicia [1] 9:23
indirectly [1] 69:22
indisputably [1] 64:8
individual [1] 11:1
individuals [2] 11:15 30:13
inevitably [1] 46:18
infirmity [3] 3:24 31:7,9 33:16 74:
  7
inflict [1] 64:18
inquiry [2] 38:23 41:3
instance [2] 13:7 19:11
insufficiency [1] 42:22
insufficiently [2] 5:6 50:15
integral [1] 11:14
intended [5] 5:5 20:1 34:6,13,18
intent [9] 8:20 9:23 41:3,16 44:14
  48:21 51:3 52:4 66:9
interest [4] 4:10 25 11:3,16 21:
  7 22:12 39:17 40:2 41:10 45:2 47:
  23 65:4
interested [1] 48:17
interests [8] 36:12 37:10 39:1 47:
  17,20 64:9 68:2,4
interfere [1] 25:5
intermediate [4] 43:21,23 58:22
  72:14
interpreted [1] 45:15
introduce [2] 3:24 69:5
introduced [3] 31:8 32:22 33:16
introduces [1] 42:14
intrude [1] 4:1
intrusion [2] 11:20 44:17
intrusions [1] 20:23
intrusive [4] 3:21 39:5,9 71:21
intuition [1] 63:21
intuitive [2] 63:8,17
invade [1] 50:1
invalid [4] 25:7 26:16 33:10,14
invalidate [1] 55:17
invalidated [1] 29:2
invalidation [3] 29:2 30:2,3
invalidity [2] 32:23 41:1
invasive [1] 46:24
invoke [2] 19:14,15
involved [2] 60:4 71:3
ire [1] 20:25
irony [1] 27:6
irrelevant [1] 51:4
isn't [7] 40:4 41:11 45:12 47:24 49:
  25 57:22 58:24
issue [8] 17:14 24:4 41:22 54:11
  60:24 61:14,17 71:23
issues [1] 60:17
Item [1] 56:17
itself [4] 17:3 28:19 39:8 45:11,17

49:9 74:8

J

judgment [6] 29:21 43:3 44:5,7,19
  65:23
judicial [1] 23:7
July [1] 49:3
jump [1] 7:22
Justice [150] 1:21 3:3,13 5:17,20 7:
  17,21 8:16 9:5,7,8,9,10 10:22 12:
  11,13,14 14:5 15:4,5,5,6,7,18 17:
  10,12,12,13 18:18,20 20:6,8,9,11
  23:11,13,14 25:8,11,16 27:1,3,4
  29:12 30:12,14,25 31:11,13,14,15,
  25 32:3,7 33:3,6,17,24 34:4,12,25
  35:4,20,25 38:4 40:5,8 41:14,17,
  18,19 42:15 43:5,7,15,17 45:3,5,6,
  18 46:19 48:8,11,12,12,12,15,15,
  16 51:1 52:12,14,15 53:13,16 54:
  2,5 55:21,23,24 56:4 57:2,5,13,21
  58:5,24,25 59:1,2,2,3,6,16 60:8,
  13,19 61:13,16 63:4,6,6,7 65:15
  66:18,20,21,22,23,25 67:2,3,7
  68:7,17,20 69:9,11 70:11,13,15
  71:7,10 72:10 74:14 75:4,5
justification [8] 24:23 42:23 47:5
  51:18 54:24 56:10 64:15 69:7
justified [2] 50:15 64:21

K

Kagan [16] 23:13,14 25:8,11,16 58:
  25 59:2,3,6,16 60:8,13,19 61:13,
  16 74:14
Kavanaugh [21] 31:13,14,25 32:3
  33:3,6,17,24 34:4,12 67:1,2,7 68:
  7,17,20 69:9 70:11,13,15 71:7
keep [1] 7:25
key [3] 33:3,17 67:18
kind [18] 9:21 10:2 21:20 29:21 32:
  8 39:7,9,14 47:8,21 53:7,14 54:17
  58:10 59:22 64:17 65:10
kinds [4] 15:14 37:14 47:19 58:8
knocking [1] 11:5

L

lack [1] 69:7
lamps [1] 56:18
landline [3] 11:4,17 24:15
landlines [3] 11:25 73:16 74:5
last [4] 15:6 22:22 25:14 35:5 74:
  12
later [3] 18:11 69:1,1
Laughter [1] 56:3
law [31] 4:15 8:14 10:21 16:8 17:1,
  4 20:13 21:13 26:6 31:4,6,8,10 32:
  22,24,24 33:1,15 40:11,16 43:10
  68:19,22,22 69:19,20,24,25 73:5
  74:2 75:3
laws [7] 6:12 13:18,24 16:12 17:7
  58:12 61:6
64:12 69:14 73:2 74:22,25
lawsuit [1] 69:21
leading [1] 27:7
leads [1] 15:7
least [4] 15:21 17:4 29:10 31:18

Heritage Reporting Corporation

Official - Subject to Final Review

32:4 33:22 39:5,15 45:14 65:16 73:15
leave [2] 14:7 56:22
leaves [1] 15:2
legal [6] 10:6,15,17 13:14 19:19 46:6
legislate [1] 55:19
legislation [4] 34:15,16,18 62:7
legislature [1] 39:13
legislature's [1] 64:6
legislatures [1] 17:8
less [4] 4:1 11:9 29:19 46:24
level [5] 30:19,19 53:1 67:16,17
leveling [2] 32:5,6
levels [2] 18:24,24
liberating [1] 29:23
Libertarians [1] 46:13
liberty [1] 62:14
life [2] 11:14 15:11
light [1] 55:20
likely [3] 8:22 9:23 16:8
limit [2] 48:24 53:23
limitation [1] 17:3
limited [3] 3:25 13:25 17:1
line [1] 46:7
link [1] 32:11
list [1] 70:9
lists [1] 58:15
little [3] 7:22 23:23 27:9
loan [1] 12:19
long [2] 38:13 60:9
longer [2] 42:6 61:11
look [18] 5:9 6:3 8:10 9:22 13:3 14:3 15:23 18:9 24:6 41:13 43:23 44:5 47:25 48:1 49:23 51:8,14 73:23
looked [1] 73:5
looking [6] 5:23 10:1 13:5 43:10 49:22 57:1
lose [3] 14:10 70:16,18
lot [2] 11:9 21:24
lower [1] 3:17
lowest [1] 48:24

**M**

made [19] 5:11 13:16,19 21:23,25, 25 22:5 24:19 26:23 28:8,17 34:22 37:8 44:4,7,10 45:10 46:6 60:24
Main [1] 43:16
majority [4] 7:16 16:20 35:17 57:17
MALCOLM [5] 1:20 2:3,9 3:10 72:7
manifestation [2] 48:20 51:2
manner [4] 45:20,24 46:5,14
many [4] 53:19 56:13,20 73:9
marketing [1] 61:4
marketplace [1] 62:4
Martin [1] 71:19
MARTINEZ [61] 1:23 2:6 35:22,23, 25 38:4,22 40:6,23 41:15,20 42:11,16 43:6,9,16,19 45:13 46:2 47:3 48:9,16 49:14 51:5 52:15,21 53:14,16 54:1,4,14 57:7,18,24 58:7

**N**

namely [1] 18:25
narrow [2] 4:1 49:21
narrowly [2] 21:13 54:10
narrowness [1] 49:19
natural [2] 7:7 32:25
nature [2] 66:11,12
nearly [2] 11:3 32:16
necessary [1] 50:5
need [7] 14:3 15:9 17:16 41:12 51:23 52:3 64:10
needed [1] 36:24
neither [1] 30:6
never [5] 22:6 55:6 68:9,11,19
next [1] 3:4
nobody [2] 13:23 40:17
non-commercial [10] 36:22 37:2 41:8 44:2,8,15 48:4 73:10,18 74:9
non-telemarketing [1] 44:8 48:5
nonetheless [2] 47:18 50:10
noon [1] 49:3

**O**

object [1] 38:10
objecting [2] 18:23 19:2
objective [1] 28:13
objectives [2] 25:4,6
obligation [1] 47:1
obvious [1] 40:14
obviously [5] 11:9 18:19 25:16 34:21 52:22
occasions [2] 11:10 12:7
odd [1] 9:11
offensive [1] 71:9
offset [1] 22:18
often [2] 10:4 13:2
Okay [8] 1:6 12:19 32:3 34:4 56:6 57:17,21,21
once [2] 38:9 57:4
one [29] 4:8 5:20 7:1 8:19 10:13,16 16:6 23:24 26:21 28:20 29:19 31:4 32:15,19 39:25 42:4 45:18,19 49:2,24 52:18 53:3 54:21 55:6 56:22 63:2 66:6 68:17 69:13
ones [1] 64:9
only [13] 5:9 10:5 14:6 17:21 23:25 24:1,3,21 26:4 28:17 44:21 51:17 75:1
open [2] 12:8 36:23
opening [1] 55:11
opposed [2] 29:21 42:10
opposite [1] 39:19
opt [1] 70:12
options [1] 70:4
oral [5] 1:15 2:2,5 3:10 35:23
order [6] 19:25 36:25 44:6 48:3 60:21 70:5
ordinary [1] 14:24
organization [2] 12:21,24
organizations [1] 36:2
original [4] 34:17 47:5 64:15 65:18
originally [3] 45:8,9 64:20
other [23] 5:3,9 9:3 15:3 20:16 21:23 22:5,9 24:2 26:8,22 28:9 36:13, 21 40:9 50:6 51:18 52:3 58:9 59:16 60:12 61:4 69:23 72:18
others [2] 23:10 53:18
otherwise [3] 21:25 32:25 40:22
out [13] 6:2 42:4 46:25 56:5,7,22 57:25 62:17,24 67:16,16 70:14 72:22
out-of-the-blue [2] 46:21 47:9
outlaws [1] 36:21

**P**

p.m [2] 49:3 75:7
PAGE [5] 2:2 24:12 48:2 60:21 73:23
pages [1] 48:2,2 51:8
paramount [1] 37:16
part [11] 5:25 11:14 12:2 13:4 14:3 20:23 26:13 33:10 50:6 53:21 56:7
particular [16] 13:7,16,22 14:2 16:8 17:1,2 26:10 30:10 47:6 49:19, 20 54:24 59:22 72:22 73:21
particularly [3] 3:21 42:2
parties [1] 64:18
party [7] 18:22,25 19:2,6,10,13 62:25
passed [2] 68:19,24
Pay [1] 12:23
peek [2] 69:12,13
people [18] 11:11,20,21 12:1 20:24 32:18 35:17 60:4 64:11,24 69:14 70:3,5 71:5,8,17,20 74:8
perceived [1] 70:21
percent [1] 47:15
percentage [1] 25:1
perfectly [4] 34:1 44:3 47:11,12
performing [1] 8:5
perhaps [2] 48:24 60:7
permissible [1] 63:13
permit [1] 53:24
permitted [1] 65:24
person [2] 11:4 45:14
person's [2] 18:15,16
perspective [1] 65:4
persuade [3] 10:17 14:22 26:14
persuaded [1] 10:16
petition [2] 22:24 74:10
Petitioners [6] 1:5,22 2:4,10 3:11 72:8
philosophical [3] 15:8 63:23,24
Philosophically [1] 64:10
phone [12] 6:5 11:1,5,18 36:20 40:18 46:13 64:16,25 67:22 69:15 73:22
phrase [1] 68:10
pick [2] 23:24 69:10
pieces [2] 49:16 55:1
place [6] 32:16 34:24 62:1,6 64:19 70:19

59:4,5,11 60:6,18 61:15,17 62:10 63:22 66:5 67:4,6,25 68:14,21 69:18 70:12,14,23 71:8,12,14 72:11 73:8 74:14,14
matter [8] 1:15 15:25 19:21 31:19 51:21 61:1,8 64:13
matters [1] 44:1
mean [9] 9:19 10:4 25:14,16,23 28:4 34:11 38:19 43:18 55:3 59:19 68:25 71:4
meaningful [1] 7:13
means [2] 32:20 66:14
meant [1] 33:25
members [1] 12:9
mentioned [1] 51:22
mere [1] 16:25
merely [1] 69:5
merits [5] 10:8 28:24 29:9,10 73:24
message [7] 12:18,20,22 16:7 45:23 46:1 49:4
messages [3] 35:17 36:7,11
might [14] 12:8 22:5 26:21 27:20 30:12,13,15 40:1,1 47:9 61:2 63:13 71:8,17
million [1] 37:11
mind [1] 20:10
minute [2] 35:1 71:13
misunderstood [1] 60:7
money [6] 43:1,3 44:24,25 45:1 53:18
Morales-Santana [2] 18:5 19:12
morning [1] 27:4
most [7] 11:11,14,20 12:1 15:21 20:16,25 25:24 36:5 37:14 39:9, 19 44:1 58:11,19,21 72:14
mothers [1] 19:18
moving [1] 38:14
much [7] 17:11 34:5 41:7 50:1 53:15 61:25 74:4
multitude [1] 6:25
must [2] 37:19 66:17

normal [1] 57:1
normally [1] 27:16
note [1] 57:11
noted [2] 24:9 27:6
nothing [5] 8:3 13:10 15:16 22:22 55:13
NPRM [1] 48:1
nuanced [2] 49:16,17
nuisance [1] 71:18
Number [8] 42:13,19 51:22 58:16
numbers [1] 34:20

outset [1] 6:10
over [5] 9:2 36:15 47:15 55:5,5
overall [1] 25:3
overbroad [1] 70:17
overlooks [1] 73:12
overwhelmingly [1] 64:24
owe [2] 12:18,23 21:6
owed [5] 12:16 13:9 22:17 46:23 56:11
own [2] 11:11 57:23

Heritage Reporting Corporation

**placed** [1] 26:3
**placement** [1] 3:15
**plaintiff** [7] 9:25 10:5,13,16 15:2 19:15,22
**plaintiff's** [1] 27:17
**plaintiffs** [7] 7:3,8 13:22 14:17 27:15,18,23
**plans** [1] 64:23
**please** [3] 3:13 12:20 36:1
**plenty** [1] 70:4
**point** [11] 8:17,18 16:4 33:15,17 35:6 40:10 47:7 54:22 65:16 69:10
**pointed** [4] 21:15 22:10 67:15,16
**pointing** [1] 24:8
**points** [7] 5:21 32:8,11,13 40:24 54:14 57:8
**police** [1] 62:18
**policy** [1] 64:7
**POLITICAL** [19] 1:7 3:6 7:14 12:21,24 14:8 24:19 36:2,3,15,21 41:8 44:1,15 47:10 54:9 56:7 60:17 71:17
**politics** [1] 57:5
**popular** [2] 32:17 40:16 69:14,19 70:22 71:3
**pose** [1] 11:23
**position** [7] 27:11 48:19 52:2,2,16 66:10 72:18
**poster** [1] 69:20
**potential** [1] 22:7
**potentially** [2] 12:4,5
**powers** [1] 29:14
**practical** [5] 10:1,5,19 19:21 20:5
**precedent** [4] 17:18,25 67:8,14
**precedents** [1] 18:4
**precisely** [1] 21:25
**predators** [1] 22:19
**predicated** [1] 45:7
**preeminence** [1] 9:1
**preface** [1] 24:7
**prefer** [2] 22:14 66:2
**preferred** [4] 8:21,22 29:17 30:6
**premise** [2] 33:19,20
**premised** [1] 23:8
**prerecorded** [1] 73:15
**prerequisites** [1] 26:19
**preserve** [1] 32:18
**pretty** [3] 40:12,14 51:2
**prevailing** [2] 10:6,15
**prevalent** [1] 11:9
**prevent** [1] 28:12
**prevents** [1] 5:4
**primarily** [1] 68:15
**primary** [2] 36:19 66:10
**prime** [1] 68:6
**principal** [1] 28:7
**principle** [1] 17:6
**principles** [6] 9:22 14:24 15:1 18:2 19:25 66:16
**prior** [1] 5:12
**privacy** [30] 4:2 11:1,2,15,24 12:5 25:3 26:25 28:12 36:12 37:1,5,10,15 39:5 41:10 43:2,4,25 44:9,17,

24 47:17,20,23 50:1 53:11 68:4, 24,25
**privacy-based** [1] 37:6
**private** [4] 21:3 22:19,23 56:12
**probably** [3] 49:21 50:2 52:25
**problem** [23] 5:15 29:8,9 34:17,19 38:8 40:13,25 41:21,23 42:1,2,4,6, 10 50:17,20,24 51:10,17 62:19 67:9,11
**problematic** [4] 7:24 22:22 39:16, 20
**problems** [1] 69:24
**process** [1] 27:17
**produce** [1] 30:3
**produced** [1] 8:11
**product** [1] 61:4
**prohibit** [3] 45:21,22 64:5
**prohibited** [2] 65:20 66:3
**prohibiting** [1] 24:2
**prohibits** [1] 45:23
**proof** [1] 55:17
**properly** [3] 4:8 5:25 10:11
**proposed** [1] 29:15
**proposition** [2] 10:17,18
**propositions** [1] 10:15
**prospect** [1] 58:2
**protect** [9] 9:2 36:25 53:12 70:2,5 71:5,6,16,20
**protected** [4] 32:17 37:5 71:22,23
**protecting** [3] 4:4 22:13 26:24
**protection** [6] 5:5 18:6,22 21:10 25:3 28:12 30:9,16,17,20
**protects** [2] 44:10 62:13
**prove** [1] 54:7
**provided** [1] 44:22
**provision** [13] 3:18 6:6,16 26:16 27:14 33:9,12,14 47:6 49:7 50:8 53:24 72:19
**provisions** [1] 8:2
**public** [5] 8:14 31:4,6,8,10
**purpose** [3] 36:19 39:16 71:15
**purposes** [3] 8:21 33:13 42:20
**pursue** [1] 28:20
**pursued** [1] 28:18
**pursues** [1] 10:14
**put** [6] 7:4 55:2 56:19,22 61:25 62:5
**putting** [3] 21:1,11 53:20

---

**Q**

**quality** [2] 30:18 32:14
**question** [23] 7:23 8:19 10:7,24 14:23 15:8,10 17:18 19:12 23:18 26:14 28:11,25 30:8 40:10 48:18 49:17 54:13 56:6 59:18 67:15,18, 24
**questions** [1] 10:6
**quo** [1] 63:20

---

**R**

**raise** [2] 21:10 62:1
**raised** [1] 54:22
**raises** [1] 5:14
**range** [1] 61:2

**ranges** [1] 61:8
**Rappa** [1] 52:3
**rare** [1] 11:10
**rather** [5] 5:24 51:19 67:11 72:23 73:6
**rational** [2] 44:17 55:19
**rationale** [2] 24:24 73:6
**re-jigger** [1] 10:2
**reach** [1] 38:12
**read** [1] 10:11
**real** [3] 41:23 62:1 69:13
**realize** [1] 57:13
**really** [22] 5:23 8:23 10:18 11:15 17:15 26:17,25 28:10 37:15 38:24 39:3,21 40:4 41:11 42:6 44:14 45:20 47:24 49:25 53:11 54:19 73:12
**reason** [16] 10:2 12:7 22:25 37:6 44:18 46:22 48:10 50:2,13 56:23 59:15 63:23,24,24 64:19 69:21
**reasonable** [2] 15:24 57:2
**reasons** [3] 26:7 51:22 54:21
**REBUTTAL** [3] 2:8 72:6,7
**receive** [1] 64:25
**receiving** [1] 36:23
**recipient** [2] 5:12 23:4
**recognize** [3] 46:16 64:15 69:4
**recognized** [2] 47:19 71:19
**record** [1] 20:14
**reduce** [1] 48:23
**Reed** [12] 6:7,9,11,23,23 16:11 35:11,12 57:11,16 62:13 73:2
**reelection** [1] 24:15
**reenact** [1] 65:12
**refer** [2] 33:14 35:6
**reference** [1] 73:2
**referred** [1] 16:11
**referring** [1] 16:10
**refund** [1] 22:18
**regarded** [2] 38:14 46:24
**regardless** [1] 58:13
**regime** [1] 29:18
**regulate** [5] 13:16,18 17:8 72:23 73:7
**regulated** [1] 73:14
**regulation** [10] 15:12,19 16:21 17:20 56:19 57:6 59:13,22,24 72:22
**regulations** [6] 56:16,16 58:3,10, 11,21
**regulatory** [1] 28:10
**reimagine** [1] 29:17
**reinstate** [1] 50:11
**reject** [3] 28:17 37:24 63:21
**relationship** [6] 6:1 13:12 59:17 60:10 62:8,9
**relative** [1] 21:20
**relaxed** [1] 74:19
**relief** [9] 27:14,17,19 28:1,2 29:2 38:2 54:17,19
**remain** [1] 49:10
**remedial** [1] 37:24
**remedies** [1] 70:9
**remedy** [9] 9:13,21 10:9,12 14:19 15:2 18:24 27:8 29:7,11,15 33:11 53:23 54:12 67:17

**remember** [1] 57:12
**remind** [2] 3:8 16:4
**reminder** [1] 47:1
**render** [1] 17:4
**renders** [2] 5:6 49:8
**reply** [3] 11:13 51:9 55:12
**request** [1] 27:17
**require** [1] 56:19
**required** [1] 66:9
**requiring** [1] 36:12
**residential** [11] 11:17,24 12:5 24:15 37:3 43:24 44:21 68:16 73:16, 22 74:5
**respect** [7] 19:8 20:19,21 22:7 26:7 28:25 29:11 46:3,24 47:4 49:18 55:9 60:6,18 74:5,6,13
**respective** [1] 73:12
**respectively** [1] 73:22
**Respondent** [4] 4:20 9:14,16 35:7
**Respondent's** [1] 75:2
**Respondents** [12] 1:9,24 2:7 4:22 5:13 6:17 7:12 24:12 26:11 28:7 29:1 35:24
**Respondents'** [5] 4:7 5:1 6:20 24:9 35:15
**response** [2] 18:21 48:14
**responses** [1] 14:16
**responsibilities** [1] 73:12
**rest** [2] 7:25 8:5
**restrict** [2] 26:9 41:25
**restricting** [1] 54:8
**restriction** [75] 3:15,19 4:10,15,25 5:4,10,16 6:16,19 8:12 14:21 16:17,18 19:3,7 23:20,25 24:1,24 26:1,13,21 29:3 30:3 31:5,23 32:15 35:8,10 36:23 37:18 40:4 41:1,12, 23 42:1,5,9,17,23 43:13 45:21,25 46:4 47:22 49:20 50:3,10,11,14, 22,25 51:11,11,19,24 52:11,18 53:21 54:20 55:10,17 57:10 66:14,17 67:21,21 68:5,9,13 70:19 72:2,12 73:11
**restrictions** [13] 7:6,15 9:1 13:23 26:3 34:24 46:15,17 52:16,24 58:8 62:12 70:18
**result** [9] 8:20 9:24 10:1,19 14:25 19:23 20:5 30:10 40:20
**results** [1] 74:3
**return** [1] 22:18
**reveal** [1] 69:7
**revealed** [1] 69:2
**reveals** [1] 42:21
**revenue** [2] 43:2 65:4
**review** [3] 23:7 72:21 73:4
**reviewed** [1] 72:19
**revised** [1] 66:2
**rid** [6] 40:15 50:16,23,23 51:23 63:18
**rightly** [1] 37:20
**rights** [3] 37:5 44:9 71:20
**ring** [1] 55:25
**rings** [1] 11:18
**ROBERTS** [36] 3:3 5:17,20 7:17, 21 8:16 9:5 12:11 15:4 17:12 20:6

**23:**11 **27:**1 **31:**11 **34:**25 **35:**20 **38:**4 **40:**5,8 **41:**14,17 **45:**3 **48:**8,11,15 **52:**12 **55:**21 **58:**25 **59:**2 **63:**4 **66:**18,21,25 **71:**10 **72:**4 **75:**5
**robo** [1] 20:20
**robo-calls** [2] 20:20 40:17
**robocall** [1] 56:2
**robocalls** [9] 34:9,23 52:17,25 53:7,19 65:19 67:22 69:15
**robot** [1] 20:20
**robust** [1] 62:11
**robustly** [1] 74:4
**role** [1] 69:4
**ROMAN** [3] 1:23 2:6 35:23
**Ross** [1] 18:5
**rubber** [1] 55:14
**rule** [2] 18:8,13
**ruled** [1] 28:23
**rules** [2] 15:16 59:21

**S**

**sake** [1] 17:17
**sale** [1] 13:20
**same** [2,7] 7:15 11:23 16:20 25:21,25 26:2,7 30:8 35:16 36:8,10,12 37:7 38:16,20 44:1 59:24 60:3 61:19 62:16 73:5
**satisfied** [1] 60:10
**satisfies** [1] 57:9
**satisfy** [4] 30:20 31:20,24 53:1
**satisfying** [1] 55:6
**save** [1] 40:20
**saying** [3] 42:25 61:5,18
**says** [6] 20:16 22:16 33:8 36:24 49:7 58:16
**scale** [1] 70:17
**scams** [1] 53:19
**scheme** [4] 3:25 5:3 28:10 36:14
**schemes** [1] 53:18
**scope** [1] 42:17
**scrutiny** [29] 5:21 10:24 17:5 21:12 26:6 31:21 32:1 42:18 43:22,23 46:17 53:2,22 55:4,7,8,14 56:9,25 57:4,9 58:13,22 59:10,14 61:25 62:5 72:15 74:19
**SEC** [2] 15:15 56:15
**second** [8] 8:17,18 10:18 16:10 22:7 30:7 31:5 32:11,21 65:16,22 66:1 73:8
**securities** [3] 13:20 14:1 26:8
**Security** [1] 22:19
**see** [7] 6:2 12:15 15:24 20:14 34:7 65:15 73:24
**seek** [3] 10:12 28:1 29:4
**seeking** [1] 20:5
**seem** [7] 9:11,13,14 10:25 11:2 26:23 51:1
**seemingly** [1] 27:23
**seems** [4] 8:23 9:16 40:14 69:16
**selling** [1] 56:15
**sense** [4] 7:13 25:17 69:16,17
**sensitive** [1] 64:7
**sentence** [3] 55:9,11,12
**separate** [2] 8:14 10:15

**separation** [1] 29:14
**sequence** [6] 8:11 18:9 31:3 32:21 33:15 63:18
**serious** [1] 26:24
**serve** [1] 4:3
**set** [2] 16:5 57:11
**settled** [1] 58:23
**sever** [5] 7:25 8:2 9:12 42:2 50:10
**severability** [8] 8:19 9:22 10:3 17:14,19 18:2 19:4,23,25 26:14 30:8 32:5,9,12 33:5,8,19 41:2,13 46:20 48:17 50:4 63:9 66:8,16 67:5,8 75:2
**severance** [7] 7:22 14:6,14,24 27:12 30:10 40:9
**severed** [2] 18:7 52:8
**severely** [1] 4:2
**shall** [2] 49:10,10
**shift** [1] 10:23
**shoes** [1] 64:6
**shouldn't** [4] 8:8 53:23 54:12 64:9
**show** [5] 20:22 21:13 26:19 41:10 43:12
**showing** [1] 21:19
**shown** [1] 21:2
**shows** [3] 41:7 44:23 47:23
**side** [5] 17:25 20:16 40:9 51:15 52:19
**sign** [3] 6:24 7:5 40:1
**significantly** [1] 25:5
**signs** [4] 6:24 7:2,3,11
**simple** [1] 49:4
**simply** [14] 4:13 10:11 16:21 29:22 32:18 40:20 46:25 53:24 58:19 74:20,21
**single** [5] 15:13 24:19 55:9,10,11
**situation** [10] 6:22 8:7 10:20 19:5 39:12 49:13 51:4 52:7 60:21 66:2
**situations** [2] 21:5 56:13
**skeptically** [2] 72:20 73:5
**sky's** [1] 58:17
**slightly** [1] 59:8
**small** [8] 16:21 20:15,19,23 22:3,4 25:1 66:6
**smallness** [1] 21:20
**so-called** [1] 17:14
**social** [2] 12:7 22:19
**solicitations** [1] 71:22
**Solicitor** [1] 1:20
**solve** [5] 40:15 41:25 42:1 50:16,24
**someone** [2] 9:17 11:5
**sometimes** [1] 10:7
**somewhat** [1] 15:8
**sorry** [5] 30:15 48:2 55:25 66:21 70:15
**sort** [4] 42:3 51:15 58:3,9
**Sotomayor** [8] 20:8,9 52:14,15 53:13,16 54:2,5
**sought** [4] 13:8 27:15 28:20 29:1
**space** [1] 16:12
**speakers** [1] 36:9
**special** [1] 62:17
**specialized** [1] 62:24

**specially** [1] 56:12
**specific** [2] 41:4 52:4
**specifically** [1] 17:25
**speech** [61] 6:13 9:15,16 15:12,13 16:13,19,20,22,25 17:1,21 18:15,17 19:1,3 24:2 27:7 29:18,24 30:22 35:13,15 36:3,15,16 37:17,23 38:1,11,18 39:6,8,9,15,19 40:3 41:8 52:20 54:9 58:9,12,21 62:12,15 64:1,3,5 67:10 71:3,5,6,17,18 72:2,12,15,22 73:1,3,6
**spheres** [1] 17:9
**squarely** [1] 39:23
**stage** [1] 14:14
**stamp** [1] 55:14
**standing** [5] 27:24 28:2,25 29:4,8
**standpoint** [2] 30:5 39:17
**stare** [1] 57:19
**start** [2] 42:12 56:24
**started** [3] 3:7 23:16 55:25
**state** [2] 8:12 17:7
**statement** [2] 6:11 15:7
**STATES** [3] 1:1,16 34:7
**states'** [1] 69:11
**statistics** [1] 20:18
**status** [1] 63:20
**statute** [42] 5:9 6:17 8:1,6,6,8 10:11 11:8 24:5,13 25:8,11,12,14,19 26:23 28:12 41:5 43:20 45:8,9,16 46:11 49:6,9,9,13 50:8,21 51:10,18 52:23 53:14 54:6 55:3 59:7 63:1 65:12,18 66:2,13 74:7
**statute's** [2] 36:8 37:1
**statutes** [5] 13:15 15:13 58:16,18,20
**statutory** [5] 3:25 5:3,9 23:2 28:10
**step** [1] 38:20
**stepping** [1] 64:6
**steps** [1] 38:7
**STEWART** [51] 1:20 2:3,9 3:9,10,12 5:17,19 6:8 7:19 8:9,18 9:6,11,19 11:7 12:25 14:15 16:2 17:13,24 18:19 19:8 21:17 23:15 24:7 25:9,13,23 28:4 29:25 30:13,24 31:2,16,22 32:1,10 33:4,7,22 34:3,11,14 35:2,3 54:22 67:19 72:6,7,9
**Stewart's** [1] 67:16
**stick** [1] 57:15
**still** [6] 3:1 11:23 43:12 51:21,23 70:19
**stop** [3] 30:14,15 46:21
**straightened** [1] 56:5
**stricken** [1] 49:11
**strict** [25] 5:21 10:24 17:5,5 21:12 26:6 31:20 32:1 42:18 46:17 53:22 55:4,7,8,13 56:9,9,24 57:4,9 58:12 59:10,14 61:25 62:5
**strike** [4] 14:6,20 54:19 72:1
**striking** [6] 27:13 32:15 33:11 53:23 54:6 75:3
**strong** [5] 32:8 40:4,10 47:24 65:3
**strongest** [2] 32:11,13
**strongly** [1] 68:3
**struck** [6] 18:8 26:16 33:1 36:17

**37:**19 **66:**17
**student** [1] 12:18
**sub-category** [2] 56:21,23
**subject** [13] 4:15 7:14 13:21 17:5 55:4 58:12 60:11 61:1,8 72:14,16,20 74:19
**submitted** [2] 75:6,8
**substance** [1] 30:19
**substantive** [1] 55:12
**subvert** [1] 36:11
**succinct** [1] 16:3
**sufficient** [1] 17:3
**sufficiently** [1] 25:4
**suggest** [1] 9:12
**sum** [1] 66:4
**sums** [1] 66:5
**supporters** [1] 69:25
**suppose** [5] 29:16 30:16,23 48:25 59:7
**supposedly** [1] 36:12
**suppressed** [3] 29:18,19,24
**suppression** [2] 27:7 62:3
**SUPREME** [2] 1:1,16
**surely** [2] 24:20 25:6
**survive** [2] 55:2 56:25
**suspect** [1] 53:24
**sweeps** [1] 36:21
**Switching** [1] 14:5

**T**

**tail** [2] 8:23 32:14
**tailored** [2] 21:13 54:10
**tangled** [1] 58:9
**target** [5] 6:13 16:12,19 35:13 73:2
**targeted** [4] 7:9,13 23:8 35:15
**targets** [1] 6:19
**task** [1] 9:20
**tax** [2] 22:18,18
**taxpayers** [1] 56:11
**TCPA** [10] 22:1,6 30:4 33:10 34:17 36:4 37:5 44:10 48:6 53:8
**TCPA's** [3] 3:14 34:23 36:19
**technical** [3] 34:16 61:14,17
**technologies** [2] 3:20 36:10
**technology** [1] 45:24
**telemarketing** [3] 36:20 53:6 70:7
**telephone** [1] 55:25
**temporal** [5] 8:11 18:9 31:3 32:21 33:15
**temporary** [1] 7:1
**term** [2] 27:19 35:11
**terms** [3] 24:23 74:15,16
**test** [3] 16:3 57:9 62:11
**text** [1] 36:6
**textual** [1] 69:6
**Thanks** [1] 59:1
**theory** [2] 5:1 42:20
**There's** [20] 4:6,11,13 8:3 19:12 22:21,25 27:11 37:6 44:17 48:9 51:13,20 52:1,19 53:19 63:22,23 65:7 69:23
**therefore** [3] 23:1 28:20 42:17
**thinking** [1] 57:23
**thinks** [1] 13:23

Official - Subject to Final Review

**third** [5] 15:19,23 16:23 52:2 57:3
**Thomas** [10] 9:8,9 10:22 41:18,19 42:15 43:5,7,15,17
**thoroughly** [1] 33:21
**though** [9] 14:1 15:1 20:2 26:23 38:2 44:25 50:7 64:14 73:20
**threat** [1] 11:23
**three** [2] 21:17 29:25
**thwart** [1] 51:2
**tick** [1] 32:8
**tiny** [2] 49:2,24
**today** [2] 40:13 43:10
**today's** [1] 64:22
**together** [2] 32:4 65:7
**took** [3] 52:3 72:11 75:2
**tools** [2] 36:5 71:1
**topics** [1] 61:9
**total** [1] 48:25
**totality** [1] 49:22
**touched** [1] 20:11
**town** [1] 6:23
**trade** [2] 43:1 44:24
**tradeoffs** [1] 64:7
**transformed** [1] 61:9
**transmit** [1] 35:18
**tread** [1] 47:20
**treat** [7] 8:24 22:25 25:21,24,25 44:18 56:12
**treated** [2] 18:16 35:16
**treating** [1] 37:7
**treatment** [10] 18:23 19:1,17,20 20:4 41:8 44:21 51:20 68:15 72:17
**treatments** [1] 6:25
**treats** [1] 16:19
**tried** [2] 28:23 51:16
**tries** [1] 48:23
**trigger** [2] 46:17 58:22
**triggers** [1] 42:17
**trillion** [1] 37:13
**true** [7] 9:20 13:1 45:12,13 48:7 50:4 58:19
**Trump** [2] 24:16,17
**try** [1] 49:15
**trying** [11] 39:5,13,13 53:12 55:13 57:22,23 59:20 61:19 62:7 74:25
**turn** [5] 3:8 55:13 59:13,17 63:8
**turns** [3] 46:8 62:25 66:9
**two** [18] 4:13 8:9 10:6,15 21:17 29:25 32:4,10,13 40:23,24 42:12 47:7 49:15 54:14 60:2 61:18 68:6
**type** [1] 64:2
**types** [4] 44:1 46:5 52:19 53:24
**typical** [1] 4:3

**U**

**ubiquitous** [1] 11:13
**ultimate** [1] 8:19
**unconstitutional** [13] 17:21 38:1 41:4 49:9 50:3 52:11,17,19 58:18 64:12 68:5,13 72:2
**under** [11] 5:7,22 21:12 53:22 58:23 63:14 66:15,15 70:9 72:22 74:2

**underlying** [16] 4:25 5:16 18:8 33:20,23 34:1 42:21,22 52:10 67:12,20,21 68:9,12 69:7 73:18
**undermine** [1] 39:3
**undermines** [1] 38:25
**undermining** [1] 48:6
**underscored** [1] 33:18
**understand** [4] 17:15 27:10 50:8 67:9
**understandably** [1] 26:11
**understanding** [2] 66:16 72:25
**understood** [1] 35:11
**undertaken** [1] 72:13
**undertook** [1] 47:2
**unequal** [1] 18:23
**UNITED** [2] 1:1,16
**unjustified** [3] 37:18 43:13 50:22
**unlimited** [1] 37:12
**unnoticed** [1] 34:15
**unpopular** [1] 40:22
**unsuccessful** [1] 14:13
**unusual** [2] 10:20 22:14
**unwanted** [3] 11:22,24 70:6
**unwed** [2] 19:17,17
**up** [14] 7:4 16:5 18:24 30:19 32:5 35:1 58:9 62:25 65:6 66:4,6 67:16 69:10 71:13
**upheld** [2] 3:17 5:7
**uphold** [1] 15:25
**using** [6] 36:5 45:23 46:13,13,14 73:15
**usual** [1] 72:25

**V**

**valid** [2] 26:19 28:18
**validating** [1] 21:15
**vast** [7] 15:16 16:20 17:7 32:18 34:20 35:17
**version** [1] 30:4
**versus** [1] 3:5
**vested** [1] 73:19
**victory** [1] 10:5
**view** [3] 15:22 37:9 70:17
**viewed** [2] 4:8 5:25
**viewpoint-based** [3] 17:22 24:22 25:18
**violate** [1] 24:20
**violates** [1] 36:16
**violation** [5] 10:11 14:20 20:3 29:7,23
**violations** [1] 37:23
**virtually** [1] 11:20
**voice** [2] 73:15,16
**vulnerable** [1] 8:6

**W**

**wages** [1] 22:21
**wagging** [2] 8:23 32:14
**wanted** [12] 7:3 10:20 19:13,14,15,22 27:8,20,20 31:19 46:20 65:12
**wants** [5] 18:25 19:6,10 40:17 44:2
**warrant** [1] 47:21
**Washington** [3] 1:12,21,23

**way** [25] 4:11,11 16:1 23:17,24 25:22,25 27:11 28:5,6 30:23 35:16 40:14 51:13,16 53:4 55:19 57:1 59:8 61:24 62:18 67:8,14 68:11 70:25
**ways** [3] 4:14 60:2 61:18
**weaker** [1] 43:11
**Wednesday** [1] 1:13
**welcome** [1] 54:17
**well-heeled** [1] 62:25
**whatever** [5] 12:7,19 16:24 56:20 62:25
**whatsoever** [1] 60:11
**whenever** [1] 16:25
**whereas** [1] 19:1
**Whereupon** [1] 75:7
**whether** [19] 4:7 6:5 9:1 13:2,7 14:1 16:7 18:2,7,10,23 23:22 28:18 35:9 38:24 48:18 57:15 58:13 66:1
**who's** [1] 9:17
**whole** [8] 6:8 14:21 21:21 32:15 49:13 69:23 75:3
**will** [11] 8:24 11:21,23 14:7,13 56:16,16,25 57:12,16 70:19
**WILLIAM** [2] 1:3 3:4
**Williams-Yulee** [6] 38:6,13,23 39:11,22,24
**willing** [2] 43:1 44:24
**win** [3] 21:15 58:19 70:3
**within** [3] 39:23 56:17,18
**without** [7] 15:2 19:7 33:25,25 48:5 67:12,22
**won** [1] 38:2
**wonder** [2] 8:7 48:18
**wondering** [2] 23:22 57:14
**words** [2] 59:17 60:12
**work** [2] 12:6 30:17
**works** [1] 53:4
**world** [3] 21:24 64:22 69:13
**worried** [2] 44:15,16
**worries** [1] 56:8
**worry** [1] 70:2
**wrap** [3] 35:1 65:6 71:13
**write** [1] 61:23
**written** [1] 59:7
**wrongly** [1] 29:24

**Y**

**years** [5] 3:16 32:16 40:11 45:19 70:20

Heritage Reporting Corporation