# Exhibit A

2021 WL 1226618
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Sherman Division.

CRAIG CUNNINGHAM, Plaintiff,
v.
MATRIX FINANCIAL SERVICES,
LLC, ET AL., Defendants.

Civil Action No. 4:19-cv-896
|
03/31/2021

Judge Mazzant

## MEMORANDUM REJECTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**\*1** Came on for consideration the report of United States Magistrate Judge Christine Nowak in this action, this matter having been heretofore referred to the Magistrate Judge pursuant to 28 U.S.C. § 636. On February 12, 2021, the report of the Magistrate Judge (Dkt. #142) was entered containing proposed findings of fact and recommendations that the Court has subject matter jurisdiction over the action; that Plaintiff Craig Cunningham's claims against Defendants Matrix Financial Services, LLC, David Glenwinkel, and Sing for Service, LLC d/b/a Mepco (Dkt. #50) be dismissed in their entirety pursuant to Rule 12(b)(6); and that Plaintiff's claims against Defendants National Car Cure, LLC and Zander, Collins & Smith, LLC (Dkt. #50) be dismissed in part pursuant to Rule 12(b)(6). Having received the report of the Magistrate Judge and having conducted a de novo review, the Court is of the opinion that the Magistrate Judge's report should be rejected as to the issue of subject matter jurisdiction.

### BACKGROUND

Plaintiff Craig Cunningham ("Cunningham") is a citizen who allegedly received calls to his cell phone in violation of the Telephone Consumer Protection Act of 1991 ("TCPA"). On May 4, 2020, Cunningham filed an amended complaint asserting, among others, TCPA claims against Defendants Matrix Financial Services, LLC, David Glenwinkel, Sing for Service, LLC d/b/a Mepco, National Car Cure, LLC, and Zander, Collins & Smith, LLC. After Cunningham filed his amended complaint, Defendants moved for dismissal for failure to state a claim. In addition, several Defendants later filed motions to dismiss for lack of subject matter jurisdiction.

In the report, the Magistrate Judge recommended the Court deny the motions to dismiss for lack of subject matter jurisdiction (Dkt. #142 at pp. 9–18). After framing the issue and presenting the parties' contentions (Dkt. #142 at pp. 9–14), the Magistrate Judge analyzed the arguments and their applicability to existing law (Dkt. #142 at pp. 15–18). In the report, the Magistrate Judge found three points sufficiently compelling to recommend denial of the motions to dismiss for lack of subject matter jurisdiction. First, while acknowledging its non-binding status, the Magistrate Judge found footnote twelve of Justice Kavanaugh's plurality opinion persuasive (Dkt. #142 at p. 15, 17). Second, the Magistrate Judge found persuasive that the majority of district courts that already decided this issue had held that federal courts retained subject matter jurisdiction over the sort of claims in question (Dkt. #142 at pp. 15–16). Third, the rationales of the district courts finding subject matter jurisdiction lacking in similar situations were unconvincing to the Magistrate Judge (Dkt. #142 at p. 16).

After concluding that Defendants' motions to dismiss for lack of subject matter jurisdiction should be denied, the Magistrate Judge turned to Defendants' motions to dismiss for failure to state a claim (*see* Dkt. #142 at pp. 18–34). The Magistrate Judge ultimately recommended that the claims against Defendants Matrix Financial Services, LLC, David Glenwinkel, and Sing for Service, LLC d/b/a Mepco be dismissed in their entirety and the claims against Defendants National Car Cure, LLC and Zander, Collins & Smith, LLC be dismissed in part (Dkt. #142 at p. 2).

### LEGAL STANDARD

**\*2** " 'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.' " *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see* 13 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3522 (3d ed.) ("A federal court's entertaining a case that is not within its subject matter jurisdiction is no mere technical violation; it is nothing less than

an unconstitutional usurpation of state judicial power."). Absent subject matter jurisdiction, federal courts are without authority to act. *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 927 (5th Cir. 2017). And while "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists," *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)), parties may challenge the constitutional or statutory subject-matter jurisdiction of a federal court under Federal Rule of Civil Procedure 12(b)(1), *Kumar v. Frisco Indep. Sch. Dist.*, 443 F. Supp. 3d 771, 777 (E.D. Tex. 2020). *See* FED. R. CIV. P. 12(b)(1), (h)(3). If a 12(b)(1) analysis indicates that a court lacks subject-matter jurisdiction, then the case must be dismissed without prejudice. *Mitchell v. Bailey*, 982 F.3d 937, 944 (5th Cir. 2020).

In considering a 12(b)(1) motion, courts may examine "any of the following: '(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.' " *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). Courts "accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff." *Earl v. Boeing Co.*, No. 4:19-CV-00507, 2020 WL 759385, at *2 (E.D. Tex. Feb. 14, 2020) (citing *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994)). Once a defendant moves for dismissal under 12(b)(1), "the party asserting jurisdiction" bears "[t]he burden of proving subject matter jurisdiction" "by a preponderance of the evidence." *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020); *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017) ("The party asserting jurisdiction 'constantly bears the burden of proof that jurisdiction does in fact exist.' " (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001))). "Yet that is no high bar: 'It is extremely difficult to dismiss a claim for lack of subject matter jurisdiction.' " *Outlaw Lab., LP v. Shenoor Enter., Inc.*, 371 F. Supp. 3d 355, 360 (N.D. Tex. 2019) (cleaned up) (quoting *Santerre v. Agip Petrol. Co.*, 45 F. Supp. 2d 558, 566 (S.D. Tex. 1999)).

## ANALYSIS

The immediate dispute concerns the Court's authority to adjudicate this case. Cunningham presses three causes of action against Defendants and proffers that the Court has subject matter jurisdiction over the case on account of the federal question involved (Dkt. #50 at pp. 2, 16–18). For each and every case or controversy, it is incumbent upon the Court to police its subject matter jurisdiction vigilantly because "district courts may not exercise jurisdiction absent a statutory basis." [1] *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005); *see Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019).

**\*3** The crux of the matter involves a recent Supreme Court case, *Barr v. American Association of Political Consultants, Inc.* (*AAPC*), 140 S. Ct. 2235 (2020). In their motions, Defendants argue that, in finding the government-debt exception of 47 U.S.C. § 227(b)(1)(A)(iii) unconstitutional, *AAPC* invalidated the statutory provision during the exception's operative time period, thereby stripping federal courts of subject matter jurisdiction over alleged violations of § 227(b)(1)(A)(iii) that occurred from the moment Congress enacted the government-debt exception to the Supreme Court's invalidation of the exception in *AAPC* (Dkt. #131 at pp. 2–3; Dkt. #133 at p. 2–3). Cunningham wholeheartedly disagrees (Dkt. #137 at p. 2). While these motions present the atypical situation of reevaluating subject matter jurisdiction following a Supreme Court decision, it is certainly not a first. *See, e.g.*, *Rodriguez Delgado v. Shell Oil Co.*, 322 F. Supp. 2d 798, 816–17 (S.D. Tex. 2004). Moreover, because complete diversity is not present in this suit (Dkt. #50 at p. 1), the stakes are high—if Defendants are correct, the Court must dismiss this case. *See id.* at 816.

### I. *AAPC*

In *AAPC*, the two-part question before the Supreme Court was:

> Whether the government-debt exception to the TCPA's automated-call restriction violates the First Amendment, and whether the proper remedy for any constitutional violation is to sever the exception from the remainder of the statute.

Petition for Writ of Certiorari at I, *AAPC*, 140 S. Ct. 2335 (2020) (No. 19-631), 2019 WL 6115075, at *I. [2] As summarized in the plurality opinion, six Justices found the government-debt exception of 47 U.S.C. § 227(b)(1)(A)(iii) violative of the First Amendment as a content-based speech

restriction, and seven Justices concluded that the pre-2015 version of § 227(b)(1)(A)(iii) should remain operative following invalidation and severance of the government-debt exception. *AAPC*, 140 S. Ct. at 2343–44 (plurality opinion). For additional clarity, the Court outlines exactly what the *AAPC* Court addressed.

Looking to the first question presented, the Supreme Court answered it in the affirmative:

the government-debt exception to the TCPA's automated-call restriction violated the First Amendment. *Id.* at 2347. Phrased differently, when Congress added the government-debt exception to the TCPA's statutory language, § 227(b)(1)(A)(iii) *in its entirety* became a content-based restriction on speech that violated the First Amendment. *Id.* at 2346; *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) ("[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."). Even though § 227(b)(1)(A)(iii) existed for nearly a quarter-century as a constitutional, content-neutral speech regulation, once Congress enacted the government-debt exception, the interaction of the preexisting statutory provision and the newly added exception worked in tandem to run afoul of the Constitution. *See Free Enter. Fund v. PCOAB*, 561 U.S. 477, 509 (2010) (pointing out that statutory provisions, "working together, [may] produce a constitutional violation").

While not phrased in "if-then" language, the second question presented to the *AAPC* Court was conditioned on locating a constitutional infirmity in the statute at issue. *See* Petition for Writ of Certiorari at *I, *AAPC*, 140 S. Ct. 2335 (No. 19-631). Upon finding the First Amendment violation in § 227(b)(1)(A)(iii), the Supreme Court also proceeded to answer the second question in the affirmative: the proper remedy for this constitutional violation was to sever the exception from the rest of the statute. *AAPC*, 140 S. Ct. at 2353–54. Phrased another way, to resolve the conflict between the Constitution and § 227(b)(1)(A)(iii) that the government-debt exception introduced, *id.* at 2351 n.7, the Supreme Court severed the government-debt exception to remove the statute's unconstitutional element and to restore § 227(b)(1)(A)(iii) to its pre-severance existence as a valid, content-neutral regulation of speech. *Id.* at 2355; *see* Note, *The Effect of an Unconstitutional Exception Clause Upon the Remainder of a Statute*, 55 HARV. L. REV. 1030, 1033 (1942) ("When an exception is an amendment to the original statute it will almost always be excised, on the theory that such an amendment was void *ab initio* and can neither build up nor tear down the original statute."). In short, the *AAPC* Court's answer to this question permits prospective litigants to bring lawsuits against alleged violators of § 227(b)(1)(A)(iii). *AAPC*, 140 S. Ct. at 2355.

**\*4** Additionally, given the instant dispute, it is just as important to make clear what the *AAPC* decision did *not* address. Despite Cunningham's repeated overtures to *AAPC*'s purported retroactive effect (*see* Dkt. #137 at pp. 4, 7–13, 15–20), the Supreme Court was not presented with a question regarding the retroactive effect of statutory severance and took up no such issue. *See* Petition for Writ of Certiorari at *I, *AAPC*, 140 S. Ct. 2335 (No. 19-631). As the decision's language evidences, the *AAPC* Court only considered how § 227(b)(1)(A)(iii) would operate *prospectively*.[3] *See, e.g.*, *AAPC*, 140 S. Ct. at 2344 ("As a result, plaintiffs still may not make political robocalls to cell phones, but their speech is now treated equally with debt-collection speech."); *id.* at 2354 ("When the constitutional violation is unequal treatment, as it is here, a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all."); *id.* at 2355 ("[T]he correct result in this case is to sever the 2015 government-debt exception and leave in place the longstanding robocall restriction.").

## II. Applying *AAPC*

The arguments Cunningham and Defendants present are voluminous and somewhat scattered, but the Court sees a pair of disputed positions that predominate. First, Cunningham and Defendants do not agree on the temporal effect the severability decision in *AAPC* has on the instant litigation. *Compare* (Dkt. #131 at pp. 5, 8–9; Dkt. #133 at pp. 6, 8, 12), *with* (Dkt. #137 at pp. 6– 10). Second, the litigants do not see eye to eye as to § 227(b)(1)(A)(iii)'s availability during the existence of the government-debt exception involving alleged violations unrelated to the collection of government debt. *Compare* (Dkt. #131 at pp. 4, 9–10; Dkt. #133 at pp. 5–6, 14), *with* (Dkt. #137 at pp. 8–10). The Court examines each dispute in turn.

### a. Retroactivity and Severability

### i. Analysis

In its decision, the *AAPC* Court found the government-debt exception severable from the pre-2015 version of § 227(b)(1)(A)(iii). *Id.* at 2343. The parties before the Court dispute how this statutory severance impacts the immediate

litigation. Defendants argue that the *AAPC* Court's severance applies only prospectively, meaning that the calls upon which Cunningham's alleged § 227(b)(1)(A)(iii) violations rest are nonjusticiable (Dkt. #131 at p. 8; Dkt. #133 at p. 6). Cunningham disagrees, arguing that because "the legal effect of severing the government-debt exception is retroactive," the Court retains subject matter jurisdiction over his claims (Dkt. #137 at pp. 7, 10, 12–13). The position Defendants advance proves more legally sound.

A bit of background helps contextualize the severability conversation. Severability refers to the notion that courts may remove unconstitutional language from a statutory provision and leave the remainder of the statute in force so long as the result is consistent with the intent of the legislature. [4] *Dorchy v. Kansas*, 264 U.S. 286, 289–290 (1924). "[W]hen a portion of a statute is unconstitutional, 'the traditional rule is that the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.' " *United States v. Bonilla-Romero*, 984 F.3d 414, 418 (5th Cir. 2020) (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020)); *see Texas v. United States*, 945 F.3d 355, 394 (5th Cir. 2019) (describing the two-step severability analysis), *cert. granted sub nom. California v. Texas*, 140 S. Ct. 1262 (2020) (mem.). Courts do so to "limit the solution to the problem," and, as such, sever "any 'problematic portions while leaving the remainder intact.' " *Free Enter. Fund*, 561 U.S. at 508 (internal quotation marks omitted in first quotation) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)). Importantly, severance only occurs *after* a court identifies a constitutional defect within the statute. [5] *Seila Law*, 140 S. Ct. at 2209.

*5 Cunningham argues that when the *AAPC* Court severed the government-debt exception from § 227(b)(1)(A)(iii), the statutory provision left standing remained enforceable (1) in its entirety moving forward, and (2) as to violations unrelated to government-debt collection that allegedly occurred between the time Congress enacted the government-debt exception and the Supreme Court handed down *AAPC* (Dkt. #137 at pp. 6–10). The second part of this line of reasoning is incorrect.

Starting with first principles, Congress makes law by enacting statutes. *See Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019). And, as the Supreme Court has established, statutes are inherently prospective creatures, *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982), that do not operate retroactively "unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature,' " *Union Pac. R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913) (quoting *United States v. Heth*, 7 U.S. (3 Cranch) 399, 413 (1806) (opinion of Paterson, J.)). By contrast, judicial decisions apply retroactively as "to avoid the injustice caused by the earlier application of 'incorrect' law." [6] *Wilkerson v. Whitley*, 28 F.3d 498, 505 (5th Cir. 1994); *see Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372 (1910) (Holmes, J., dissenting) ("Judicial decisions have had retrospective operation for near a thousand years.").

In *AAPC*, the Supreme Court drew two conclusions: (1) the government-debt exception was unconstitutional under the First Amendment, and (2) the proper course of action to fix this issue was to sever the government-debt exception from the rest of the statute. 140 S. Ct. at 2343–44. The first decision was quintessentially judicial in nature. *See Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 107–09 (1993) (Scalia, J., concurring). The Supreme Court examined the statutory provision, compared it to the strictures of the First Amendment, and determined that the statute conflicted with the Constitution. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803) ("If...the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."); *see also Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312–13 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.").

The *AAPC* Court's severability decision, however, was less characteristically judicial—as is the case whenever a federal court severs statutory language. Unable to allow an unconstitutional law to remain as such, the Supreme Court had to decide "whether (i) to invalidate the entire 1991 robocall restriction..., or (ii) to invalidate just the 2015 government-debt exception and sever it from the remainder of the statute." [7] *AAPC*, 140 S. Ct. at 2349. The judicial inquiry into the propriety of severance is "essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). And "[u]nless it is evident that the Legislature would not have enacted [the statutory provision at issue], independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Ref. Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932). Given the deliberate focus courts direct toward legislative intent in this area, adjudicating severability is a judicial act that is, at least somewhat, legislative. *See*

*AAPC*, 140 S. Ct. at 2365 (Gorsuch, J., concurring in the judgment in part and dissenting in part) (disagreeing with the plurality opinion's severance solution because of doubt as to the judicial authority "to rewrite the law in this way"); *see also, e.g.*, Harrison, *supra*, at 87–88 ("If the United States Court of Appeals for the First Circuit rests a judgment on the conclusion that a provision of a federal statute is void because it is inconsistent with the Constitution, that decision will bind district courts in the First Circuit, and panels of that court, in subsequent cases. That precedent will resemble a legislative act eliminating the provision for the purposes of those who expect to litigate subject to First Circuit precedent in the future.").

**\*6** Grafting the aforementioned principles onto *AAPC*, a court's decision to sever an aspect of a statutory provision appears more similar to a traditional legislative function than an adjudicatory one, which gives severance its prospective character. This conclusion makes good sense. [8] To reach the point at which severability must be considered, a court must have already exercised its judicial power and identified a constitutional issue within the statutory provision at issue. *See Marbury*, 5 U.S. at 178. At this juncture, an Article III tribunal has two choices: excise the constitutionally offensive aspect of the law or invalidate the statute *in toto*. Either way, this decision affects the applicability of a legal rule *moving forward*—those subject to the law will either (a) now be subject to the same law minus the unconstitutional facet, or (b) will no longer be subject to the same law at all. Even though federal courts act only to say what the law is, a severability decision is quasi-legislative, and thereby prospective. [9]

While federal courts shoulder the responsibility "to enforce the [constitutional] limits on federal power by striking down acts of Congress that transgress those limits," they only possess "the authority to interpret the law"—not "the expertise [or] the prerogative to make policy judgments." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). Policy decisions "are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them." *Id.* At base, the Constitution neither vests nor equips Article III tribunals with the authority or tools to alter a statute and then give it retroactive effect. *See Levin v. Com. Energy, Inc.*, 560 U.S. 413, 427, (2010) ("[C]ourts may attempt, *within the bounds of their institutional competence*, to implement what the legislature would have willed had it been apprised of the constitutional infirmity." (emphasis added)). Contrary to Cunningham's position, in situations like the one currently before the Court, the American constitutional order precludes federal courts from adjudicating severability matters with retrospective effect. *See Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 102 (1911) (Harlan, J., concurring in part and dissenting in part) ("[Courts] will not judicially legislate, since [their] function is to declare the law, while it belongs to the legislative department to make the law.").

### ii. Cunningham's Arguments

**\*7** As to the issue of retroactivity, the Court perceives Cunningham to defend his stance in three ways. The Court looks to each in turn.

First, Cunningham offers footnote twelve of the *AAPC* plurality opinion to mean that the now-severed statute applies retroactively. Footnote twelve reads, in relevant part:

> [A]lthough our decision means the end of the government-debt exception, no one should be penalized or held liable for making robocalls to collect government debt after the effective date of the 2015 government-debt exception and before the entry of final judgment by the District Court on remand in this case, or such date that the lower courts determine is appropriate. On the other side of the ledger, our decision today does not negate the liability of parties who made robocalls covered by the robocall restriction.

*AAPC*, 140 S. Ct. at 2355 n.12 (plurality opinion) (citation omitted). Cunningham specifically contends this statement indicates that *AAPC* "impacted only robocalls that were made to collect government debt after the exception was added in 2015 and that parties remained liable for robocalls made for other purposes" (Dkt. #137 at p. 8). The Court finds this argument problematic for two key reasons. First and foremost, this footnote contradicts the judgment of the Supreme Court in *AAPC*. According to Cunningham, after severing the government-debt exception, the determination as to which speakers are liable under § 227(b)(1)(A)(iii) during the exception's existence should turn on the message conveyed—*i.e.*, the speech's *content* (*see* Dkt. #137 at p.

8). Accepting this argument would produce a result entirely predicated on whether a TCPA defendant called an individual to collect government debt, which would eviscerate the six-Justice holding that Congress "impermissibly favored debt-collection speech over political and other speech[ ] in violation of the First Amendment." [10] *Id.* at 2343; *see id.* at 2366 (Gorsuch, J., concurring in the judgment in part and dissenting in part) ("[A] holding that shields *only* government-debt collection callers from past liability under an admittedly unconstitutional law would wind up endorsing the very same kind of content discrimination we say we are seeking to eliminate.").

As well, Cunningham maintains that footnote twelve is not dictum, but even if it is, the footnote is "extremely persuasive" (Dkt. #137 at pp. 17–18). For starters, footnote twelve is, by definition, dictum. *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("A statement is dictum if it 'could have been deleted without seriously impairing the analytical foundations of the holding'...." (quoting *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000))). Despite his characterization in response, Cunningham is incorrect in stating that "seven Justices joined in [footnote twelve's] holding" (Dkt. #137 at p. 17). Only Chief Justice Roberts, Justice Alito, and Justice Kavanaugh endorsed the footnote. *Id.* at 2355 n.12 (plurality opinion). Justices Breyer, Ginsburg, Sotomayor, and Kagan merely concurred in the judgment on the severability issue, meaning they agreed with the result as to severability but did not join the plurality opinion's rationale (which includes footnote twelve). *See AAPC*, 140 S. Ct. at 2357 (Sotomayor, J., concurring in the judgment); *id.* at 2363 (Breyer, J., concurring in the judgment in part and dissenting in part). Moreover, the Court simply cannot oblige Cunningham's request for the Court to give effect to footnote twelve without contravening *AAPC*'s holding. To be sure, the Court acknowledges it is "generally bound by Supreme Court dicta, especially when [such dictum] is 'recent and detailed.' " *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (quoting *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013)); s*ee United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) ("Dicta of the Supreme Court are, of course, another matter."). Nevertheless, given the *AAPC* Court's holding, 140 S. Ct. at 2356 (plurality opinion), established principles of severability, *supra* at pp. 8–11, and the discriminatory outcome that would result from Cunningham's position, *supra* at pp. 13–14 & 14 n.10, the Court concludes that footnote twelve is unpersuasive. [11]

**\*8** Second, Cunningham argues that three Supreme Court cases confirm the accuracy of his position: *Harper v. Virginia Department of Taxation*, 509 U.S. 86 (1993); *Eberle v. Michigan*, 232 U.S. 700 (1914); and *Frost v. Corporation Commission of Oklahoma*, 278 U.S. 515 (1929) (*see* Dkt. #137 at pp. 8–10). Cunningham invokes this trio of cases to argue that the *AAPC* Court's severability determination applies retroactively to all pending cases. This argument is mistaken for two main reasons. For one thing, none of these cases stand for Cunningham's proposition—in fact, *Harper*, *Eberle*, and *Frost* cut against his argument. *Harper* holds that when the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events," irrespective of whether those events "predate or postdate [the] announcement of the rule." 509 U.S. at 97. Were the Court to accept Cunningham's position as to the retroactive effect of *AAPC*'s severability decision, the Court would actually violate *Harper*'s retroactivity rule because certain TCPA speakers would be held liable under a statutory provision the Supreme Court deemed unconstitutional. *See AAPC*, 140 S. Ct. at 2366 (Gorsuch, J., concurring in the judgment in part and dissenting in part). As well, neither in *Eberle* nor *Frost*did the Supreme Court impose retroactive liability for conduct expressly authorized by Congress that was later deemed unconstitutional and severed.

Third, Cunningham presents broad assertions regarding his position on retroactivity, yet what he offers is without support. For instance, he argues that "[t]he seven-Justice majority held that the legal effect of severing the government-debt exception is retroactive" (Dkt. #137 at p. 7). As the Court already discussed, *supra* p. 7, this statement is an incorrect characterization of *AAPC*'s holding. Along the same lines, Cunningham takes bold legal stances to support his position, such as: "The Supreme Court's explanation of the consequences of its severance of the government-debt exception is in line with the well-established principle that severability determinations are interpretations of federal law that must apply retroactively to all pending cases" (Dkt. #137 at p. 8); and "The weight of authority strongly supports the retroactive application of the Supreme Court's severability holding, ensuring that parties may still be held liable for robocall violations made in the past five years" (Dkt. #137 at pp. 10–11). Because Cunningham provides no caselaw for these sweeping propositions, and the Court cannot locate precedent to such effect, these statements do not strengthen the position Cunningham takes. *See, e.g.*, *United States*

*v. Brown*, 597 F. App'x 269, 270 (5th Cir. 2015) (per curiam) (indicating an argument's futility absent supporting precedent).

### b. Section 227(b)(1)(A)(iii) Violations Outside the Government-Debt Exception

#### i. Analysis

Prior to its severance decision, the *AAPC* Court analyzed the government-debt exception and determined that it violated the First Amendment. 140 S. Ct. at 2346–47 (plurality opinion). The parties here disagree what this holding means for those § 227(b)(1)(A)(iii) violations unrelated to the government-debt exception that allegedly occurred during the exception's existence. Defendants argue that from the time of the exception's enactment until the Supreme Court's decision in *AAPC*, § 227(b)(1)(A)(iii) was constitutionally deficient and therefore unenforceable (Dkt. #131 at pp. 8–10; Dkt. #133 at pp. 6–8). Cunningham disagrees, maintaining that because the *AAPC* Court determined the government-debt exception to be unconstitutional—and thereby null and void when enacted—the exception did not affect § 227(b)(1)(A)(iii) violations outside of the exception's scope that allegedly occurred during the exception's existence (Dkt. #137 at p. 10). The position Defendants offer is more legally sound.

The First Amendment proscribes Congress from enacting any law "abridging the freedom of speech." U.S. CONST. amend. I. "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). In protecting the individual right "to speak freely," the First Amendment demonstrates its value by "defend[ing] equally all viewpoints." *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011) (en banc) (Elrod, J., writing for the majority in part). As such, if nothing else, the free-speech guarantee signifies the government's powerlessness "to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

**\*9** Content-based laws are "those that target speech based on its communicative content...and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). By contrast, content-neutral laws are "those that 'are justified without reference to the content of the regulated speech.' " *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (emphasis omitted) (quoting *Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)). This distinction is "the keystone of First Amendment law." Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L. REV. 413, 443 (1996); *see* Daryl J. Levinson, *Rights Essentialism and Remedial Equilibration*, 99 COLUM. L. REV. 857, 902 (1999) ("The single most important feature of free speech doctrine is its different treatment of content-based laws...and content-neutral laws....").

The general prohibition against content-based speech regulations is ever present, but particularly so where "speech is unpopular[—even] though such protection may be both more distasteful and more difficult." *United States v. Micheletti*, 13 F.3d 838, 849 (5th Cir. 1994) (en banc) (Smith, J., dissenting); *see Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). Determining whether government regulation concerns the content of speech can be determined on the face of the regulation, and if the regulation "describes speech by content[,] then it is content-based." *Jornaleros de Las Palmas v. City of League City*, 945 F. Supp. 2d 779, 796 (S.D. Tex. 2013).

The *AAPC* Court did just that, finding that Congress "impermissibly favored debt-collection speech over political and other speech, in violation of the First Amendment." 140 S. Ct. at 2343. The parties' dispute, however, does not concern *AAPC*'s conclusion regarding constitutionality—instead, they disagree as to the impact this holding has on § 227(b)(1)(A)(iii) violations unrelated to the government-debt exception that allegedly occurred during the exception's existence. But as the Court discussed above, *supra* p. 6, the root of § 227(b)(1)(A)(iii)'s constitutional infirmity stems from the government-debt exception's commingling with the pre-2015 version of § 227(b)(1)(A)(iii). Therefore, fundamental legal logic dictates that whenever the government-debt exception actually interacted with the pre-2015 version of § 227(b)(1)(A)(iii), all violations of § 227(b)(1)(A)(iii) were legally flawed, as they are unable to withstand constitutional scrutiny.

This result is sensible. During the time the government-debt exception was in effect, § 227(b)(1)(A)(iii) favored the content of some speech—that which concerned the collection of government debt—while all speech unrelated to government debt collection was disfavored. As *AAPC* characterized it, "A robocall that says, 'Please pay your government debt' is legal. A robocall that says, 'Please donate to our political campaign' is illegal. That is about as content-based as it gets." *Id.* at 2346. Accordingly, any instance in which this content-based speech restriction exposed some speakers to liability while shielding others altogether violated the Constitution. As a result, holding TCPA defendants liable for § 227(b)(1)(A)(iii) violations during the government-debt exception's existence would contravene the First Amendment as outlined by the Supreme Court in *AAPC*—no matter the content of the speech. [12]

**\*10** Without a doubt, Cunningham's argument carries intuitive appeal. It is certainly true that "Congress's act of amendment gains lawful expression only through enactment of a valid statute"—if a statutory amendment is invalid, "the act is *void ab initio*, and it is as though Congress had not acted at all." *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 401 (5th Cir. 2008); *Ex parte Siebold*, 100 U.S. (10 Otto) 371, 376 (1879) ("An unconstitutional law is void, and is as no law."). So if the government-debt exception was never technically law, what is the problem with enforcing the pre-2015 version of § 227(b)(1)(A)(iii) during the exception's existence?

This point notwithstanding, the reality is that the severed statutory language *did in fact exist at one point* and was presumed constitutional. *See Boumediene v. Bush*, 553 U.S. 723, 738 (2008) ("The usual presumption is that Members of Congress, in accord with their oath of office, considered the constitutional issue and determined the amended statute to be a lawful one...."). The Supreme Court has held that "[e]ven where a statute is unconstitutional and hence declared void as of the beginning,...its existence before it has been so declared is not to be ignored." *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 77 (1953). Even though unenforceable on paper from its inception, the government-debt exception nevertheless resides in the United States Code, and, prior to *AAPC*, individuals conformed their conduct in accordance with the presumptively constitutional government-debt exception. *See, e.g.*, *Lee v. Macon Cnty. Bd. of Ed.*, 453 F.2d 1104, 1112–13 (5th Cir. 1971); *see also* Ruth Bader Ginsburg, Address, *Some Thoughts on Judicial Authority to Repair Unconstitutional Legislation*, 28 CLEV. ST. L. REV. 301, 308 (1979). Giving credence to Cunningham's argument here would neglect the "operative fact" that the government-debt exception actually existed prior to "a determination of unconstitutionality"— a reality that has "consequences which cannot justly be ignored." *Chicot Cnty. Drainage Dist. v. Baxter St. Bank*, 308 U.S. 371, 374 (1940); *see, e.g.*, *United States v. Donnelly's Est.*, 397 U.S. 286, 291–95 (1970).

### ii. Cunningham's Arguments

Regarding alleged § 227(b)(1)(A)(iii) violations unrelated to the government-debt exception that occurred during the exception's existence, Cunningham cites two sets of caselaw in support of his position. The Court looks at each in turn.

First, Cunningham cites to a bevy of district-court cases for the proposition that federal courts nevertheless retain subject matter jurisdiction over claims for TCPA violations unrelated to the government-debt exception during the exception's existence (Dkt. #137 at p. 12). This caselaw is unavailing for two reasons. For one thing, not a single case Cunningham cites is binding on the Court, let alone originating from within the Fifth Circuit. [13] *See Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 300 n.1 (5th Cir. 2019) (Haynes, J., dissenting) ("[Courts] are not bound to follow out-of-circuit decisions."). Additionally, the Court finds these cases unpersuasive because they offer little to no explanation as to why or how they concluded that *AAPC*'s severability holding applies retroactively. *See, e.g.*, *Burton v. Fundmerica, Inc.*, No. 8:19-CV-119, 2020 WL 4504303, at \*1 n.2 (D. Neb. Aug. 5, 2020).

**\*11** Second, Cunningham cites two other cases, *United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020), and *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), for the notion that an individual still faces liability when their conduct falls within the ambit of statutory language that is constitutional, even when a different part of the language is unconstitutional (*see* Dkt. #137 at pp. 15–16). But Cunningham misunderstands what these cases stand for. Unlike the matter currently before the Court, the cases Cunningham offer do not concern equal treatment. *See AAPC*, 140 S. Ct. at 2354 ("The 'First Amendment is a kind of Equal Protection Clause for ideas.' And Congress violated that First Amendment equal-treatment principle in this case by favoring debt-collection robocalls and discriminating against political and other robocalls." (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting))). In *Miselis*,

there was no issue in upholding defendants' convictions under "the Anti-Riot Act's surviving applications" because the provisions the Fourth Circuit deemed unconstitutional and severed did not impact defendants' proceedings. *See* 972 F.3d at 526, 546–48. As well, *National Federation of Independent Business* does not conflict with the Court's holding because the statutory provision severed by the Supreme Court in that case involved the anticommandeering principle and other considerations of federalism, which bear little in common to the concerns involved in equal-treatment cases like *AAPC*. *See* 567 U.S. at 575–88. As such, these cases Cunningham advances are inapposite.

\*\*\*

In light of the foregoing analysis, the necessary conclusion is that § 227(b)(1)(A)(iii) was unconstitutional from the moment Congress enacted the government-debt exception until the Supreme Court handed down its decision in *AAPC*. In other words, during that stretch of time, § 227(b)(1)(A)(iii) had no legal effect. *See Ex parte Royall*, 117 U.S. 241, 248 (1886). Seeing as the § 227(b)(1)(A)(iii) violations Cunningham alleges occurred during this time period, these statutory offenses are not constitutionally sound—and are therefore inoperative. Considering that the federal question forming the basis of the Court's subject matter jurisdiction is no longer present (Dkt. #50 at p. 2), the Court must dismiss this case for lack of subject matter jurisdiction.

**CONCLUSION**

The Court understands the effect of its decision, particularly that Cunningham (and others similarly situated) are no longer able to seek relief from the Court for this specific subset of TCPA violations. Nevertheless, the Court cannot "formulate new law or pass judgment upon what the law should be, for 'judicial power is never exercised for the purpose of giving effect to the will of the Judge' but instead is exercised only to give effect 'to the will of the law.' " *Tex. Voters All. v. Dall. Cnty.*, No. 4:20-CV-00775, 2020 WL 6146248, at \*1 (E.D. Tex. Oct. 20, 2020) (quoting *Osborn*, 22 U.S. at 866). The Court has done nothing more here than say what the law is.

\*12 Having conducted a de novo review, the Court rejects the Magistrate Judge's report (Dkt. #142) as the findings and conclusions of the Court. It is **ORDERED** Plaintiff's claims against Defendants are hereby **DISMISSED WITHOUT PREJUDICE**. All relief not previously granted is **DENIED**. The Clerk is directed to **CLOSE** this action.

**All Citations**

Slip Copy, 2021 WL 1226618

**Footnotes**

1. Neither side disputes the Court's subject matter jurisdiction under Article III. The Court therefore does not address the issue. *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807 (1986) (explaining that "all cases in which a federal question is 'an ingredient' of the action" fall within the Constitution's bounds of subject matter jurisdiction (quoting *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823 (1824))).
2. The term "remedy" is regularly used in this context to describe the effect severance has on a statute. *E.g.*, *AAPC*, 140 S. Ct. at 2350, 2355–56 (plurality opinion). Justice Gorsuch took issue with the plurality opinion's invocation of the term in *AAPC*, finding it "hard to see how today's use of severability doctrine qualifies as a remedy at all." *Id.* at 2365 (Gorsuch, J., concurring in the judgment in part and dissenting in part); *see Murphy v. NCAA*, 138 S. Ct. 1461, 1485–87 (2018) (Thomas, J., concurring); John Harrison, *Severability, Remedies, and Constitutional Adjudication*, 83 GEO. WASH. L. REV. 56, 82–83 (2008).
3. The Court addresses Cunningham's argument regarding footnote twelve in the *AAPC* plurality opinion below, *infra* at pp. 13–15.
4. The doctrine of severability has existed "since the beginnings of judicial review, yet it remains shrouded in mystery." David H. Gans, *Severability as Judicial Lawmaking*, 76 GEO. WASH. L. REV. 639, 639 (2008) (footnote omitted); *see* John Copeland Nagle, *Severability*, 72 N.C. L. REV. 203, 210–15 (1993) (detailing the severability doctrine's historical development). Severability's conceptual intricacies continue to generate

significant debate. *Compare Collins v. Mnuchin*, 938 F.3d 553, 591–95 (5th Cir. 2019) (en banc) (Haynes, J., writing for the majority), *with id.* at 608–11 (Oldham & Ho, JJ., concurring in part and dissenting in part).

5   At all times, legislative intent controls severability analysis. *See Murphy*, 138 S. Ct. at 1482 (majority opinion); *see also Texas*, 945 F.3d at 394–95 (discussing the difficulties inherent to this aspect of the severability doctrine). *See generally* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 172–74 (7th ed. 2015).

6   This manner of speaking may sometimes cause the fundamental distinction between "a change in judicial doctrine and a change in law" to be misconceived. *See Lester v. United States*, 921 F.3d 1306, 1312 (11th Cir. 2019) (W. Pryor, J., respecting the denial of rehearing en banc). Sufficient for the Court's immediate purposes, when courts are faced with an unconstitutional statute, they cannot "give a 'remedy'...since an unconstitutional statute is not itself a cognizable 'wrong' "—courts are "simply to *ignore*" an unconstitutional statute. *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995) (Scalia, J., concurring). *See generally* Stephen E. Sachs, *Finding Law*, 107 CALIF. L. REV. 527 (2019).

7   While severability shorthand typically speaks in terms of "striking down" or "invalidating" acts of Congress, this characterization is inexact. *AAPC*, 140 S. Ct. at 2351 n.8. In reality, "[c]ourts hold laws unenforceable; they do not erase them." *Pool v. City of Houston*, 978 F.3d 307, 309 (5th Cir. 2020). *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933 (2018).

8   Under current precedent, that is. Several judges and scholars have expressed unease regarding the Supreme Court's modern severability jurisprudence. *See, e.g.*, *AAPC*, 140 S. Ct. at 2365–67 (Gorsuch, J., concurring in the judgment in part and dissenting in part); *Murphy*, 138 S. Ct. at 1485–87 (Thomas, J., concurring); Kevin C. Walsh, *Partial Unconstitutionality*, 85 N.Y.U. L. REV. 738, 749–55 (2010).

9   Separation-of-powers considerations confirm this conclusion. The presumption favoring severability "reflects the confined role of the Judiciary in our system of separated powers" and "manifests the Judiciary's respect for Congress's legislative role by keeping courts from unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional." *AAPC*, 140 S. Ct. at 2351 (plurality opinion); *see R.R. Ret. Bd. v. Alton R. Co.*, 295 U.S. 330, 362 (1935) ("[N]otwithstanding the presumption in favor of [severability]..., [courts] cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole."). As such, courts must tread carefully by necessity when conducting a severability analysis, for "amendment may not be substituted for construction" and "a court may not exercise legislative functions to save [a] law from conflict with constitutional limitation." *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518 (1926). As the Court recounted above, "judicial *construction* of a statute ordinarily applies retroactively." *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 56 (2015) (emphasis added). If the effects of judicial severability were to apply retroactively, the constitutional order would be in complete disarray. Congress—the creator of law—would face the steep presumption against retroactivity that requires Congress to state in " 'clear, strong, and imperative' language" that an enactment has retroactive effect, while Article III tribunals—the interpreters of law—would face no such obstacle in rendering statutory language (which they did not create) unenforceable. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) (quoting *Heth*, 7 U.S. at 413); *see* JOHN F. MANNING & MATTHEW C. STEPHENSON, LEGISLATION AND REGULATION 312–13 (2d ed. 2013) (discussing the presumption against retroactivity).

10  The following hypothetical aptly demonstrates the problem with the argument Cunningham advances here:
    [I]magine that in 2015 Congress instead created a content-based exception for ATDS calls soliciting campaign donations for, say, Republicans, while leaving the ATDS restriction for calls soliciting donations for Democrats. If both Republican and Democratic campaigns made ATDS calls under that regime—before the exception was challenged—surely no court would (1) invalidate the exception for Republican calls going forward, yet nonetheless (2) impose liability *only* for Democratic calls that had already been made. Yet footnote 12 would require [a] blatantly discriminatory remedy.
    Brief of Amicus Curiae Facebook, Inc. in Support of Appellees at 28–29, *Lindenbaum v. Realgy LLC*, No. 20-4252 (6th Cir. Mar. 24, 2021).

11     Moreover, the only forms of relief the *AAPC* plaintiffs actually requested for their alleged violations of § 227(b)(1)(A)(iii) were prospective. *See* First Am. Compl. 15, *Am. Assoc. of Pol. Consultants, Inc. v. Lynch*, No. 5:16-cv-00252-D (E.D.N.C. Aug. 5, 2016), ECF No. 18.

12     The Court's conclusion also comports with binding precedent that requires "the legal effect of conduct [to] be assessed under the law that existed when the conduct took place." *Landgraf*, 511 U.S. at 265; *see, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 107 & n.2 (1972) (assessing the constitutionality of a speech restriction as it existed when the violative conduct allegedly occurred).

13     The only other on-point case within the Fifth Circuit is *Creasy v. Charter Communications, Inc.*, No. CV 20-1199, 2020 WL 5761117 (E.D. La. Sept. 28, 2020), which produced the same result the Court does here.

**End of Document**     © 2021 Thomson Reuters. No claim to original U.S. Government Works.