# Exhibit A

No. 21-____

IN THE

# Supreme Court of the United States

————

REALGY, LLC,
                              *Petitioner,*

v.

ROBERTA LINDENBAUM, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,
                              *Respondent,*

and

UNITED STATES OF AMERICA,
                              *Respondent-Intervenor.*

————

**On Petition for Writ of Certiorari to the
United States Supreme Court**

————

**PETITION FOR WRIT OF CERTIORARI**

————

RYAN D. WATSTEIN
    *Counsel of Record*
MATTHEW A. KEILSON
KABAT CHAPMAN & OZMER LLP
171 17th St. NW, Suite 1550
Atlanta, Georgia 30363
(404) 400-7307
rwatstein@kcozaw.com
mkeilson@kcozlaw.com

*Counsel for Petitioner*

December 8, 2021

WILSON-EPES PRINTING CO., INC.  –  (202) 789-0096  –  WASHINGTON, D.C. 20002

## QUESTIONS PRESENTED

Last year, this Court held that the TCPA's robocall restriction violated the First Amendment by excepting certain government speech. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) (*AAPC*). The Court severed the exception—but did not directly address the impact severance has on lawsuits like this one, which seeks to impose liability for pre-severance speech, when the restriction was content-based.

The Sixth Circuit addressed that issue, becoming the first circuit to hold that speech could be penalized in an unconstitutionally discriminatory way. It stated that, because severance is always retroactive, the exception never existed and the restriction never perpetuated unequal treatment. This interpretation of severance creates *ex post facto* liability for favored speakers, a result Congress could not accomplish via severability clause. The Sixth Circuit surmised that favored speakers could not be sued for pre-severance speech because they lacked fair notice their speech was prohibited. Government speakers are thus shielded from past liability while other speakers are subject to punishment for past "political and other speech," re-creating the exact unequal treatment *AAPC* deemed unconstitutional and creating a circuit split on how severance operates. *AAPC*, 140 S. Ct. at 2341.

And the panel ruled after denying Petitioner's recusal motion, creating another circuit split.

The questions presented are:

1. Did this Court sever the government exception retroactively, and if so, is it permissible to reimpose the unequal treatment that this Court held "violates the First Amendment" via the fair notice doctrine?

(i)

ii

2. Does 28 U.S.C. § 455 require recusal where a judge's ruling would directly benefit her in contingency fee litigation being prosecuted by a firm that bears the judge's name and which her spouse and son own, in the judge's own circuit?

iii
## PARTIES TO THE PROCEEDINGS

Realgy, LLC is the Petitioner here and was the Defendant-Appellee below.

Roberta Lindenbaum, individually and on behalf of all others similarly situated, is the Respondent here and was the Plaintiff-Appellant below.

The United States of America is the Respondent-Intervenor here and was the Intervenor-Appellant below.

iv

## CORPORATE DISCLOSURE STATEMENT

Realgy, LLC is a privately held company. No publicly held company owns 10% or more of its stock.

v

## STATEMENT OF RELATED PROCEEDINGS

*Lindenbaum v. Realgy, LLC*, *et al.*, No. 20-4252 (6th Cir.) (opinion issued and judgment entered on Sept. 9, 2021; mandate issued Oct. 4, 2021).

There are no additional proceedings in any court that are directly related to this case, although there are hundreds (if not thousands) of pending and future proceedings that will be impacted by the questions presented here.

TABLE OF CONTENTS

Page

QUESTIONS PRESENTED .............................. i

PARTIES TO THE PROCEEDINGS.................. iv

CORPORATE DISCLOSURE STATEMENT..... v

STATEMENT OF RELATED PROCEEDINGS. vi

TABLE OF AUTHORITIES................................ ix

OPINIONS BELOW ........................................... 6

JURISDICTION .................................................. 7

CONSTITUTIONAL AND STATUTORY
PROVISIONS INVOLVED ................................. 7

STATEMENT OF THE CASE ........................... 7

REASONS FOR GRANTING THE PETITION.. 14

  I.  The Court Should Grant Certiorari to
     Ensure Compliance with this Court's
     First Amendment and Severance
     Jurisprudence ........................................... 16

     A. The Sixth Circuit's Holding that
        Severance Is Always Retroactive
        Conflicts with Supreme Court
        Precedent ............................................. 18

     B. Precedent from the Supreme Court
        and Other Circuits Confirms that
        Even Retroactive Severance Cannot
        Erase the Constitutional Harm
        Inflicted by an Unconstitutional
        Provision ............................................. 21

(vii)

viii

TABLE OF CONTENTS—Continued

Page

C. Applying "Fair Notice" to Spare Government Debt Collectors from Retroactive Liability Re-Creates the First Amendment Violation ......................... 23

D. The Sixth Circuit's Decision to Enforce a Content-Discriminatory Statute Conflicts with Supreme Court Precedent.... 24

II. The Court Should Grant Certiorari to Resolve a Circuit Split on When Federal Judges are Required to Recuse Where They Stand to Benefit Personally ............ 26

III. The Questions Presented Are Exceptionally Important ........................................... 28

CONCLUSION .................................................. 31

APPENDIX

APPENDIX A: MEMORANDUM OF OPINION AND ORDER, District Court for the Northern District of Ohio (October 29, 2020) ................................................................ 1a

APPENDIX B: MOTION, Court of Appeals for the Sixth Circuit (August 17, 2021)......... 18a

APPENDIX C: ORDER, Court of Appeals for the Sixth Circuit (September 9, 2021)..... 108a

APPENDIX D: OPINION, Court of Appeals for the Sixth Circuit (September 9, 2021)..... 114a

APPENDIX E: 47 U.S.C.A. § 227 ................. 128a

APPENDIX F: 28 U.S.C.A. § 455.................. 138a

ix

## TABLE OF AUTHORITIES

CASES                                                    Page(s)

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
   953 F.3d 760 (Fed. Cir. 2020) ................... 22

*Ayotte v. Planned Parenthood of*
   *Northern New England*,
   546 U.S. 320 (2006) .................................. 19-20

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   140 S. Ct. 2335 (2020) .............................*passim*

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) ................................ 21, 23

*Cunningham v. Matrix Fin. Svcs.*,
   531 F. Supp. 3d 1164 (E.D. Tex. 2021) ..... 20

*Fletcher v. Conoco Pipe Line Co.*,
   323 F.3d 661 (8th Cir. 2003) .................... 27

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ........................ 4, 11, 24, 25

*In re BellSouth Corp.*,
   334 F. 3d 941 (11th Cir. 2003) ................. 28

*In re Murchison*,
   349 U.S. 133 (1955) .................................. 27

*Intercollegiate Broad. Sys. v.*
   *Copyright Royalty Board*,
   684 F.3d 1332 (D.C. Cir. 2012) ................ 22

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994) ............................ 18, 19, 20

*Lindenbaum v. Realgy, LLC, et al.*,
   13 F. 4th 524 (6th Cir. 2021) ..................*passim*

*Marks v. United States*,
   430 U.S. 188 (1977) .................................. 20

x

TABLE OF AUTHORITIES—Continued

Page(s)

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)................................... 25

*Potashnick v. Port City Const. Co.*,
  609 F. 2d 1101 (5th Cir. 1980)................. 16, 28

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992)................................... 4, 25

*Rivers v. Roadway Exp., Inc.*,
  511 U.S. 298 (1994)................................... 18, 20

*Schacht v. United States*,
  398 U.S. 58 (1970).................................... 24

*Seila Law LLC v. Consumer Fin. Prot.
  Bureau*, 140 S. Ct. 2183 (2020)................. 5, 22

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017).............................*passim*

*Tumey v. Ohio*,
  273 U.S. 510 (1927)................................... 27

*United States v. Arthrex, Inc.*,
  141 S. Ct. 1970 (2021)............................ 5, 22, 29

CONSTITUTION

U.S. Const. art. I, § 9, cl. 3 ........................... 7, 19

U.S. Const. art. II, § 9 ................................. 22

U.S. Const. art. III...................................... 20

U.S. Const. amend. I ..................................*passim*

U.S. Const. amend. V .......................... 3, 7, 19, 20

xi

TABLE OF AUTHORITIES—Continued

STATUTES                                    Page(s)

28 U.S.C. § 455 ...................................... 5, 6, 7, 16

28 U.S.C. § 455(a) .................................... 6, 16, 26

28 U.S.C. § 1254(l)..................................... 7

28 U.S.C. § 2101(c) .................................... 7

47 U.S.C. § 227 ...........................................*passim*

47 U.S.C. § 501 ........................................... 2

COURT FILINGS

Br. for ACLU and Law Professors Support-
ing Appellant, *Lindenbaum v. Realgy,
LLC*, 2021 WL 1163982 (6th Cir. Mar. 18,
2021)............................................................ 12

OTHER AUTHORITIES

James V. Grimaldi et al., *131 Judges Broke
the Law By Hearing Cases Where They
Had a Financial Interest*, WALL ST. J.,
Sept. 28, 2021 9:07 am ET (https://www.
wsj.com/articles/131-federal-judges-broke-
the-law-by-hearing-cases-where-they-had-
a-financial-interest-11632834421)........... 30

## PETITION FOR WRIT OF CERTIORARI

This case presents two questions of far-reaching importance regarding the First Amendment, severability doctrine (particularly, how it operates in conjunction with unique conduct-*permitting* provisions), retroactivity, and recusal. Review is required to provide much needed clarity, resolve two circuit splits and—most critically—close the constitutional loophole the Sixth Circuit's decision created. Review is particularly critical now, during an era when legislatures have attempted to draft laws to exploit other such loopholes and where the public increasingly views the judiciary as a political body.

The first question asks the Court to decide whether a historically discriminatory speech restriction can nonetheless be enforced to punish speech that occurred during the time it unconstitutionally discriminated. It also strikes at the core of how courts should analyze severance and the First Amendment. Here, Respondent haled Realgy into court on allegations it violated the TCPA's robocall restriction when it purportedly called her twice. *See* 47 U.S.C. § 227(b)(1)(A). Those calls occurred while the robocall restriction was, according to this Court, unconstitutionally content-discriminatory—while it impermissibly favored government speech "over political and other speech" because it contained an exception for certain government-favored speech. *AAPC*, 140 S. Ct. at 2341.

Realgy moved to dismiss. It argued that binding precedent from this Court prohibits imposing liability under a speech restriction that was, as a historical fact, unconstitutionally discriminatory at the time of the speech. Realgy also argued that *AAPC* severed the government debt exception prospectively, because using retroactive severance to treat the exception as a

2

nullity that never existed and never perpetrated real
world harm is both constitutionally and logically
untenable—just as it would be incoherent to state that
severing a provision that rendered a criminal sentenc-
ing regime unconstitutional would cure all the harm
that occurred under sentences imposed during the pre-
severance regime.

Engaging in this type of legal fiction ignores that the
discriminatory robocall restriction *in fact* existed and
governed speech unequally. And, treating the sever-
ance as retroactive creates an additional, unsolvable
problem. Because it would mean that the exemption
government debt collectors relied on to make robocalls
was never legally effective, it would impose crushing
*ex post facto* liability—potentially criminal[1] in nature—
for every call made by those collectors pursuant to the
exemption that was on the books.

The Sixth Circuit disagreed. It held that liability
can be imposed under an unconstitutionally discrim-
inatory speech regime—but it did not address the
authority Realgy cited from this Court that mandates
a contrary conclusion. It took an absolutist (and erro-
neous) approach, declaring that severance is *always*
retroactive. In doing so, it ignored: (a) this Court's
pronouncement that severance should be prospective
where constitutional concerns compel that Congress
could only effect prospective severance via a sever-
ability clause, which is the source of the judiciary's
power to sever; and (b) the test this Court set forth to
make that determination—a test the Sixth Circuit did
not apply. *See Sessions v. Morales-Santana*, 137 S. Ct.
1678, 1701 (2017) (holding that "as the Government
suggests, [the severed version of the statute] should

---

[1] *See* 47 U.S.C. § 501.

3

apply, prospectively" because applying it retroactively would create other constitutional problems that Congress could not lawfully enact by legislation). It then acknowledged that treating the amended robocall restriction as if it did not exist would subject government debt collectors to *ex post facto* liability for exempt speech in violation of Due Process.

The Sixth Circuit attempted to solve that dilemma by invoking fair notice—a doctrine that prohibits punishment without adequate notice of illegality. The Sixth Circuit reasoned that although favoring government speakers over others was the *exact same* disparate treatment *AAPC* found unconstitutional¸ creating disparate treatment via fair notice somehow allays First Amendment concerns. For the Sixth Circuit, fair notice is always speech neutral—even though the only way to tell whether the fair notice doctrine applies is to first evaluate the content of the speech at issue (whether it is government debt collection speech or something else). The Sixth Circuit also ignored that its conclusion would throw innocent government debt collectors to the wolves, forcing them to defend against trillions of dollars worth of class actions and argue, case by case, that the fair notice doctrine bars recovery.

*Lindenbaum* ignores binding First Amendment precedent, muddies severability doctrine beyond recognition, and provides a roadmap for legislative abuse. By enforcing unconstitutional speech regimes and declaring that severance is always retroactive such that it purportedly wipes away all constitutional harm that occurred during the time the statute was unconstitutional, *Lindenbaum* creates a constitutional loophole. It allows legislatures to pass discriminatory exceptions to speech restrictions—including abhorrent exceptions that favor a political party, race, or other category—

4

and then enforce those restrictions in a discriminatory way until this Court severs the exception. This injustice is laid bare by the necessary results of *Lindenbaum*'s analysis.

Consider the following example. Washington D.C. amends its time, place, and manner protesting restrictions to permit pro-choice protests during restricted hours. Two protesters—one pro-life and one pro-choice—are arrested under the amendment for protesting outside the White House after 11 pm. If *Lindenbaum* is correct, the pro-life protester's conviction must stand, even if the Supreme Court finds the exception unconstitutional and severs it from the statute. The pro-choice protester, on the other hand, is entirely immune from liability because he lacked fair notice that his conduct was illegal.

The law is clear that this type of constitutional bypass is incompatible with the First Amendment. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 107 n.2 (1972) (reversing conviction even though legislature severed unconstitutional provision because the Court must "[n]ecessarily[] . . . consider the facial constitutionality of the ordinance in effect when [the defendant] was arrested and convicted"); *R.A.V. v. St. Paul*, 505 U.S. 377, 396 (1992) (reinstating dismissal of charges for cross-burning because statute was content-discriminatory, regardless of fact that conduct could be prosecuted under another statute that was not content-discriminatory); *Sessions*, 137 S. Ct. at 1699 n.24 ("a defendant convicted under a law classifying on an impermissible basis may assail his conviction without regard to the manner in which the legislature might subsequently cure the infirmity").

These decisions make clear that the constitutional harm of chilling speech cannot be undone by judicial

5

decree, which would ignore the here-and-now injury that has already occurred to the disfavored speaker. For example, if a government debt collector had been sued alongside Realgy in this case, she would have been immediately dismissed with prejudice under the exception that actually existed at the time. That speech discrimination—evidenced by the countless number of lawsuits faced by non-government debt collectors prior to *AAPC* while such collectors were immune—cannot be undone. The speech has already been chilled because the exception existed as a historical fact and people ordered their lives based on it. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2196 (2020) (holding person subject to unconstitutional agency's power suffers from "here-and-now" injury despite subsequent severance of unconstitutional provision and remanding for consideration of "whether . . . [post-severance] ratification in fact occurred and whether, if so, it is legally sufficient to cure the constitutional defect"); *see also United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1987 (2021) (remedy for constitutional harm that occurred pre-severance must be "tailored" to the constitutional harms). Because the consequences of the path taken by the Sixth Circuit are dire, *Lindenbaum* should be reviewed.

The second question concerns the circumstances under which a judge is required to recuse under 28 U.S.C. § 455 where she stands to personally benefit from the outcome of the case. Realgy sought recusal of Judge Branstetter Stranch, one of three judges on the Sixth Circuit panel, immediately upon learning that her husband and son are owners of a small, closely-held plaintiff's firm, Branstetter Stranch, that is actively prosecuting class action cases within the Sixth Circuit under the specific TCPA sub-sub-sub section challenged in *Lindenbaum* (the robocall

6

restriction), a practice that has netted millions in past contingency payouts to the firm. Though she would clearly and directly benefit financially from a ruling reversing the district court and permitting liability under the robocall restriction during the time it was discriminatory—thus permitting Branstetter Stranch to continue pursuing their pending TCPA class actions under the robocall restriction they currently had pending—Judge Branstetter Stranch elected to ignore the recusal statute. But Congress's mandate is clear: it ***requires*** recusal in "any proceeding in which a judge's impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

Emblematic of a disconcerting trend of judicial abdication toward mandatory recusal obligations, the panel brushed aside the facts at bar and conclusorily stated that "a reasonable, objective person would not question Judge Stranch's impartiality." App. 113a. The facts dictate otherwise, and if the passive ownership of a small amount of stock requires recusal, the circumstances presented in *Lindenbaum* surely do.

The question presented here—whether a judge must recuse when she stands to benefit personally and directly to the tune of hundreds of thousands or millions of dollars by ruling in a certain way—therefore also warrants review. Without such review, Realgy has no remedy and no way to ensure 28 U.S.C. § 455 is followed, given Judge Branstetter Stranch participated in deciding the motion to recuse her and there is no neutral appellate mechanism other than review by this Court.

## OPINIONS BELOW

The Sixth Circuit's opinion is reported at 13 F. 4th 524 and reproduced at App. 114a-126a. The Sixth Circuit's order denying Realgy's motion seeking

7

recusal is unreported and reproduced at App 111-113. The district court's order granting Realgy's motion to dismiss is reported at 497 F. Supp. 3d 290 and reproduced at App. 1a-17a.

## JURISDICTION

The Sixth Circuit issued its final opinion and judgment on September 9, 2021. Realgy did not petition for rehearing. The mandate issued on October 4, 2021. This Court therefore has jurisdiction under 28 U.S.C. § 1254(1) and 28 U.S.C. § 2101(c).

## CONSTITUTIONAL AND
## STATUTORY PROVISIONS INVOLVED

The First Amendment provides, in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I.

The Fifth Amendment provides, in relevant part, that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Cont. amend. V.

Article 1 of the U.S. Constitution provides, in relevant part: "No Bill of Attainder or *ex post facto* Law shall be passed." U.S. Const. Art. I, § 9, cl. 3.

The relevant provisions of the TCPA, 47 U.S.C. § 227, are reproduced at App. 128a-137a.

The relevant provisions of 28 U.S.C. § 455 are reproduced at App. 138a-141a.

## STATEMENT OF THE CASE

1. Between 2015 and July 2020, Congress required companies like Realgy to curb their speech to comply with the TCPA's robocall restriction. Congress did not impose the same speech restriction on those who placed calls to collect government debts during that

8

period; rather, they were exempt from liability under a speech-permitting amendment to the robocall restriction. As a result of this disparity, companies like Realgy faced trillions of dollars in TCPA lawsuits and enforcement actions for the same speech that government debt collectors were permitted to engage in at will. Many of the would-be claims against the exempted government speakers are now forever barred by the TCPA's four-year statute of limitations, a speech inequity that can never be cured, because the government speakers were exempted for that period of time, whereas the private actors were repeatedly subject to suit.

2. In *AAPC*, this Court addressed a prospective challenge to the robocall restriction—specifically, whether the addition of the government debt exception to the TCPA's robocall restriction rendered the restriction unconstitutional such that it could not be enforced going forward. 140 S. Ct. at 2343, 2346-47. The opinion was fractured, but a majority explained the robocall restriction was an unconstitutional content-based speech restriction, when combined with the government debt exception, because the addition of the speech-permitting exception meant the restriction favored government speech "over political and other speech" in violation of the First Amendment. *Id.* at 2343, 2346-47.

Writing for a plurality, three members of the Court (Justices Kavanagh, Alito, and Chief Justice Roberts) then addressed how to remedy this unequal treatment problem going forward. *Id.* Recognizing that the "Court's "remedial preference . . . has been to salvage rather than destroy the rest of the law passed by Congress," the Court determined that the statute could be restored to constitutional health by severing

9

the government debt exception. *Id.* at 2350-5. Although that approach did not allow the *AAPC* petitioners to make calls going forward, it "fully address[ed]" the "unequal treatment" injury that was "at the heart of their suit," since their suit only sought prospective relief. *Id.* at 2355.

The Court did not specifically decide the impact of its decision on pending lawsuits like this one, where a plaintiff seeks to impose liability for calls made while the restriction was unconstitutionally discriminatory. *Id*. at 2355 n.12. Nor did the Court have occasion to address that question. The parties did not brief or argue the issue because the petitioners' challenge was prospective and there was no underlying litigation seeking to impose liability. *Id.*

Members of the Court nonetheless recognized that "shield[ing] only government debt collection calls from past liability under an admittedly unconstitutional law would wind up endorsing the very same kind of content discrimination we [the majority] say we are seeking to eliminate"—favoring government speech over political and other speech. *Id.* at 2365 (Gorsuch, J., joined by Thomas, J., concurring in part and dissenting in part).

3. Prior to *AAPC*, Respondent sued Realgy, alleging that it violated the robocall restriction after she received two calls without consent. App. 1a-2a, 120. All the calls allegedly occurred while the robocall restriction was unconstitutional. App. 1a-2a, 5a. Based on these allegations, Respondent claimed that she and the putative class members were entitled to $1,500 in treble damages for each call. App. 137a.

It is undisputed that had Respondent sued Realgy *and* a government debt collector for this same speech,

10

Respondent's claims against the debt collector would have been dismissed immediately with prejudice under the then-existing government debt exception.

4. Realgy moved to dismiss because the district court lacked subject matter jurisdiction to enforce the robocall restriction against Realgy, as *AAPC* deemed it unconstitutional prior to the prospective severance of the government debt exception.  App. 5a-6a.  In opposition, Respondent argued that *AAPC* only deemed the exception void *ab initio* and retroactively removed it as if it never existed.  App. 6a.  Since it was always unconstitutional and thus void, Respondent claimed, government debt collectors were never actually shielded from liability and thus are now liable for speech specifically exempted by Congress.  App. 6a.

5. The district court agreed with Realgy and dismissed.  App. 6a-16a.  It noted that the only way to uphold this Court's "equal treatment" mandate under the First Amendment is to treat the favored and disfavored equally with respect to pre-severance speech.  App. 16a.  To do otherwise would (as Justice Gorsuch alluded in *AAPC*) perpetuate the same content discrimination the *majority* recognized and cured prospectively in *AAPC*.  App. 16a.  And because the Respondent's position endorses *ex post facto* liability (potentially criminal liability, *supra* n. 2) for government debt collectors, the district court reasoned, severance must apply prospectively to uphold the constitutional rights of not just Realgy, but government debt collectors themselves.  As the district court noted, "[i]t would be an odd result to say the least if the judiciary could accomplish by severance that which Congress could not accomplish by way of amendment" (*i.e.*, retroactive liability for government debt collectors).  App. 15a.

11

6. Respondent appealed. To the Sixth Circuit, she argued that *AAPC* only deemed the 2015 amendment unconstitutional—not the robocall restriction with the amendment, despite *AAPC*'s clear language to the contrary—and severed it retroactively, not prospectively. App. 120a-121a. She again argued that this meant the amendment was void *ab initio* such that it never legally existed, meaning that government debt-collectors could be liable under it for their previously exempt conduct. App. 120a-121a. But in an attempt to avoid the due process and *ex post facto* liability dilemma her position admittedly created, Respondent contended that government debt collectors would not be liable because of the fair notice doctrine: a doctrine that prohibits punishment without sufficient notice of illegality. App. 126a-127a. Thus, for speech made during 2015-2020, companies like Realgy could uniformly face liability for their speech while similarly situated government speakers would be uniformly exempt for theirs. In this manner, Respondent sought to re-impose, through the back door, the *exact same* discriminatory speech restriction that this Court just held unconstitutional: Everyone is liable for their speech except government debt collectors.

7. Realgy reiterated that Respondent's position was constitutionally untenable. Binding Supreme Court precedent makes clear that liability cannot be imposed under a speech restriction that was, as a historical fact, unconstitutionally content-based at the time of the speech, regardless of any subsequent severance, since the harm (including chilling of speech) cannot be undone. *Grayned*, 408 U.S. at 107 n.2. Engaging in the legal fiction that the robocall restriction never contained the exception would necessarily impose unconstitutional *ex post facto* liability on government debt collectors. App. 125a-126a. And attempting to

12

solve that constitutional problem by sparing govern-
ment debt-collectors via fair notice would re-create the
same unequal treatment *AAPC* held violated the First
Amendment: "favor[ing] debt-collection speech over
political and other speech."  App. 121a; *AAPC*, 140 S.
Ct. at 2343.

Several *amici*—including the ACLU and constitu-
tional law professors, such as Erin Chemerinsky,
supported Realgy.  Br. for ACLU and Law Professors
Supporting Appellant, *Lindenbaum v. Realgy, LLC*,
2021 WL 1163982 (6th Cir. Mar. 18, 2021).  They
agreed that Respondent's position was constitution-
ally untenable, because it countenanced the creation
of a discriminatory speech regime whereby Congress
could enact an exception to any speech restriction for
favored groups and then enforce that restriction against
disfavored speakers until the Supreme Court cures the
law via severance.  Even after severance, Congress's
illegal purpose would be accomplished for the period
the illegal law was on the books: government-favored
speakers would be exempt during that period because
they lacked fair notice their conduct was equally
prohibited, and disfavored speakers would still be
subject to crushing civil or criminal liability for the
same speech.

8. After briefing, the Sixth Circuit released the
names of the judges on the panel, two weeks before
argument occurred. App. 23a, 111a.  The panel included
Judge Jane Branstetter Stranch.  App. 111a.  Realgy
soon discovered that Judge Branstetter Stranch's
spouse and son are owners of (and her daughter is also
an attorney in) Branstetter Stranch & Jennings PLLC.
Branstetter Stranch is a small, closely-held law firm—
that was then (and is now) representing plaintiffs,
including within the Sixth Circuit, seeking to impose

13

class-action liability under the robocall restriction, the exact same sub-sub-sub section at issue here. App. 20a-22a. Realgy moved to recuse Judge Stranch based on an obvious appearance of impropriety: Judge Stranch's husband and two children all work for a firm bearing her name that is currently prosecuting (and actively soliciting for) contingency fee litigation under the TCPA's robocall restriction, which lucrative litigation could have been fully or partially extinguished by a ruling in Realgy's favor. App. 20a-22a. Branstetter Stranch is located primarily in the Sixth Circuit, and it advertises its plaintiff's-side TCPA class action results on its website, noting prominently that it has achieved "multi-million-dollar settlements" in TCPA matters, which presumably resulted in significant payouts to the firm's partnership (and thus Judge Stranch's husband). App. 25a. The firm has filed at least four TCPA class actions since January 1, 2016, that specifically involve liability for calls under the robocall restriction, the exact provision at issue in this case. App. 21a. Two of these cases were pending when the *Lindenbaum* decision issued, and one is within the Sixth Circuit.

9. Realgy moved to recuse Judge Stranch based on the appearance of impropriety that her inclusion on the panel created, but the Sixth Circuit denied Realgy's motion. App. 111a. It did not dispute any of the facts underlying Realgy's motion but stated that no reasonable lay observer would question Judge Stranch's impartiality. App. 111a-114a.

10. The Sixth Circuit then, with Judge Stranch on the panel and having participated in deliberations for months, reversed the district court on the merits. It reasoned that because courts can only say what the law has always been, severance *always* operates retroactively—even where Congress could not accomplish

14

retroactive severance by severability clause. App. 122a-124a. And because severance always applies retroactively in an absolutist sense, the robocall restriction (with the amendment) did not ever legally exist. App. 122a-124a. Thus, the panel reached the legally fictive conclusion that there was no real content discrimination at the time of the speech at issue, even though millions of messages were stifled by the discrimination that actually did exist in the U.S. Code for five years. App. 124a-125a.

11. The Sixth Circuit also acknowledged that treating the Restriction as if it did not exist would subject government debt-collectors to unconstitutional liability for exempt speech, as Realgy contended. App. 125a. It reached two other conclusions to combat this problem. Though it asserted (incorrectly) that the issue was not before it, the panel first speculated that the fair notice doctrine might shield government debt collectors from liability. App. 125a-126a. It then concluded that imposing liability against a defendant for its speech but exempting government debt-collectors for theirs does not violate the First Amendment. App. 125a-126a. The panel reasoned that although favoring government speakers over others was the exact same unequal treatment the Supreme Court in *AAPC* found unconstitutional¸ applying the fair notice doctrine did not pose any First Amendment concerns. App. 125a-126a. For the Sixth Circuit, fair notice is always speech neutral—even though the only way to tell whether to even apply the fair notice doctrine is to first evaluate the content of the speech. App. 125a-126a.

## REASONS FOR GRANTING THE PETITION

Granting this petition will give the Court an opportunity to clarify severability doctrine, address a Circuit split, and provide much needed guidance on

15

the standard for recusal. Both questions presented carry extraordinary consequences for free speech, unequal treatment, and the People's faith that the judiciary will act impartially and uphold Constitutional mandates.

The questions presented are independently worthy, and together they compel review. First, the Sixth Circuit's decision on the merits is deeply flawed and constitutionally untenable. The panel ignored binding precedent from this Court holding that content-discriminatory speech restrictions are unenforceable, regardless of subsequent severance. In fact, if the decision below stands, it would be the first instance a Circuit court has *ever* imposed liability under a discriminatory speech restriction without later being reversed by this Court. The decision endorses the creation of discriminatory speech regimes, and it re-creates the same unequal treatment the Court deemed unconstitutional in *AAPC* just last year.

Along the same lines, and most gravely, the Sixth Circuit's decision creates a roadmap for legislatures to sidestep the First Amendment. It permits them to enact statutory exceptions to speech restrictions that favor a political party, gender, or ideology and then enforce those laws against disfavored speakers until the Supreme Court cures the law via severance. From inception to the date of severance, favored speakers would be exempt because they lacked fair notice that their conduct was equally prohibited. Though this problem features prominently in Realgy's (and *amici*'s) briefing below, the Sixth Circuit's decision *does not even address* the constitutional loophole created by its decision. This Court's intervention is thus necessary to correct an egregious constitutional error and ensure

16

that the government is not given license to enact speech regimes that favor its preferred content.

Additionally, Court intervention is needed to clarify the circumstances in which a judge is required to recuse under 28 U.S.C. § 455 where she stands to benefit financially from her decision. Although § 455(a) "clearly mandates . . . a judge err on the side of caution and disqualify [her]self in a questionable case[,]" Judge Stranch's refusal to recuse here is a clear deviation from that standard. *Potashnick v. Port City Const. Co.*, 609 F. 2d 1101, 1112 (5th Cir. 1980). Any reasonable lay person would question her impartiality when made aware that both she and several immediate family members stand to reap a significant financial benefit from her ruling—a benefit far more substantial and immediate than ownership of a small amount of stock in a party, which unquestionably requires recusal. *See id.*

In sum, each of the questions presented merits review on its own. Reviewing both questions will allow the Court, in one case, to correct the injustice created by *Lindenbaum*, resolve a Circuit split as to each question, and provide long-needed clarity to severability doctrine and the recusal standard. The Court should grant review.

## I. The Court Should Grant Certiorari to Ensure Compliance with this Court's First Amendment and Severance Jurisprudence.

The Sixth Circuit's decision contains several critical constitutional errors. The panel overlooked contrary precedent from this Court in declaring that severance always operates retroactively such that it erases all pre-severance constitutional harm, and when it held that Realgy can be held liable for alleged violations of

17

a discriminatory speech restriction. Intervention is needed to correct *Lindenbaum's* disregard of precedent and remedy its consequences for free speech and legislative abuse.

Initially, *AAPC*'s severance of a conduct-*permitting* provision was not—and could not have been— retroactive, including because the judiciary cannot constitutionally accomplish by severance what Congress could not by a severability clause, which is the source of a court's power to sever in the first instance. *Lindenbaum* therefore represents a raw usurpation of power from the legislature because it arrogates to the judiciary a legislative power—creating *ex post facto* liability by retroactively eliminating a conduct-permitting provision—that the legislature does not itself possess.

And even assuming severance could operate retroactively in a purely legal sense, it cannot erase the constitutional harm that had already occurred, as this Court's precedents establish. Rather, a remedy must be fashioned to address that harm.

To this end, the remedy cannot be the application of fair notice to shield only government debt collectors from liability, because that: (a) re-recreates the exact discriminatory speech regime that this Court held "violates the First Amendment;" and (b) leaves government debt collectors to face billions in lawsuits, which they would have to defend one-by-one and attempt to convince the district court they lacked fair notice.

Thus, all paths lead back to the same result: Neither government debt collectors nor other speakers can be prosecuted under the restriction for 2015-20 speech. Any other conclusion would either blatantly violate separation of powers principles and due process, or it

18

would violate the core tenet of this Court's holding in *AAPC*, that the TCPA's unequal treatment based on the content of speech "violates the First Amendment."

Aside from being compelled by the majority ruling of *AAPC*, this is the only result consistent with and compelled by this Court's past First Amendment holdings, which are unanimous that liability cannot be imposed under a speech restriction during a time it was, as a historical fact, unconstitutionally discriminatory—regardless of whether it was fixed by severance (either retroactively or prospectively).

### A. The Sixth Circuit's Holding that Severance Is Always Retroactive Conflicts with Supreme Court Precedent.

The panel's core premise is that severance always applies retroactively, even in the unique case of severing a conduct-*permitting* exception. This premise is incorrect and contradicted by recent Supreme Court precedent. Though the Sixth Circuit acknowledged that legislative intent is the "hallmark" of whether the judiciary may sever, it overlooked why that means *AAPC*'s severance of the government debt exception *must* apply prospectively, in this unique case involving the removal of a conduct-*permitting* exception. App. 123a.

This Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994) held that a statute cannot impose liability retroactively absent "'clear, strong, and imperative' language" from Congress. *See also Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 313 (1994). No such language exists in the TCPA's severability clause, which is where the judiciary derives power to sever. App. 128a-127a; *AAPC*, 140 S. Ct. at 2349. Thus, *Landgraf* and *Rivers* compel the conclusion that

19

Congress did not intend severance to permit retroactive liability.

Nor could Congress have created retroactive liability if it wanted to—the Constitution prohibits it. Consider the following example to illustrate why. Suppose Congress had foreseen the constitutional challenge in *AAPC* and amended the TCPA's severability clause to provide: "If the government debt exception is deemed unconstitutional, then government debt collectors have retroactive liability for all past calls made pursuant to the exception." That provision would violate Due Process or the *Ex Post Facto* Clause, as it is a fundamental tenet of our Republic that conduct Congress expressly permits cannot be punished—much less subjected to both criminal and quasi-criminal, bankrupting monetary penalties. This is especially true in the First Amendment context, where the regulated conduct is not harmful in the traditional sense (unlike other conduct, such as assault or murder) and where there is constitutional permission to engage in the conduct (again, unlike other areas of regulated conduct, such as assault or murder).

Rather than acknowledge any of this, the panel in *Lindenbaum* simply held that *Landgraf* does not apply because the case's presumption against retroactive liability only constrains *legislative* exactments—not *judicial* "interpretations." App. 122a-123a. While a correct statement on its face, this reasoning evinces a fundamental misunderstanding of how *severance* works and from where the judiciary's power to sever derives. The judiciary's power to sever is entirely based on its interpretation of legislative intent, as constrained by the constitution. *See, e.g.*, *Ayotte v. Planned Parenthood of Northern New England*, 546

20

U.S. 320, 330 (2006) ("the touchstone" of the severability analysis "is legislative intent").    If the Sixth Circuit's understanding of severance were correct in the context of severing a conduct-*permitting* provision, courts would have more legislative power via severance than Congress, because they could impose retroactive liability, post-severance, regardless of its unconstitutional effect.    *See Cunningham v. Matrix Fin. Svcs.*, 531 F. Supp. 3d 1164, 1174 n.9 (E.D. Tex. 2021) ("If the effects of judicial severability [in a case involving severance of an *exception* to liability] were to apply retroactively, the constitutional order would be in complete disarray. Congress—the creator of law—would face the steep presumption against retroactivity . . . while Article III tribunals would face no such obstacle," even though Article III tribunals' job in carrying out severance is to effect Congress's intent as constrained by the constitution); *see also Marks v. United States*, 430 U.S. 188, 191–92 (1977) (freedom from *ex post facto* liability is "protected against judicial action by the Due Process Clause of the Fifth Amendment.").    That makes no sense, and it would blatantly violate separation of powers principles.  The panel's absolutist position on severance cannot be right, and the Court should grant review to correct it.

Because Congress neither expressed a desire to impose retroactive liability nor could it have, the result is that the statute was unconstitutional from the time the amendment went into effect until the date of severance—which is the normal result in the case of an unconstitutional statute.    Severance only saved this particular statute going forward because that is all Congress could have done by amendment or with the severability clause (and it is all we must presume Congress intended to do, under *Landgraf* and *Rivers*).

21

In *Sessions*, the Court reached a similar result, holding that whether severance is retroactive requires determining whether there are constitutional barriers to retroactivity, such as the violation of the constitutional rights of others (there, depriving other citizens of vested citizenship). *See* 137 S. Ct. at 1701. Thus, if constitutional rights would be violated by applying severance retroactively, it ***must*** operate prospectively. *Id.* (holding that "as the Government suggests, [the severed version of the statute] should apply, ***prospectively***") (emphasis added). That is the case here, because applying severance retroactively—*i.e.*, treating the government debt exception as if it never had any legal effect—would mean that government debt collectors are now liable for trillions of dollars in liability for calls made while those collectors believed (erroneously) that they were shielded from liability based on the government debt exception. Such an obviously unconstitutional result proves the Sixth Circuit's error.

## B. Precedent from the Supreme Court and Other Circuits Confirms that Even Retroactive Severance Cannot Erase the Constitutional Harm Inflicted by an Unconstitutional Provision.

Even if severance of the conduct-permitting exception at issue were retroactive in an academic sense, it could not have erased the constitutional harm perpetrated while the unconstitutional provision was on the books. Just this past term, the Court again reaffirmed that "it is still possible for an unconstitutional provision to inflict compensable harm" despite the Court's severance of the unconstitutional provision. *See Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021) (after severing unconstitutional provision, remanding for lower court to address remedy and rejecting

22

legal fiction that unconstitutional law never actually existed); *see also United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1987 (2021) (remedy for constitutional harm that occurred pre-severance must be "tailored" to the constitutional harms); *Seila Law*, 140 S. Ct. at 2196.

Further, in addition to conflicting with Supreme Court precedent, the Sixth Circuit's erroneous view of severance conflicts with the holdings of other Circuits. For example, in *Intercollegiate Broad. Sys. v. Copyright Royalty Board*, 684 F.3d 1332, 1340-42 (D.C. Cir. 2012), the Court severed removal protections for Copyright Royalty Judges because they violated the Appointments Clause, and *then vacated and remanded* the case to the lower court because there was an "Appointments Clause violation at the time of decision." In other words, the severance enacted by the court did not cure the litigants' subjection to an unconstitutionally appointed panel of copyright judges as if the unconstitutional provision never existed. *Id*.; *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760, 767 (Mem) (Fed. Cir. 2020) ("that the statute can be rendered constitutional by severance does not remedy any past harm—it only avoids continuing harm in the future") (O'Malley, J. concurring).

If judicial severance always operates retroactively such that it erases all constitutional harm that occurred when the pre-severance version of the statute was in effect, then the D.C. Circuit in *Intercollegiate* would not have needed to remand because the severance would have retroactively eliminated the unconstitutional removal restrictions, such that they never effected any constitutional harm to begin with. This, of course, makes no sense, as this Court has recognized time and again. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2196;

23

*Collins*, 141 S. Ct. at 1789 (remanding case to address a remedy appropriate to the constitutional harm); *see also id*. at 1798, n.2 (rejecting position that "there was no [past] constitutional violation at all" due to retroactive severance as "foreign") (Gorsuch, J., concurring).

### C. Applying "Fair Notice" to Spare Government Debt Collectors from Retroactive Liability Re-Creates the First Amendment Violation.

Nor can the application of fair notice solve these constitutional problems as the Sixth Circuit suggests. Even if the panel was correct about the fair notice doctrine enabling severance to be retroactive, the only way to ensure equal treatment during that time when government debt collectors were uniformly immune from liability under that doctrine because of the debt exception is to prosecute neither government debt collectors nor others for speech during the time the exception was on the books. Otherwise—if private actors could be prosecuted and government debt collectors are immune based on fair notice—the result is "the very same kind of content discrimination [the majority in *AAPC* says] we are seeking to eliminate"—favoring government speech over political and other speech. *See* 140 S. Ct. at 2365 (Gorsuch, J., joined by Thomas, J., concurring in part and dissenting in part)

And, further, theorizing that government debt collectors have a fair notice defense clearly is not sufficient to protect them from liability. That would mean government debt collectors are subject to billion-dollar class actions in which they would have to individually raise that defense and convince the court that they had no notice whatsoever that their conduct could be punished. This is why it must be decided at the *severability stage* whether the severance creates

24

constitutional barriers to retroactivity such that it must be prospective. *See Sessions*, 137 S. Ct. at 1701 (applying severance prospectively because applying it retroactively would create other constitutional problems that Congress would not and could not itself carry out). Thus, because it is constitutionally impermissible to hold government debt collectors liable for pre-*AAPC* violations of the robocall restriction, neither is it possible to hold Realgy liable during that period, because that unequal treatment violates the First Amendment, according to majority's core holding in *AAPC*.

### D. The Sixth Circuit's Decision to Enforce a Content-Discriminatory Statute Conflicts with Supreme Court Precedent.

Consistent with the principle that retroactive severance is impermissible if it causes constitutional concerns, unanimous Supreme Court authority establishes that—regardless of whether a defendant violated the discriminatory law, whether the speech restriction was cured via legislative or judicial severance, and whether the restriction was a legal nullity that did not technically exist—liability cannot be imposed under a speech restriction that was, as a historical fact, unconstitutionally content-based at the time of the speech. *See, e.g.*, *Grayned*, 408 U.S. at 107 n.2; *Sessions*, 137 S. Ct. at 1699 n.24; *Schacht v. United States*, 398 U.S. 58, 63 (1970) (severing a content-discriminatory provision and reversing the conviction under that provision).

In *Sessions,* in the course of discussing judicial severance, the Court declared expressly that a defendant penalized under an unconstitutionally discriminatory law can attack that historical wrong without regard for how the legislature (or courts, in carrying

25

out legislative intent via severance) "might subsequently cure the infirmity." 137 S. Ct. at 1699 n.24. Thus, even if the judiciary carries out Congress's will by severing, a defendant can still challenge being prosecuted under that historically unconstitutional law. And the Court cited to *Grayned* in so holding. Years earlier, in *Grayned*, the Court reversed the conviction of a defendant who violated a content-discriminatory speech restriction, disclaiming the relevance of subsequent severance and the existence of a severability clause because a court "[n]ecessarily[] must consider the facial constitutionality of the ordinance in effect when [the defendant] was arrested and convicted." 408 U.S. at 107 n.2. If the Sixth Circuit's understanding of severance was correct, *Grayned* would have been decided differently and the conviction there would have stood. That did not occur.

The Sixth Circuit's decision did not address any of this contrary precedent or cite a single case where liability was imposed under a speech restriction that the Supreme Court deemed unconstitutionally content-based and discriminatory. App. 119a-126a. Nor could it have. *Lindenbaum* cannot be squared with the unanimous *Grayned* decision or the Court's precedents uniformly holding that such restrictions are unenforceable. *See id.*, 408 U.S. at 107 n.2; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (reversing fine because election law discriminated on basis of content); *R.A.V.*, 505 U.S. at 396 (in reversing conviction for cross-burning because statute was content-discriminatory, though conduct at issue was otherwise proscribable, noting: "Let there be no mistake . . . that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means at its disposal to prevent such behavior without

26

adding the First Amendment to the fire."). This alone warrants review by the Court.

But worse, *Lindenbaum* carries additional disastrous consequences for free speech, as it means that government-favored debt-collectors will be forever exempt for their speech from 2015-20—under an unconstitutional speech regime—while all others are punished for theirs. The Court deemed this *exact* type of speech favoritism unconstitutional in *AAPC*. And if such an unconstitutional speech regime is permissible, the government has a constitutional loophole to pass flagrantly unconstitutional laws that serve its own political ends. Specifically, *Lindenbaum* authorizes legislatures to enact exceptions to the TCPA—or another statute—and then enforce that restriction against disfavored speakers until this Court cures the law via severance. Meanwhile, favored speakers would be exempt until the date of severance because they lacked fair notice their conduct was equally prohibited. As evidenced by the example of the pro-life protester, discussed *supra*, who is convicted under a content-discriminatory statute while the pro-choice protester is immune from liability, *Lindenbaum*'s reasoning is anathema to free speech, and it cannot be allowed to stand.

## II. The Court Should Grant Certiorari to Resolve a Circuit Split on When Federal Judges are Required to Recuse Where They Stand to Benefit Personally.

A federal judge "shall disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The law is thus clear that disqualification is required "'if a reasonable person who knew the circumstances would question the judge's impartiality, even though no

27

actual bias or prejudice has been shown.'" *Fletcher v. Conoco Pipe Line Co*., 323 F.3d 661, 664 (8th Cir. 2003). And, this Court has mandated recusal where an appellate judge has a direct, personal, or substantial connection to the outcome of the case. *See, e.g., In re Murchison*, 349 U.S. 133, 136 (1955) ("no man is permitted to try cases where he has an interest in the outcome"); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (concluding that judges should not preside over cases where they have a "direct, substantial pecuniary interest" in the outcome).

Judge Branstetter Stranch should have recused herself from serving on the Sixth Circuit panel due to the Branstetter Stranch firm's active and continuing prosecution of contingency fee TCPA litigation under the specific statutory provision at issue, and because she would benefit directly from reversal of the district court's order (or stated differently, would be directly harmed by affirming because that would have resulted in dismissal of lucrative contingency cases Branstetter Stranch was handling). App. 20a-23a. If a judge must recuse herself because her spouse owns a nominal amount of stock in one of the parties—even though a judicial decision almost never moves a company's stock—then surely Judge Stranch should have recused herself under the circumstances here, where the financial impact of a ruling in Realgy's favor would be much more significant, immediate, and far-reaching to Judge Stranch' spouse (and thus Judge Stranch herself). *Infra*, n. 2. Regardless of what this Court or Judge Stranch's colleagues might think, no *reasonable lay person* would think a judge would be capable of being impartial in such a circumstance, and that is the standard Congress chose.

28

In addition granting certiorari to review the refusal to recuse, the Court should also grant review to clarify and resolve a Circuit split regarding when recusal is required. Courts in other circuits have held that where "a relative within the proscribed proximity stands to benefit financially as a partner in a participating firm—even if the relative is not himself involved—[that] is sufficient to require recusal." *In re BellSouth Corp.*, 334 F. 3d 941, 944 (11th Cir. 2003); *see also Potashnick*, 609 F. 2d at 1113 ("We hold that when a partner in a law firm is related to a judge within the third degree, that partner will always be 'known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's law firm."). The Sixth Circuit came to a different conclusion on facts even more appropriate for recusal, warranting this Court's granting of certiorari to resolve the circuit split on when recusal is warranted.

### III. The Questions Presented Are Exceptionally Important.

Both questions presented are tremendously important and will have consequences far beyond this case. In *AAPC*, two Justices recognized that it would be impermissible under the First Amendment to "shield[] only government debt collectors from past liability under an admittedly unconstitutional law[.]" *See* 140 S. Ct. at 2366 (Gorsuch, J., joined by Thomas, J., concurring in part and dissenting in part). Yet that is precisely the holding that the Sixth Circuit adopted—at great cost to free speech. Consider just one of the myriad unjust and unconstitutional results *required*

29

based on the Sixth Circuit's reasoning: A consumer sues three defendants for calls in 2019: (1) a credit union for making one payment-reminder call per month to each of its 100,000 customers about private debt; (2) a vaccine manufacturer for making the same number of calls to notify people of free vaccines; and (3) a bank for making the same number of harassing calls to collect a government-backed student loan from the same customers. According to *Lindenbaum*, the bank would face no liability, but the credit union and vaccine manufacturer would face between $2.4 and $7.2 billion in liability for the same speech. The same result would follow in other even more egregious contexts, such as with the pro-life protestor, discussed *supra*.

The framers designed the First Amendment as a bulwark against "abridging the freedom of speech." U.S. Const. amend. I. Yet, according to the Sixth Circuit in *Lindenbaum*, the government can enact laws to favor its preferred speech—and such favoritism survives even a judicial decree that the restriction is unconstitutional. This Court's timely review is therefore imperative to correct the Sixth Circuit's errors and ensure that legislatures are not given free reign to bypass the First Amendment to serve their own political purposes. Further, the Court's recent cases involving severance have emphasized that severance does not cure constitutional harm, and in fashioning a remedy for a constitutional violation, courts must use an approach that is "tailored" to the violation, not one that re-creates it. *See Arthrex,* 141 S. Ct. at 1987-88 (severing section of statute insulting decisions of Patent Trial and Appeal Board from review by director, and remanding case to afford direct an "adequate opportunity for review."). As evidenced by *Lindenbaum*, the lower courts are inconsistently applying this doctrine, and this case provides the

30

perfect vehicle for the Court to clarify its parameters. *See AAPC,* 140 S. Ct. at 2354-55 ("To be sure, some equal-treatment cases can raise complex [severability] questions about whether it is appropriate to extend benefits or burdens, rather than nullifying the benefits or burdens . . . [T]here can [also] be due process, fair notice, or other independent constitutional barriers to extension of benefits or burdens."), 2366 ("Many have questioned the propriety of modern severability doctrine . . . and today's case illustrates some of the reasons why.") (Gorsuch, J., joined by Thomas, J., concurring in part and dissenting in part).

Equally important, the Court should address whether a federal judge is required to recuse herself under circumstances where she stands to reap a financial benefit by ruling in a particular way. The need to address this issue is particularly dire given it has recently come to light that judges are routinely (though often accidentally) flouting their mandatory recusal obligations.[2] And, it is more critical now than ever that judges avoid even the appearance of impropriety given the increasing numbers of Americans who presume judges are political actors who will vote according to their personal leanings and biases instead of faithfully applying the rule of law. Both issues are of paramount concern, and the Court can address them both within the same case.

---

[2] *See* James V. Grimaldi et al., *131 Judges Broke the Law By Hearing Cases Where They Had a Financial Interest*, WALL ST. J., Sept. 28, 2021 9:08 am ET (https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-116328344 21).

31

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for certiorari.

Respectfully Submitted,

RYAN D. WATSTEIN
    *Counsel of Record*
MATTHEW A. KEILSON
KABAT CHAPMAN & OZMER LLP
171 17th St. NW, Suite 1550
Atlanta, Georgia 30363
(404) 400-7307
rwatstein@kcozaw.com
mkeilson@kcozlaw.com

*Counsel for Petitioner*

December 8, 2021

**APPENDIX**

1a

**APPENDIX A**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

[Filed October 29, 2020]

————

Case No. 1:19 CV 2862

————

ROBERTA LIDENBAUM, *on behalf of herself
and others similarly situated*,

*Plaintiff*,

v.

REALGY, LLC *et al.*,

*Defendants.*

————

Judge Patricia A. Gaughan

————

MEMORANDUM OF OPINION AND ORDER

————

INTRODUCTION

This matter is before the Court upon Realgy, LLC's Motion to Dismiss Amended Complaint (Doc. 20). This is a class action arising under the Telephone Consumer Protection Act ("TCPA"). For the reasons that follow, the motion is GRANTED.

FACTS

Plaintiff, Roberta Lindenbaum, brings this class action lawsuit against defendant Realgy, LLC and ten John Doe corporations alleging violations of the TCPA.

2a

According to the complaint, defendant placed a pre-recorded call to plaintiff's cellular telephone. After the filing of this lawsuit, defendant placed a second pre-recorded call, this time to plaintiff's landline. Plaintiff never provided express written consent to receive these calls. Plaintiff alleges that defendant violated 47 U.S.C. § 227.

During the pendency of this lawsuit, the Supreme Court decided *Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335 (2020)("*AAPC*"). *AAPC* addressed the constitutionality of 47 U.S.C. § 227(b)(1)(A)(iii). This Court stayed this action until the Supreme Court issued *AAPC*. After its issuance, plaintiff filed a motion to lift the stay, which the Court granted. In *AAPC*, the Supreme Court held that 47 U.S.C. § 227(b)(1)(A)(iii) violated the Constitution, but that severance of part of the offending part of the statute cured the constitutional infirmity. Defendant now moves to dismiss the case for lack of subject matter jurisdiction on the basis that this Court lacks jurisdiction to preside over cases involving laws that are "unconstitutional and void." Plaintiff opposes the motion.

## STANDARD OF REVIEW

When a court's subject matter jurisdiction is challenged under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the party seeking to invoke jurisdiction bears the burden of proof. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Rogers v. Stratton*, 798 F.2d 913, 915 (6th Cir. 1986). This burden is not onerous. *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). The party need only show that the complaint alleges a substantial claim under federal law. *Id.*

3a

A 12(b)(1) motion to dismiss may constitute either a facial attack or a factual attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Facial attacks question the sufficiency of the jurisdictional allegations in the complaint. *Id*. Thus, those allegations must be taken as true and construed in the light most favorable to the nonmoving party. *Id*. Factual attacks, however, challenge the actual fact of the court's jurisdiction. *Id*. In such cases, the truthfulness of the complaint is not presumed. *McGee v. East Ohio Gas Co.*, 111 F.2d 979, 982 (S.D. Ohio 2000) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990)). Instead, the Court may weigh any evidence properly before it. *Morrison v. Circuit City Stores, Inc.*, 70 F.Supp.2d 815, 819 (S.D. Ohio 1999) (citing *Ohio Nat'l*, 922 F.2d 320; *Rogers*, 798 F.2d 913).

When presented with a facial attack, the nonmoving party "can survive the motion by showing any arguable basis in law for the claim made." *Musson Theatrical*, 89 F.3d at 1248. Thus, such a motion will be granted only if, taking as true all facts alleged in the complaint, the Court is without subject matter jurisdiction to hear the claim. *Matteson v. Ohio State University*, 2000 WL 1456988 *3 (S.D. Ohio Sept. 27, 2000).

## ANALYSIS

In *AAPC*, the Court addressed the constitutionality of 47 U.S.C. § 227(b)(1)(A)(iii). That provision as originally enacted in 1991, "prohibited almost all robocalls to cell phones." *AAPC*, 140 S.Ct. at 2344. In 2015, Congress amended the provision, as follows:

(a) IN GENERAL– Section 227(b) of the Communications Act of 1934 . . . is amended—

(1) in paragraph (1)—

4a

(A) in subparagraph (A)(iii), by inserting 'unless such call is made solely to collect a debt owed to or guaranteed by the United States' after 'charged for the call.'

The effect of this "government-debt" exception is to allow government debt collectors to place robocalls.

The plaintiffs in *AAPC* consisted of various organizations that participate in the political system and desired to make robocalls in support of their political issues. Plaintiffs sought an injunction prohibiting enforcement of Section 227(b)(1)(A)(iii) on the grounds that it is an unconstitutional content-based restriction that favors certain speech over other speech. The district court determined that the statute indeed contained a content-based restriction to which strict scrutiny must be applied. The district court went on to decide that the statute as written survived strict scrutiny. On appeal, the Fourth Circuit recognized that plaintiffs mounted a facial challenge and agreed with the district court that the provision as drafted is an unconstitutional content-based restriction requiring the application of strict scrutiny. The circuit court disagreed, however, that the government satisfied this exacting standard. The court conducted a severability analysis and determined that severance of the government-debt exception comported with congressional intent. Absent the government-debt exception, the remainder of the provision passes constitutional muster.

The government appealed to the Supreme Court. In a deeply fractured plurality opinion, the Supreme Court determined that the provision containing the government-debt exception is a content-based restriction. Because at least five Justices agreed that the

5a

statute failed either strict or intermediate scrutiny, the Court upheld the judgment of the Fourth Circuit.

The Supreme Court next turned to severance. Although plaintiffs did not request severance, the Supreme Court nonetheless proceeded to analyze whether severance of the offending provision of the statute would be proper. Two Justices joined Justice Kavanaugh's plurality opinion, concluding that severance of the government-debt exception is proper. Four additional Justices concurred in the judgment. Justice Gorsuch dissented and Justice Thomas joined in the dissent on the basis that severance is not proper in the context of the case.

Defendant argues that, although the Supreme Court severed the unconstitutional portion of the statute, severance can only be applied prospectively. According to defendant, the statute is enforceable for robocalls made from 1991-2015, *i.e.*, the time period prior to the enactment of the government-debt exception, as well as for calls made after the date of the final judgment in *AAPC*. But for robocalls made from 2015 through entry of final judgment in *AAPC*, the statute remains unconstitutional on its face and cannot be enforced against *any* robocaller, including defendant. It appears that defendant makes this argument only with respect to cases currently pending. Defendant concedes that the analysis is different for cases that proceeded through final judgment prior to the Supreme Court's pronouncement in *AAPC*.

Plaintiff disputes defendant's argument. According to plaintiff, language in the plurality opinion supports the conclusion that severance of the government-debt exception applies retroactively to all currently pending cases. Plaintiff argues that the entire point of severance is to invalidate only a portion of a statute, not

6a

invalidate a statute in its entirety–even if only for a period of time. Plaintiff further notes that *AAPC* relies on other Supreme Court cases establishing this proposition.

Upon review, the Court agrees with defendant that severance of the government-debt exception applies only prospectively. *AAPC* sets forth the general law regarding severance:

> The Court's cases have instead developed a strong presumption in favor of severability. The Court presumes that an unconstitutional provision in a law is severable from the remainder of the law or statute. Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.

*AAPC*, 140 S.Ct. at 2350 (internal citations and quotations omitted).

> The Court's presumption of severability supplies a workable solution–one that allows courts to avoid judicial policymaking or *de facto* judicial legislation in determining just how much of the remainder of a statute should be invalidated. The presumption also reflects the confined role of the Judiciary in our system of separated powers–stated otherwise, the presumption manifests the judiciary's respect for Congress's legislative role by keeping courts from unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional . . . . Those and other considerations, taken together, have steered the Court to a presumption of severability.

7a

Applying the presumption, the Court invalidates and severs unconstitutional provisions from the remainder of the law rather than razing whole statutes of Acts of Congress.

*Id.* at 2351.

"Before severing a provision and leaving the remainder of the law intact, the Court must determine that the remainder of the statute is capable of functioning independently and thus would be fully operative as a law." *Id.* (Internal citations and quotations omitted). Because the statute is capable of functioning independently of the government-debt exception, the unconstitutional clause may be severed from the remainder of the provision.

The plurality opinion noted, however, that the case before it "is an equal-treatment case, and equal-treatment cases can sometimes pose complicated severability questions." *Id.* at 2354. In First Amendment equal treatment cases, "a court theoretically can cure the unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all." *Id.* The plurality opinion notes that:

To be sure, some equal-protection cases can raise complex questions about whether it is appropriate to extend benefits or burdens, rather than nullifying the benefits or burdens. For example, there can be due process, fair notice, or other independent constitutional barriers to extension of benefits or burdens. There also can be knotty questions about what is the exception and what is the rule. But here, we need not tackle all of the possible hypothetical applications of

8a

severability doctrine in equal treatment
cases. The government-debt exception to
the broad robocall restriction is a relatively
narrow exception to the broad robocall re-
striction, and severing the government-debt
exception does not raise any other constitu-
tional problems.

*Id*. at 2354-55.

The parties in *AAPC* offered opposite solutions to
the constitutionality problem facing the Supreme
Court. Plaintiff sought an injunction preventing enforce-
ment of the provision, thereby allowing political
speech. This would have cured any unequal treatment
concern because it would have allowed essentially all
speech. On the other hand, the government argued
that severance of the government-debt exception
cures the unequal treatment because, in essence, it
prevents all speech thereby eliminating any content-
based restriction. The Supreme Court took the uncom-
mon (although not unprecedented) step of extending
burdens rather benefits. It cured the unequal treat-
ment concern by *preventing* parties from engaging in
speech.

The Supreme Court did not directly address the ef-
fect of severance on currently pending cases. In other
words, it is undisputed that prior to the amendment
in 2015 and after the issuance of a final judgment in
*AAPC*, defendant could not have made the robocalls
at issue in this case. Severance of the government-
debt exception restored the statute to its pre-amend-
ment constitutional standing. But, according to de-
fendant, at the time it allegedly made the robocalls,
the statute was facially invalid and cannot be en-
forced. This issue was not before the Supreme Court.
In a footnote, however, the plurality opinion provides:

9a

As the government acknowledges, although
our decision means the end of the government-
debt exception, no one should be penalized
or held liable for making robocalls to collect
government debt after the effective date of
the 2015 government-debt exception and be-
fore entry of final judgment by the District
Court on remand in this case, or such other
date that the lower courts determine is appro-
priate. On the other side of the ledger, our de-
cision today does not negate liability of par-
ties who made robocalls covered by the ro-
bocall restriction.

*Id*. at n.12.

The dissent seemingly acknowledges that the plu-
rality suggests that severance of the government-debt
exception might apply retroactively to pending cases.
The dissent first notes that plaintiffs did not seek sev-
erance of the exception and it was not "clear the plain-
tiffs would even have standing to challenge the gov-
ernment-debt exception." *Id*. at 2366. Rather, plain-
tiffs sought the right to speak and obtained no relief in
that regard. Moreover, "the analogy to equal protec-
tion doctrine" does not solve the problem. Rather
"somehow, in the name of vindicating the First
Amendment, our remedial course today leads to the
unlikely result that not a single person will be allowed
to speak more freely and, instead, more speech will be
banned." *Id*. at 2366. The dissent then notes:

In an effort to mitigate at least some of these
problems, the [plurality] opinion suggests
that the ban on government-debt collection
calls announced today might be applied only
prospectively. But prospective decision mak-
ing has never been easy to square with

10a

> judicial power. And a holding that shields
> only government-debt collection callers from
> past liability under an admittedly unconstitu-
> tional law would wind up endorsing the very
> same kind of content discrimination we say
> we are seeking to eliminate.

*Id.*

The Court agrees with defendant that *AAPC* did not
address whether severance of the government-debt ex-
ception applies retroactively to cases currently pend-
ing. In addition, footnote 12 is contained in a pluarity
opinion endorsed by only three Justices. Therefore, the
Court finds that footnote 12 constitutes non-binding
*obitur dictum*. Although non-binding, this Court al-
ways strives to give serious consideration of, and per-
suasive effect to, *obitur dictum* set forth in Supreme
Court Opinions. That said, this Court agrees with the
characterization of footnote 12 set forth in the recent
decision *Creasy v. Charter Communications, Inc.*, 2020
WL 5761117 (E.D. La. Sept. 28, 2020). *Creasy* charac-
terized footnote 12 as "passing Supreme Court *dicta* of
no precedential force."

Absent footnote 12, the Court finds little, if any, sup-
port for the conclusion that severance of the govern-
ment-debt exception should be applied retroactively so
as to erase the existence of the exception. Although not
addressed by the parties, the Court first turns to the
Supreme Court's pronouncement in *Harper v. Virginia
Dept. of Taxation*, 509 U.S. 86 (1993). *Harper* ad-
dressed whether a Supreme Court decision holding
certain taxes unconstitutional should be applied to
cases pending before the decision issued. *Harper* held:

> When this Court applies a new rule of federal
> law to the parties before it, that rule is the

11a

controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. This rule extends *Griffith*'s ban against selective application of new rules . . . . Our approach to retroactivity heeds the admonition that the Court has no more constitutional authority in civil cases than criminal cases to disregard current law or to treat similarly situated litigants differently.

*Harper*, 509 U.S. at 97.

Although the rule in *Harper* is well-settled, a recent concurring opinion concluded that the rule does not apply when a court severs an unconstitutional provision of a statute. In *Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760 (Fed. Cir. 2019), the Federal Circuit addressed a request for rehearing *en banc*. The court previously ruled that a statute directed at the appointment of administrative patent judges violated the Constitution's Appointments Clause. *Arthrex, Inc., v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). The court severed the provision directed at the removal of the administrative patent judges, thereby rendering the statute constitutional. *Id*. The court then remanded the case for a new administrative hearing. *Id*.

In an opinion concurring in the denial of the request for rehearing, three judges addressed the retroactivity of severance:

[The] dissent urges that to be consistent with *Harper*, retroactive application of *Arthrex* and its remedy is necessary. But that contention

12a

misreads *Harper* . . . . While the principle of retroactive application requires that we afford the same remedy afforded the party before the court to all others still in the appellate pipeline, judicial severance is not a 'remedy;' it is a forward-looking judicial fix.

*Anthrax, Inc.,* 941 F.3d at 766-67 (concurring opinion)

*Arthrex* noted that *Harper* requires that a court not "give prospective-only effect to our rulings, both as to the merits and as to the precise remedy." *Id*. at 767. Because the harm in *Arthrex* consisted of the adjudication of patent rights under an unconstitutional scheme, severance provided no remedy to plaintiff. Rather, "[o]ur decision that the statute can be rendered constitutional by severance does not remedy any past harm– it only avoids continuing harm in the future. It is only meaningful prospectively, once severance has occurred." *Id*.

The same holds true here. The plaintiffs in *AAPC* sought the right to speak going forward on the grounds that the statute, as written, is an unconstitutional content-based restriction. The Supreme Court denied that relief, but offered a remedy in the form of eliminating the content-based restriction. But, in our case, severance of the content-based restriction does not offer a "remedy" to correct *past* harm. Here, defendants do not seek the right to speak, having already done so. They seek the right to be free from punishment for speaking during a time when an unconstitutional content-based restriction existed. A forward-looking fix offers no remedy for this past wrong. Accordingly, because severance offers no remedy to defendants, the rule in *Harper* does not control. Rather, the Court agrees with the analysis in *Arthrex,* which relies on the Supreme Court's decision in *Seila Law LLC v.*

13a

*Consumer Financial Protection Bureau*, 140 S.Ct. 2183 (2020)(severing provision that would render agency decisions unconstitutional, but remanding the case to address whether the government's argument that the "civil investigation demand" was validly ratified)[1].

Plaintiff relies heavily on *Eberle v. People of the State of Michigan*, 232 U.S. 700 (1914) in support of the general proposition that unconstitutional amendments are void. In *Eberle*, the state legislature enacted a state law prohibiting the sale of alcohol if the voters voted in favor of prohibition. Subsequently, the legislature amended the statute to allow the sale of wine and cider under certain circumstances. Thereafter, the state filed criminal charges against defendants for selling beer in violation of the statute. The state court held that amendments to an otherwise valid statute are void if a later created exception causes equal treatment concerns. Defendants appealed to the Supreme Court, which upheld the convictions on the grounds that,

> The original [statute] had been held to be constitutional, and prohibited, without discrimination, the manufacture of all liquors. That valid act the defendants violated, and their conviction cannot be set aside on the ground that some or all of the electors voted to make

---

[1] The statute at issue in *Seila Law* violated Article II's separation of powers mandate because the head of the agency could be removed by the President only under certain limited circumstances. The Supreme Court severed the removal protection and concluded that "the agency may therefore continue to operate, but its Director . . . must be removable by the President at will." If severance applied retroactively, there would be no need for the past acts to be ratified.

14a

> the law operative in Jackson county under
> the supposition that, as wine could be manu-
> factured, the equal protection clause of the
> Constitution would make it likewise lawful to
> manufacture beer and other liquors.

*Eberle*, 232 U.S. at 706.

The Court finds *Eberle* distinguishable from the in-
stant case. As an initial matter, the state supreme
court– not the Supreme Court– determined that the
original statute was constitutional and that the subse-
quent amendment was "void." The principal issue be-
fore the Supreme Court was whether voter irregular-
ity existed since voters may not have enacted the law
in the first place had they known that the amendment
violated equal protection. The Supreme Court held
that it was for the state court to decide whether the
nature of the provision voided the election.

Plaintiff notes that *AAPC* cited *Eberle* favorably.
But, the *AAPC* plurality contained no discussion re-
garding *Eberle* and its effect on the retroactivity of sev-
ered statutes. Rather, it cited *Eberle* and other cases
from early last century to support the concept that sev-
erance of the government-debt exception does not af-
fect the validity of the remainder of the statute. Alt-
hough the plurality mentions that an unconstitutional
statutory amendment is a "nullity" and "void," and
therefore has "no effect on the original statute," it does
not follow that the result is that the amendment never
existed in the first place. The plurality could not have
intended as such. Although *dicta*, the plurality noted
in footnote 12 that "no one should be penalized or held
liable for making robocalls to collect government debt
after the effective date of the 2015 government-debt
exception and before the entry of final judgment [in
this case] . . . ." This statement would make no sense

15a

if the term "void" meant "void *ab initio*," because, in essence, footnote 12 indicates the statute *as amended* should be enforced with respect to government-debt collector robocalls made during this period.

Presumably, the plurality was rightly concerned with due process issues that would arise if courts treated the amendment as void *ab initio*. But, if the statute is not considered void *ab initio*, it contains an unconstitutional content-based restriction that improperly favors some speech over other speech. And, to treat it as void *ab initio* only as to certain parties would likely raise its own set of equal treatment concerns– the very concern raised by the *AAPC* dissent. The fact remains that at the time the robocalls at issue in this lawsuit were made, the statute could not be enforced as written. And, a later amendment to a statute cannot be retroactively applied. *See, Grayned v. City of Rockford*, 408 U.S. 104, at n.2 (Supreme Court considers the facial constitutionality of the statute in effect when the speech was undertaken, not statute as amended). It would be an odd result to say the least if the judiciary could accomplish by severance that which Congress could not accomplish by way of amendment.

Defendant points that *Eberle* is different because the exception severed in *Eberle* was contained in a separate statutory provision, whereas here, the exception and the "exception to the exception" are contained within the same statutory provision. Although the Court is not convinced that the *location* of the unconstitutional provision or clause matters much, the Court agrees with defendant that the provision at issue is unlike provisions severed in other cases. Here, the original statute contained a valid time, place, and manner restriction, *i.e.*, it limited all robocall speech.

16a

*Creasy v. Charter Communications, Inc.*, 2020 WL 5761117 at * 2 (noting that the Supreme Court observed that pre-2015, the TCPA provision constituted a valid time-place-manner restriction on speech). The insertion of the government-debt exception transformed this valid time, place, and manner restriction into an unconstitutional content-based restriction. This is unlike cases in which Congress adds an exception, the entirety of which results solely in unequal treatment, to an otherwise valid statute. Although the plurality opinion characterizes the case as involving "equal treatment," the fact remains that at the time defendants engaged in the speech at issue, defendant was subject to an unconstitutional content-based restriction.[2] The Court cannot wave a magic wand and make that constitutional violation disappear. Because the statute at issue was unconstitutional at the time of the alleged violations, this Court lacks jurisdiction over this matter.

## CONCLUSION

For the foregoing reasons, Realgy, LLC's Motion to Dismiss Amended Complaint (Doc.20) is GRANTED. Defendant's request for oral argument is DENIED as unnecessary. IT IS SO ORDERED.

---

[2] This is important because the majority of Justices agreed that the government-debt exception is a content-based restriction. And, as the Fourth Circuit noted, this case involves a facial, as opposed to an as-applied, challenge. *American Association of Political Consultants, Inc. v. Federal Communications Commission*, 23 F.3d 159, 164 (4th Cir. 2019)(noting that the case presents a facial challenge). Thus, it is not relevant that defendants here did not engage in political speech. *See, Grayned*, 408 U.S. 104. Because it is a facial challenge, the Court agrees with defendant that it is fundamentally no different than if the regulation prohibited some political robocalls, while allowing others.

17a

<u>/s/ Patricia A. Gaughan</u>
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

Dated: 10/29/20

18a

**APPENDIX B**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

[Filed August 17, 2021]

————

No. 20-4252

————

ROBERTA LINDENBAUM,

*Plaintiff-Appellant*,

v.

REALGY, LLC, et al.,

*Defendants-Appellees*.

————

Appeal From United States District Court Northern
District of Ohio, Eastern Division
Civil Action No. 1:19-CV-2862

————

APPELLEE'S MOTION SEEKING
RECUSAL OF JUDGE
JANE BRANSTETTER STRANCH

————

Ryan D. Watstein
Matthew A. Keilson
KABAT CHAPMAN & OZMER LLP
171 17th St. NW, Suite 1550
Atlanta, Georgia 30363
Phone: (404) 400-7307
E-mail: rwatstein@kcozlaw.com
E-mail: mkeilson@kcozlaw.com

19a

Paul A. Grammatico
Kabat Chapman & Ozmer LLP
333 S. Grand Ave., Suite 2225
Los Angeles, California 9007
Phone: (213) 493-3988
E-mail: pgrammatico@kcozlaw.com
COUNSEL FOR APPELLEE

————

## I.  INTRODUCTION

Judge Stranch should recuse herself from this Appeal pursuant to 28 U.S.C. § 455(a) because she and close family members would directly benefit from a reversal of the District Court, a circumstance that requires recusal. Judge Stranch's husband and son are partners (and her daughter is an attorney) in a law firm—Branstetter Stranch—that currently represents plaintiffs, including within the Sixth Circuit, seeking to impose class-action liability under the TCPA's Robocall Restriction (47 U.S.C. § 227(b)(1)(A)(iii)). Appellee here lodges a constitutional challenge that would render the Robocall Restriction unenforceable for at least a five-year period.[1] A ruling in Appellee's favor would impact current Branstetter Stranch litigation, as well as future TCPA cases they may take, which the firm is actively and currently soliciting via its website. In rare circumstances like these, where a judge's impartiality might reasonably be questioned

————

[1] Because it is not clear when the statute ceased to discriminate on the basis of content, the period of unenforceability could extend beyond five years. *See Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, n.12 (2020) (plurality opinion) (suggesting severance would not be effective until "entry of final judgment by the District Court on remand in this case," an event that has yet to occur).

20a

by a layperson observer, disqualification is manda-tory. *Liteky v. United States*, 510 U.S. 540, 548 (1994).

To be clear, Appellee does not seek recusal here because a judge's distant relatives work at a firm that dabbles in the type of legal work at issue in an appeal—which would be inappropriate. Appellee seeks recusal because a judge's spouse and two children all work for a firm bearing her name, based primarily in the Sixth Circuit where this Court's ruling will be binding, that is currently handling and is actively advertising for litigation under a very specific statutory sub-section-litigation that could be fully or partially extinguished by a ruling in Appellee's favor. Under these unique circumstances, where the con-stitutional issue raised in this Appeal has implications extending beyond this particular case, and the Court's decision will impact claims under the Robocall Re-striction for at least a five-year period, recusal is required by the plain language of 28 U.S.C. § 455(a).

## II. RELEVANT FACTS

### A. Branstetter Stranch & Jennings PLCC.

James G. Stranch, III, Judge Stranch's husband, is a member of Branstetter Stranch & Jennings PLLC ("Branstetter Stranch"). J. Gerard Stranch IV, Judge Stranch's son, is the firm's managing partner. K. Grace Stranch, Judge Stranch's daughter, also practices at the firm.[2] Judge Stranch also practiced exclusively at the firm prior to being appointed to the federal bench, and her father, Cecil Branstetter, is the

---

[2] All relevant information pertaining to Branstetter Stranch is available on the firm's website, including primarily the "Our Attorneys" and "Practice Areas" sections of its web site. *See* https://www.bsjfirm.com/our-attorneys/ (last visited 8/17/21).

21a

firm's founder.[3] The name of the firm ("Branstetter Stranch") bears Judge Stranch's maiden and married names.

The firm is primarily located in the Sixth Circuit, with offices in Nashville, Louisville, and Cincinnati. It advertises its plaintiffs-side TCPA class action results on its web site, noting prominently that it has achieved "multi-million dollar settlements" in TCPA matters, which presumably resulted in significant payouts to the firm's partnership.[4] A search on PACER reveals that the firm has filed at least four TCPA class actions since January 1, 2016 involving liability for calls under the Robocall Restriction specifically, which Appellee challenges here. *See* Exhibit A (compiling the four complaints).[5]

Two of these cases, *Olsen v. Desert Lake Group, LLC*, No. 4:20-cv-00165-BSM (E.D. Ark. Oct. 16, 2020), and *Elrod v. No Tax 4 Nash*, No. 3:20-cv-00617 (Mid. D. Ten. July 17, 2020) are currently pending, and *Elrod* is within the Sixth Circuit. In both cases, the plaintiffs are seeking class-wide damages up to $1,500 per violation based on violations of the Robocall Restriction that Appellee argues was unconstitutional and unenforceable from 2015 until at least the Supreme Court's decision in *AAPC* and potentially longer.

In *Olsen*, the TCPA class-action liability sought by Branstetter Stranch is in excess of $5 million. That

---

[3] Judge Stranch's Questionnaire for Judicial Nominees. *See* https://www.judiciary.senate.gov/imo/media/doc/JaneStranch-PublicQuestionnaire.pdf (last visited 8/17/21).

[4] *See* https://www.bsjfirm.com/practice-areas/consumer-protection/ (last visited 8/17/21).

[5] This was revealed by a cursory federal search; this list is unlikely to be exhaustive.

22a

case would be substantially narrowed, if not elimi-
nated, by adoption of the constitutional argument
Appellee makes in this appeal. This is true because
one of the classes is premised on violations of the
Robocall Restriction that took place from October 16,
2016 through October 16, 2020. *See* Ex. A, *Olsen*
Complaint, pp. 12 -14 (describing class consisting of
text messages in alleged violation of the Robocall
Restriction).[6] Thus, if Realgy is correct that the
Robocall Restriction is unenforceable from 2015 to at
least 2020, the great majority of the putative class's
claims would be extinguished, including the claim of
the representative plaintiff.[7] Similarly, in *Elrod*, the
class consisting of alleged Robocall Restriction viola-
tions could also be entirely eliminated, depending on
whether and to what extent this Court determines
that the Robocall Restriction is unenforceable. Given
that the TCPA's statute of limitations is four years,
any future TCPA class actions Branstetter Stranch
brings under the Robocall Restriction will be similarly
impacted for years to come.

_____

[6] It is not uncommon for TCPA class action liability to reach
millions of dollars, based on the statutory penalties. *See, e.g.*,
*Wakefield v. Visalus, Inc.*, No. 3:15-cv-1857-SI, Dkt. 377 (D. Or.
Aug. 14, 2020) (holding $925,220,000.00 judgment did not violate
due process); *McMillion, et al. v. Rash Curtis & Assoc.*, No. 4:16-
CV-03396-YGR, Dkt. 430 (N.D. Cal. May 4, 2020) (judgment
awarding class damages for TCPA violations in amount of
$267,349,000).

[7] Although *Olsen* is pending in the 8th Circuit and the Court's
decision will not bind it, the Court's decision here will be the first
time a Circuit court has addressed Appellee's constitutional
argument and it will be persuasive authority.

23a

### B. Timing of this Motion.

Appellee learned of the makeup of the appellate panel in this Appeal on July 12, 2021, barely more than a month ago. *See* attached Dec. of R. Watstein, ¶ 3, beginning on p. 14 of this Motion. That was 17 days prior to the oral argument, during the time Appellee was making its final preparations for oral argument. *Id.* Appellee's Counsel did not become aware of the extensive involvement of Judge Stranch's family's law firm in TCPA class action litigation involving the Robocall Restriction until it discovered it in a search after oral argument on or about August 1, 2021. *Id.*, ¶ 4.[8] Once Appellee's Counsel became aware of this information, it proceeded with an intensive intra-firm review process to assess the applicable law and carefully consider whether it was appropriate to seek recusal under these circumstances. *Id.*, ¶ 5. Appellee brought this Motion as soon as possible after concluding that intra-firm review and determining, after respectful and careful consideration, that recusal is required under the unique circumstances of this Appeal by the plain language of the applicable statute. *Id.*, ¶ 7.

### III. LEGAL STANDARD

A federal judge "shall disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs.*

---

[8] Neither KCO nor undersigned counsel has filed a recusal motion before. *Id.*, ¶ 6. There was no basis to investigate filing one at the time the panel was assigned, considering that the recusal statute is designed to be self-executing.

24a

*Acquisition Corp.*, 486 U.S. 847, 865 (1988). Because the purpose of the rule is to avoid the *appearance* of impropriety, the "standard . . . is objective. It asks what a reasonable person knowing all the relevant facts would think about the impartiality of the judge." *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980); *see also Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 & n.12 (11th Cir. 1988) (emphasizing the test is whether a "lay observer," and not one "trained in the law," would reasonably question the judge's impartiality); *Feminist Women's Health Ctr v. Codispoti*, 69 F.3d 399, 400 (9th Cir. 1995) (disqualification "is to be judged objectively as a reasonable person with knowledge of all the facts would judge").

Under this standard, if the disqualification question is close, the judge "whose impartiality might reasonably be questioned must recuse" from hearing the appeal. *See Roberts*, 625 F.2d at 129; *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 886 (2009) (citing *In re Murchison*, 349 U.S. 133, 136 (1955), for the proposition that "[d]ue process 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'"). Thus, 455(a) "clearly mandates . . . a judge err on the side of caution and disqualify himself in a questionable case." *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1112 (5th Cir. 1980).

## IV.  ARGUMENT

### A. Judge Stranch Should Recuse Herself from Further Participation in this Appeal.

Judge Stranch is required to recuse herself from further involvement in this Appeal because her family's law firm is involved in active and continuing

25a

litigation and solicitation of TCPA class actions under the specific statutory provision at issue in this Appeal, including within the Sixth Circuit, and would thus benefit directly from a reversal of the District Court. On this basis, Judge Stranch's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). In particular, the following facts lead to this conclusion:

- Branstetter Stranch has handled and is currently handling significant and lucrative class action litigation involving the TCPA's Robocall Restriction, including advertising on its web site multi-million-dollar TCPA judgments;

- Branstetter Stranch is actively soliciting TCPA claims by advertising its prior success in this area on its website;

- Branstetter Stranch is located primarily in the Sixth Circuit, and the decision of this panel will be binding there, where the firm has active TCPA litigation under the Robocall Restriction;

- Judge Stranch's husband and son currently have ownership interests in Branstetter Stranch, and her daughter currently practices at the firm;

- Judge's Stranch's father, Cecil Branstetter, was the founder of Branstetter Stranch, Judge Stranch formerly worked there, and the firm continues to bear her name, compounding the appearance of impropriety;

- Judge Stranch's husband and son stand to benefit, both in pending and future

26a

cases, from Circuit courts rejecting the
argument Appellee makes here—that the
Robocall Restriction is unenforceable for
the period for which it discriminated on
the basis of content (from 2015 until at
least the Supreme Court's decision in
*AAPC*).

The law is clear that disqualification is required "'if
a reasonable person who knew the circumstances
would question the judge's impartiality, even though
no actual bias or prejudice has been shown.'" *Fletcher
v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir.
2003). And, the Supreme Court has mandated recusal
where an appellate judge has a direct, personal, or
substantial connection to the outcome of the case. *See,
e.g., In re Murchison*, 349 U.S. 133, 136 (1955) ("no
man is permitted to try cases where he has an interest
in the outcome"); *Tumey v. Ohio*, 273 U.S. 510, 523
(1927) (concluding that judges should not preside over
cases where they have a "direct, substantial pecuniary
interest" in the outcome). Here, this panel will be
issuing a binding ruling on a constitutional issue that
will impact cases Judge Stranch's family firm (which
practices primarily in this Circuit) is currently both
prosecuting and soliciting for, in an area that has
netted millions in past payouts for Branstetter
Stranch clients. Thus, there is no question that Judge
Stranch's impartiality might be reasonably questioned
by a layperson observer—and this *requires* recusal.
That is true regardless of whether impartiality
actually exists.

An analogy to another section of the recusal statute
is illustrative. 28 U.S.C. § 455(b) identifies particular
scenarios in which a judge "shall . . . disqualify
[her]self," which include when "[she] knows that . . .

27a

[her] spouse . . . has a financial interest in the subject matter in controversy . . . that could be substantially affected by the outcome of the proceeding." Based on the plain language of this provision, a judge is required to recuse herself from a case in which her husband owns a stock interest in one of the parties, however small. *See Union Carbide Corp. v. U.S. Cutting Service, Inc.*, 782 F.2d 710, 714 (7th Cir. 1986) ("Although the prohibition results in recusal in cases where the interest is too small to sway even the most mercenary judge, occasional silly results may be an acceptable price to pay for a rule that both is straightforward in application and spares the judge from having to make decisions under an uncertain standard apt to be misunderstood.").

If a judge must recuse herself because her spouse owned a nominal amount of stock in one of the parties, then surely she must also recuse herself under the circumstances here, where the financial impact of a ruling in Appellee's favor would be much more significant, immediate, and far-reaching to a judge's spouse (and thus the judge herself). The appearance of impropriety, rather than any actual impropriety, mandates recusal.

## B. This Motion is Timely.

"Recusal motions should normally be made 'at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for such a claim.'" *In re Nat. Prescription Opiate Lit.*, No. 19-3935, 2019 WL 7482137, at *1 (6th Cir. 2019) (quoting *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987)). Here, Appellee did not discover the underlying facts for the motion until August 1, 2021. It thereafter brought the motion as soon as it was possible to do so after that—which was not until the issue had been

28a

thoroughly researched and carefully considered by the undersigned's firm.

## V. CONCLUSION

Judge Stranch's husband and son have ownership interests in a law firm based in the Sixth Circuit, bearing Judge Stranch's family name, that is engaged in current and ongoing TCPA litigation, including in the Sixth Circuit, under a specific sub-section that would be undercut by a constitutional ruling in favor of Appellee here. Branstetter Stranch is also actively advertising for future TCPA class action litigation that would also be impacted by a ruling in Appellee's favor. All such cases, and thus Branstetter Stranch and Judge Stranch herself, would benefit from reversal of the District Court. These facts require recusal under 28 U.S.C. § 455(a). Thus, Appellee respectfully requests that Judge Stranch recuse herself from further involvement in this appeal.

Dated: August 17, 2021

Respectfully submitted,

/s/ *Ryan D. Watstein*
Ryan D. Watstein
Matthew A. Keilson
KABAT CHAPMAN &
    OZMER LLP
171 17th St. NW, Suite 1550
Atlanta, Georgia 30363
Phone: (404) 400-7307
E-mail:
    rwatstein@kcozlaw.com
E-mail:
    mkeilson@kcozlaw.com

29a

Paul A. Grammatico
KABAT CHAPMAN &
    OZMER LLP
333 S. Grand Ave., Suite 2225
Los Angeles, California 90071
Phone: (213) 493-3988
Email
    pgrammatico@kcozlaw.com

30a

<u>DECLARATION OF RYAN WATSTEIN IN
SUPPORT OF MOTION SEEKING RECUSAL</u>

The undersigned hereby declares as follows:

1.   My name is Ryan Watstein. I am a partner at Kabat Chapman & Ozmer LLP ("KCO") and lead counsel for Appellee in this Appeal.

2.   The information contained herein is based upon my personal knowledge.

3.   Appellee was notified of the appellate panel for this Appeal on July 12, 2021, which was 17 days prior to the oral argument. During that period of time, I and my co-counsel were making our final preparations for oral argument.

4.   KCO did not become aware of the extensive involvement of Judge Stranch's family's law firm in TCPA class action litigation involving the Robocall Restriction until we discovered it after oral argument on or about August 1, 2021.

5.   Once we became aware of this information, we proceeded with an intensive intra-firm review process in order to assess the applicable law and carefully consider whether it was appropriate to seek recusal under these circumstances.

6.   Neither KCO nor the undersigned has ever before filed a recusal motion and we would not make such a motion without thorough and intensive consideration.

7.   KCO filed this motion as soon as possible after concluding that intra- firm review and determining, after respectful and careful consideration, that recusal is appropriate here.

31a

I declare under penalty of perjury that the foregoing Declaration and the facts stated in it are true and correct.

Dated: August 17, 2021          /s/ *Ryan D. Watstein*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion complies with the type-volume limitation provided in Fed. R. App. P. 32(a)(7)(B). The foregoing Motion contains 2,436 words of Times New Roman (14 point) proportional type. The word processing software used to prepare this Brief was Microsoft Word 2016.

*/s/ Ryan D. Watstein*
Ryan D. Watstein
COUNSEL FOR APPELLEE

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2021, I electronically filed the foregoing Motion with the clerk of the court by using the CM/ECF System, which will automatically generate and send by email a Notice of Docket Activity to all registered attorneys participating in this case, and this Notice of Docket Activity will constitute service on those registered attorneys as provided in Sixth Circuit Rule 10.1

*/s/ Ryan D. Watstein*
Ryan D. Watstein
COUNSEL FOR APPELLEE

32a

## **EXHIBIT A**

### *3:20cv617, Elrod Et Al v. No Tax 4 Nash Et Al*

US District Court Docket
United States District Court, Tennessee Middle
(Nashville)

This case was retrieved on 08/09/2020

_____

Header

| | |
|---|---|
| Case Number: | 3:20cv617 |
| Date Filed: | 07/17/2020 |
| Assigned To: | District Judge Eli J. Richardson |
| Referred To: | Magistrate Judge Barbara D. Holmes |
| Nature of Suit: | *Telephone Consumer Protection Act* (485) |
| Cause: | Restrictions of Use of *Telephone* Equipment |
| Lead Docket: | None |
| Other Docket: | None |
| Jurisdiction: | Federal Question |
| Class Code: | Open |
| Statute: | 47:227 |
| Jury Demand: | Plaintiff |
| Demand Amount: | $0 |
| NOS Description: | *Telephone Consumer Protection Act* |

33a

| Litigants | Attorneys |
| --- | --- |
| Rachel Anne Elrod<br>Plaintiff | Anthony A. Orlandi<br>ATTORNEY TO BE NOTICED<br>Branstetter, Stranch &<br>  Jennings, PLLC<br>223 Rosa L. Parks Avenue,<br>Suite 200<br>Nashville, TN 37203<br>USA<br>(615) 254-8801<br>Fax: (615) 255-5419<br>Email:Aorlandi@bsjfirm.com<br><br>Joey P. Leniski , Jr.<br>ATTORNEY TO BE NOTICED<br>Branstetter**,** Stranch &<br>  Jennings, PLLC<br>223 Rosa L. Parks Avenue,<br>Suite 200<br>Nashville, TN 37203<br>USA<br>(615) 254-8801<br>Email:Joeyl@bsjfirm.com<br><br>John Tate Spragens<br>ATTORNEY TO BE<br>NOTICED<br>Spragens Law PLC<br>311 22nd Ave. N.<br>Nashville, TN 37203<br>USA<br>(615) 983-8900<br>Fax: (615) 682-8533<br>Email:John@spragenslaw.com |

34a

| Andrew Kaufman<br>Plaintiff | Anthony A. Orlandi<br>ATTORNEY TO BE<br>NOTICED<br>Branstetter, Stranch &<br>  Jennings, PLLC<br>223 Rosa L. Parks Avenue<br>Suite 200<br>Nashville, TN 37203<br>USA<br>(615) 254-8801<br>Fax: (615) 255-5419<br>Email:Aorlandi@bsjfirm.com |
|---|---|

35a

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

[Filed August 17, 2021]

————

No. __

————

RACHAEL ANNE ELROD, ANDREW KAUFMAN, and
SARAH MARTIN, on behalf of themselves and
all others similarly situated,

*Plaintiffs*,

v.

NO TAX 4 NASH, JIM ROBERTS, MICHELLE FOREMAN,
KIMBERLY EDWARDS, and JOHN DOES 1-10,

*Defendants*.

————

CLASS ACTION

————

JURY TRIAL DEMANDED

————

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF PURSUANT TO
47 U.S.C. § 227 *ET SEQ*. (TELEPHONE
CONSUMER PROTECTION ACT)

Plaintiffs Rachael Anne Elrod, Andrew Kaufman, and Sarah Martin, individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of counsel, and on information and belief as follows:

36a

NATURE OF ACTION

1.  This case involves activities conducted by a
group identified as "No Tax 4 Nash" (or "NoTax4Nash")
which is believed to be controlled by Defendants Jim
Roberts, Michelle Foreman, Kimberly Edwards, and
other persons and/or entities whose identities are
presently unknown to Plaintiffs ("John Does 1-10"),
specifically the contacting of individuals through the
use of prerecorded messages and automated calls in
violation of the Telephone Consumer Protection Act,
47 U.S.C. § 227 *et seq.*, and the Federal Communica-
tion Commission ("FCC" or "Commission") rules prom-
ulgated thereunder, 47 C.F.R. § 64.1200 (hereinafter
referred to as the "TCPA").

2.  "No Tax 4 Nash" has violated the TCPA by
making calls to Plaintiffs and Class Members using an
"automatic telephone dialing system" and an "artifi-
cial or prerecorded voice" as described in 47 U.S.C.
§ 227(b)(1), without Plaintiffs' and Class Members'
prior express consent within the meaning of the TCPA.

3.  Plaintiffs bring this action for injunctive relief
and statutory damages, all arising from the illegal
activities of "No Tax 4 Nash" and all Co-Defendants.

JURISDICTION AND VENUE

4.  This matter in controversy exceeds $5,000,000,
as each member of the proposed Class of thousands is
entitled to up to $3,000.00 in statutory damages for
each call that violated the TCPA, since the calls at
issue violated the TCPA in two ways. Accordingly,
this Court has jurisdiction pursuant to 28 U.S.C.
§ 1332(d)(2). Further, Plaintiffs allege a national
class, which will result in at least one Class member
belonging to a different state. Therefore, both ele-
ments of diversity jurisdiction under the Class Action

37a

Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

5. This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6. This Court has personal jurisdiction over Defendants because each individual Defendant is a resident of the State of Tennessee for purposes of personal jurisdiction, and Defendant No Tax 4 Nash's principal place of business is in the State of Tennessee, where it directed the illegal telephone calls at issue in this case.

7. Venue is proper in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a) because Defendant No Tax 4 Nash is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced, all known individual Defendants reside in this judicial district, and Defendant No Tax 4 Nash's contacts with this judicial district are sufficient to subject it to personal jurisdiction here.

<u>PARTIES</u>

8. Plaintiff Rachael Anne Elrod is, and at all times mentioned herein was, an individual citizen of the State of Tennessee and resident of Nashville.

9. Plaintiff Andrew Kaufman is, and at all times mentioned herein was, an individual citizen of the State of Tennessee and resident of Nashville.

10. Plaintiff Sarah Martin is, and at all times mentioned herein was, an individual citizen of the State of Tennessee and resident of Nashville.

38a

11.   Defendant "No Tax 4 Nash" (or "NoTax4Nash") is a corporation, association of persons banded together for a specific purpose, or the trade name of a corporation or association. Its mailing address, P.O. Box 210976, Nashville, TN 37221, is registered to Defendant Jim Roberts.

12.   Defendants Jim Roberts, Michelle Foreman, and Kimberly Edwards are, and at all times mentioned herein were, individual citizens of the State of Tennessee.

13.   Defendants John Does 1-10 are individuals and entities whose identities are presently unknown to Plaintiffs and will be revealed in discovery, and who placed the calls at issue in this action or who directed the placement of the calls at issue in this action by actual or apparent agents as their principals, or ratified their agents' acts.

<u>THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. § 227</u>

14.   In 1991, Congress enacted the TCPA,[1] in response to a growing number of consumer complaints regarding certain telemarketing practices.

15.   The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers." Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. The TCPA defines an "automatic

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*

telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[2]

16. According to findings by the FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[3]

17. In 2003, the FCC affirmed that it is unlawful "to make any call using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number."[4]

18. The 2003 FCC order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call."[5] The FCC concluded that "[t]he basic function of such equipment . . . [is] the capacity to dial numbers

---

[2] 47 U.S.C. § 227(b)(1)(A)(iii).

[3] Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

[4] *Id.*, ¶ 165. *See* 47 U.S.C. § 227(b)(1), which contains exceptions for calls made for emergency purposes or made with the prior express consent of the called party.

[5] *Id.* at 14,143 n. 31.

40a

without human intervention."[6] The 2008 Declaratory Ruling "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[7] And in yet another order issued in 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists."[8] In 2018, a D.C. Circuit decision struck down portions of a 2015 FCC Order, but the prior FCC Orders are still binding.

19.    Courts have long held that that a "called party" under the TCPA is the recipient of the call, not the party the caller was intending to reach.[9]

20.    On January 4, 2008, the FCC released a Declaratory Ruling wherein it "reiterate[d] that the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party."[10]

---

[6] *Id.* at 14,092.

[7] 23 FCC Rcd. at 566.

[8] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15391, 15399 (2012).

[9] *See, e.g.*, *Osorio v. State Farm Bank, F.S.B.,* 746 F.3d 1242, 1251 (11th Cir. 2014); *Soppet v. Enhanced Recovery Co., LLC,* 679 F.3d 637, 638-39 (7th Cir. 2012).

[10] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("FCC Declaratory Ruling"), 23 F.C.C.R. 559, ¶ 11, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (2008).

41a

21.   In a portion unaffected by the D.C. Circuit, the 2015 FCC Order held that consumers may revoke consent through reasonable methods. Thus, consumers may revoke consent through any reasonable method, including orally: "[c]onsumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location, among other possibilities."[11]

22.   A single call using both a prerecorded voice and an autodialer constitutes two violations of the TCPA, even if both violations arose from the same call. *See Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015).

23.   The TCPA and the Regulations impose liability on a person or entity where calls are made on its behalf. The FCC has found that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations. Indeed, vicarious liability is a critical feature of the TCPA, which does not permit a party to avoid liability by placing it on its expressly, impliedly, or apparently authorized agents. *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Mem. And Order, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995); *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674-75 (2016).

24.   Political campaign-related calls or text messages are not exempt from the TCPA or the FCC's rules and require the called party's prior express consent if an autodialer is used to send the messages or a prerecorded message is played on the call.

---

[11]  2015 Order at (¶ 64).

42a

25.   The FCC issued a biennial reminder for political campaigns about robocalls and text abuse on March 14, 2016 with enforcement advisory number 2016-03:

> **Prohibition Against Prerecorded Voice Messages and Autodialed Calls to Cell Phones and Other Mobile Services.** Prerecorded voice messages and autodialed calls (including autodialed live calls, prerecorded or artificial voice messages, and text messages) to cell phones and other mobile services such as paging systems are prohibited, subject to only three exceptions: (1) calls made for emergency purposes, (2) calls made with the prior express consent of the called party, (3) and calls made to collect debts "owed to or guaranteed by the United States." **This broad prohibition covers prerecorded voice and autodialed calls, including those sent by nonprofit or political campaign-related organizations.** Callers contending that they have the prior express consent to make prerecorded voice or autodialed calls to cell phones or other mobile service numbers have the burden of proof to show that they obtained such consent. Further, call recipients may revoke their consent to be called using any reasonable method including verbally or in writing.

FCC Enforcement Advisory No. 2016-03, available at https://docs.fcc.gov/public/attachments/DA-16-264A1.pdf (accessed July 17, 2020) (citations omitted, second emphasis added).

26.   On July 6, 2020, the U.S. Supreme Court rejected a challenge by political organizations seeking

43a

to invalidate the TCPA's restrictions on political campaign calls and texts, holding that "plaintiffs still may not make political robocalls to cell phones[.]" *Barr v. Am. Ass'n of Political Consultants, Inc.*, No. 19-631, 2020 WL 3633780, at *2 (U.S. July 6, 2020).

## FACTUAL ALLEGATIONS

27. Plaintiffs are, and at all times mentioned herein were, "persons" as defined by 47 U.S.C. § 153(39).

28. On or around July 16, 2020, Plaintiffs received autodialed and pre-recorded calls on their cellular phones from a group identifying itself as "No Tax for Nash."

29. Plaintiff Rachael Anne Elrod was sitting at home with her husband on the evening of July 16, 2020, when her cellular phone rang. The incoming telephone number, (615) 348-5237, was not familiar to her. She answered the call on speakerphone and said "Hello?" There was silence, and she said "Hello?" a second time. Then a prerecorded message played, featuring a female voice saying:

> Nashville voters, if you would like to sign the recall petition for the mayor and council members who supported the 34% property tax increase, we will be at all 11 polling locations on Friday and Saturday for early voting. If you have any questions, find us on Facebook or go to our website, notax4nash.com. Have a wonderful evening, and don't forget to vote! Paid for by No Tax 4 Nash.

30. Elrod recognized the call as using an automated telephone dialing system because there was a significant delay after she answered before the

44a

recorded message began. In addition, the voice tone and background noise on the call sounded prerecorded, as opposed to a live voice.

31.  Plaintiff Andrew Kaufman received an identical call on the evening of July 16, 2020. He was at home with his family when he received an incoming call on his cellular phone from (615) 348-5237, a number he did not recognize. He did not answer the call but allowed it to go to his voicemail.

32.  Upon checking his voicemail, Kaufman heard a prerecorded message identical to the message described in paragraph 29. He recognized the call as using an automated telephone dialing system because there was an approximately three-second delay at the beginning of the voicemail message before the recorded message began. In addition, the voice tone and background noise on the message sounded pre-recorded, as opposed to a live voice.

33.  Plaintiff Sarah Martin received an identical call on the evening of July 16, 2020. She was at home with her husband at approximately 8:32 p.m. when she received an incoming call on her cellular phone from (615) 348-5237, a number she did not recognize. She did not answer the call, and it went to her voicemail.

34.  Upon checking her voicemail, Martin heard a prerecorded message identical to the message described in paragraph 29. She recognized the call as using an automated telephone dialing system because there was an approximately three-second delay at the beginning of the voicemail message before the recorded message began. In addition, the voice tone and background noise on the message sounded prere-corded, as opposed to a live voice.

45a

35.   That evening, dozens of residents and former residents of Nashville complained on social media platforms about receiving an annoying, harassing prerecorded "robocall" playing the message described in paragraph 28. Some people posted screenshots of voicemail messages from the same phone number that called Elrod and Kaufman; they appeared to be identical to the voicemail message received by Mr. Kaufman.

36.   Defendants are, and at all times mentioned herein were, "persons," as defined by 47 U.S.C. § 153(39).

37.   Defendant "No Tax 4 Nash" paid for, authorized, and directed the unwanted robocalls to Plaintiffs and members of the proposed class, according to the recorded message on the call.

38.   Defendant Jim Roberts controls Defendant No Tax 4 Nash, and the mailbox where it receives mail is registered in his name.

39.   Defendant Michelle Foreman is "spearhead[ing]" Defendant No Tax 4 Nash.[12] She is the entity's public "spokeswoman" and representative.[13] She works in

---

[12] Tennessee Star, "Tennessee Star Senior Reporter Laura Baigert Discusses Two Grassroots Nashville Campaigns Opposing Mayor Cooper's Property Tax Increase,"_https://tennesseestar.com/2020/05/28/tennessee-star-senior-reporter-laura-baigert-discusses-two-grassroots-nashvillecampaigns-opposing-mayor-coopers-property-tax-increase/ (accessed July 17, 2020).

[13] Tennessee Star, "Grassroots Groups Pledge to Recall Nashville Mayor and Council Members Who Vote for a Property Tax Increase," https://tennesseestar.com/2020/06/17/grassroots-groups-pledge-to-recall-nashville-mayor-and-council-members-who-vote-for-a-property-tax-increase/ (accessed July 17, 2020).

46a

concert with "a small team of people that may not want to be named[.]"[14]

40.    According to media reports, Defendant Roberts, leader of a political referendum campaign to implement the Nashville Taxpayer Protection Act, is involved with the illegal robocall campaign, along with Defendant Foreman and Defendant Kimberly Edwards.[15]

41.    Other individuals and/or entities whose names are not known to Plaintiffs but will be revealed in discovery are funding and directing the illegal robocall campaign described above,[16] or placing the illegal calls described herein as agents of one or more Defendants. Courts "have routinely found that parties are permitted to conduct discovery to discover the identities of John Doe defendants." *Martin v. Glob.*

---

[14] Tennessee Star, "Citizens Fight Back Against Mayor John Cooper's Proposed 32 Percent Property Tax Increase," https://tennesseestar.com/2020/05/27/citizens-fight-back-against-mayor-john-coopers-proposed-32-percent-property-tax-increase/ (accessed July 17, 2020).

[15] Nate Rau, *Tennessee Lookout*, "Secretly-funded efforts target mayor, Nashville tax policy," https://tennesseelookout.com/2020/07/17/nashville-lawyer-leads-secretly-funded-group-to-to-recall-mayor-change-tax-approval/ (accessed July 17, 2020); Nate Rau, July 16, 2020 Tweet, https://twitter.com/tnnaterau/status/1283945302236508163.

[16] *See* Tennessee Star, "Carol Swain Describes Grassroots Movement to Stop the 32 Percent Property Tax Increase Proposal," May 22, 2020, *available at* https://tennesseestar.com/2020/05/22/nashville-taxpayer-protection-act-carol-swain-descri bes-grassroots-movement-to-stop-the-32-perecent-property-tax-increase-proposal/ (describing private meeting with mayor and "important citizens" and "concerned citizens" including Michelle Foreman, Lee Beaman, Carey Bringle, Steve Moore, Karen Moore, and Carol Swain).

47a

*Mktg. Research Servs., Inc.*, No. 614CV1290ORL31 KRS, 2015 WL 6083537, at *6 (M.D. Fla. Oct. 15, 2015) (TCPA case).

42. In receiving unwanted and unsolicited calls on their cellular telephones, Plaintiffs suffered concrete harm in the form of lost time spent fielding the unwanted calls, loss of use of their cellular telephones as the calls came in, loss of capacity of the voice mailbox (in Mr. Kaufman's and Ms. Martin's case), invasion of their privacy, and intrusion upon their seclusion and evening time with their families.

43. All telephone contact made by or at the direction of Defendants to Plaintiffs on their cellular telephones occurred via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and used "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A).

44. The telephone numbers on which Defendants used to contact Plaintiffs via an "artificial or prerecorded voice" made by an "automatic telephone dialing system" were assigned to a cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

45. Plaintiffs did not provide their "prior express consent" allowing Defendants to place telephone calls to Plaintiffs' cellular phone utilizing an "artificial or prerecorded voice" and placed by an "automatic dialing system" within the meaning of 47 U.S.C. § 227(b)(1)(A). In fact, Plaintiffs never had any dealings with Defendants before receiving the call paid for by No Tax 4 Nash.

46. Telephone calls made to Plaintiffs' cellular phones by Defendants were not "for emergency purposes" as described in 47 U.S.C. § 227(b)(1)(A).

48a

47. Telephone calls to Plaintiffs' cellular phone made by Defendants utilized an "artificial or prerecorded voice" and an "automatic telephone dialing system" for non-emergency purposes and in the absence of Plaintiff's prior express consent violated 47 U.S.C. § 227(b)(1)(A).

48. Defendants bear the burden of demonstrating that they placed the calls with Plaintiffs' prior express consent. *See, e.g.*, *Toney v. Quality Res., Inc*., 2014 WL 6757978, at *3 (N.D. Ill. Dec. 1, 2014).

## CLASS ACTION ALLEGATIONS

49. Plaintiffs bring this action on behalf of himself and behalf of all other persons similarly situated (hereinafter referred to as "the Class").

50. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons in the United States who received a call from "No Tax 4 Nash" from an automated telephone dialing system and/or utilizing a prerecorded voice on or after July 16, 2020, without the recipients' prior express consent.

Collectively, all these persons will be referred to as "Class members." Plaintiffs represent, and are a member of, the Class. Excluded from the Class are Defendants and any entities in which a Defendant has a controlling interest, Defendants' agents and employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, Plaintiffs' counsel, and any claims for personal injury, wrongful death and/or emotional distress.

51. Plaintiffs do not know the exact number of members in the Class, but on information and belief,

49a

the number of Class members at minimum is in the thousands.

52.  Plaintiffs and all members of the Class have been harmed by Defendants' acts, including, but not limited to, the invasion of their privacy, annoyance, waste of time, depletion of their cellular phone battery, and the intrusion on their cellular telephone that occupied it from receiving legitimate communications.

53.  This Class Action Complaint seeks injunctive relief and money damages.

54.  The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim. The disposition of claims in a class action will provide substantial benefit to the parties and the judicial economy of the Court in avoiding a multiplicity of identical suits. The Class can be identified easily through records maintained by Defendants and/or any vendors who placed the illegal calls on their behalf.

55.  There are well defined, nearly identical, questions of law and fact affecting all Class members. The questions of law and fact involving the Class claims predominate over questions which may affect individual Class members. Those common questions of law and fact include, but are not limited to, the following:

a.  Whether non-emergency calls made to Plaintiffs and Class members' cellular telephones used an automatic telephone dialing system and/or an artificial or prerecorded voice;

b.  Whether such calls were made by or at the direction of one or more of the Defendants;

c.  Whether Defendants can meet their burden of showing they obtained prior express consent (*i.e.*,

50a

consent that is clearly and unmistakably stated) to make such calls;

d. Whether Defendants' conduct was knowing and/or willful;

e. Whether Defendants are liable for damages, and the amount of such damages; and

f. Whether Defendants should be enjoined from engaging in such conduct in the future.

56. As persons who received telephone calls using an automatic telephone dialing system and an artificial or prerecorded voice, without their prior express consent within the meaning of the TCPA and Rules, Plaintiffs assert claims that are typical of each Class member. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have no interests which are antagonistic to any member of the Class.

57. Plaintiffs have retained counsel experienced in handling class action claims involving violations of federal and state consumer protection statutes, including claims under the TCPA.

58. A class action is the superior method for the fair and efficient adjudication of this controversy. Classwide relief is essential to compel Defendants to comply with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the statutory damages in an individual action for the violation of the TCPA are small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and prerecorded the Class members did not provide prior express consent

51a

required under the statute to authorize such calls to their cellular telephones.

59.   Defendants have acted on grounds applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate. Moreover, on information and belief, Plaintiffs allege that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

<u>CAUSES OF ACTION</u>

<u>FIRST COUNT</u>

<u>KNOWING AND/OR WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 *ET SEQ.*</u>

60.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

61.   The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

62.   As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and each member of the Class are entitled to treble damages of up to $1,500.00 for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

63.   Plaintiffs and all Class members are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by Defendants in the

52a

future. Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs.

## SECOND COUNT

### STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT 47 U.S.C. § 227 *ET SEQ.*

64.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

65.  The foregoing acts and omissions of Defendants constitutes numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq.*

66.  As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and Class members are entitled to an award of $500.00 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

67.  Plaintiffs and Class members are also entitled to and do seek injunctive relief prohibiting Defendants' violation of the TCPA in the future.

## THIRD COUNT

### CIVIL CONSPIRACY TO VIOLATE THE TELEPHONE CONSUMER PROTECTION ACT 47 U.S.C. § 227 *ET SEQ.*

68.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

69.  Defendants agreed among themselves to violate the TCPA and injure Plaintiffs and Class members by conducting an illegal robocalling campaign to

53a

encourage Nashville residents to sign their referendum petition on Friday, July 17, 2020, and Saturday, July 18, 2020.

70.  Defendant Roberts procured a post office box on behalf of Defendant No Tax 4 Nash, Defendants created a website, hired a telephone call vendor (a Defendant John Doe), directed and approved a recorded message to be played to unsuspecting call recipients, supervised the calls, and paid for these services, achieving the outcome of generating awareness of their referendum petition drive.

71.  Defendants met in person and/or communicated by phone and email to achieve the objectives of the conspiracy.

72.  Plaintiffs and Class members were injured by the conspiracy in the form of the annoyance, burden, time, and expense of dealing with the unwanted, illegal robocalls.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs and all Class members the following relief against Defendants:

A.  Injunctive relief prohibiting such violations of the TCPA by Defendants in the future;

B.  As a result of Defendants' willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each Class member treble damages, as provided by statute, of up to $1,500.00 for each and every violation of the TCPA;

C.  As a result of Defendants' violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and

54a

each Class member $500.00 in statutory damages for each and every violation of the TCPA;

D.    An award of attorneys' fees and costs to counsel for Plaintiffs and the Class;

E.    An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class (and any Subclasses the Court deems appropriate), finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

F.    A trial by jury on all counts so triable; and

G.    Such other relief as the Court deems just and proper.

Date: July 17, 2020          Respectfully submitted,

John Spragens, TN
Bar No. 31445
SPRAGENS LAW PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533

*Attorneys for Plaintiffs and the Proposed Class*

55a

*320cv657, Hawkins v. Well Path, LLC*

US District Court Docket
United States District Court,
Tennessee Middle
(Nashville)

This case was retrieved on 11/12/2020

Header

| | |
|---|---|
| Case Number: | 3:20cv657 |
| Date Filed: | 07/31/2020 |
| Assigned To: | District Judge William L. Campbell, Jr |
| Referred To: | Magistrate Judge Jeffery S. Frensley |
| Nature of Suit: | *Telephone Consumer Protection Act* (485) |
| Cause: | Restrictions of Use of *Telephone* Equipment |
| Lead Docket: | None |
| Other Docket: | New York Southern, 7:19-cv-08969 |
| Jurisdiction: | Federal Question |
| Class Code: | Closed |
| Closed | 02/02/2021 |
| Statute: | 47:227 |
| Jury Demand: | Plaintiff |
| Demand Amount: | $5,000,000 |
| NOS Description: | *Telephone Consumer Protection Act* (TCPA) |

56a

| Litigants | Attorneys |
| --- | --- |
| Janie Hawkins<br><br>individually and on behalf of all others similarly situated<br>Plaintiff | James Gerard Stranch , IV<br>ATTORNEY TO BE NOTICED<br>Branstetter, Stranch &<br>  Jennings, PLLC<br>223 Rosa L. Parks Avenue,<br>Suite 200<br>Nashville, TN 37203<br>USA<br>(615) 254-8801<br>Fax: (615) 255-5419<br>Email:Gerards@bsjfirm.com<br><br>Joey P. Leniski , Jr.<br>ATTORNEY TO BE NOTICED<br>Branstetter, Stranch &<br>  Jennings, PLLC<br>223 Rosa L. Parks Avenue,<br>Suite 200<br>Nashville, TN 37203<br>USA<br>(615) 254-8801<br>Email:Joeyl@bsjfirm.com<br><br>Joseph Marchese<br>ATTORNEY TO BE NOTICED<br>Bursor & Fisher, P.A.<br>888 7th Avenue, Suite 304<br>New York, NY 10106<br>USA<br>(646) 837-7150<br>Fax: (212) 989-9163<br>Email:Jmarchese@bursor.com |

57a

Philip Lawrence Fraietta
ATTORNEY TO BE NOTICED
Bursor & Fisher, P.A.
888 7th Avenue Suite 304
New York, NY 10106
USA
(646) 837-7150
Fax: (212) 989-9163

58a

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

[Filed August 17, 2021]

————

Civil Action No. 7:19-cv-08969

————

JANIE HAWKINS, individually and on behalf of
all others similarly situated,

*Plaintiff,*

v.

WELL PATH, LLC,

*Defendant.*

————

CLASS ACTION COMPLAINT

————

JURY TRIAL DEMANDED

Plaintiff Janie Hawkins ("Plaintiff" or "Ms. Hawkins"), individually and on behalf of all others similarly situated, alleges the following upon information and belief against Well Path, LLC ("Well Path" or "Defendant") regarding Defendant's violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). Plaintiff brings this Complaint to: (1) stop Defendant's practice of placing calls and sending text messages using an automatic telephone dialing system ("ATDS") to the landline telephones and cellular telephones of consumers nationwide without their prior express written consent; (2) stop Defendant's practice of placing calls and sending text messages using an artificial or prerecorded voice or message to the landline telephones and

59a

cellular telephones of consumers nationwide without their prior express written consent; (3) enjoin Defendant from continuing to place calls or send text messages using an ATDS to consumers who did not provide their prior express written consent to receive them; and (4) obtain redress for all persons injured by its conduct.

## JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed class; (b) some members of the proposed Class have a different citizenship from Defendant; and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

2.   This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves violations of a federal statute, the TCPA.

3.   This Court has personal jurisdiction over Defendant because Defendant's wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

4.   Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

60a

PARTIES

5.   Plaintiff Janie Hawkins is, and at all times mentioned herein was, a resident of Spring Valley, New York, and a citizen of the State of New York.

6.   Defendant Well Path, LLC is a corporation organized under the laws of Tennessee, with a principal place of business at 1283 Murfreesboro Road, Nashville, Tennessee 37217. Well Path conducts business in this District and throughout the United States.

FACTS COMMON TO ALL CAUSES OF ACTION

   A.  The TCPA Of 1991

7.   In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

8.   The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers," defined as equipment which "has the capacity . . . (a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." 47 U.S.C. § 227(a)(1). Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. The same section forbids making calls using an "artificial or prerecorded voice." *Id.*

9.   The FCC has issued rulings clarifying that in order to obtain an individual's consent, a clear, unambiguous, and conspicuous written disclosure must be provided by the individual. 2012 FCC Order, 27 FCC Rcd. at 1839 ("[R]equiring prior written consent will better protect consumer privacy because such consent requires conspicuous action by the consumer—pro-

61a

viding permission in writing—to authorize autodialed or prerecorded telemarketing calls. . . .").

10.    The FCC has also ruled that consumers are entitled to the same protections for text messages as they are for calls to wireless numbers. *See Satterfield v. Simon & Schuster*, Inc., 569 F.3d 946, 952 (9th Cir. 2009) ("The FCC has subsequently confirmed that the prohibition on using automatic telephone dialing systems to make calls to wireless phone numbers applies to text messages (e.g. phone-to-phone [short message service]), as well as voice calls.") (internal quotations omitted).

### B. Defendant's Calls and Text Messages To Plaintiff And Class Members

11.    In or about February 2019, Plaintiff received calls on both her landline telephone and cellular telephone from Defendant (the "Calls"). Plaintiff's landline telephone number is (845) 425-0551. Plaintiff's cellular telephone number at the time of the first call was (845) 608-6068.

12.    The Calls described a job opportunity at Well Path and gave Plaintiff the option to inquire further about the opportunity.

13.    Additionally, in or about February 2019, Plaintiff received a text on her cellular telephone from Defendant (the "Text"). Plaintiff's cellular telephone number at the time of the first text was (845) 608-6068.

14.    The Text also described a job opportunity at Well Path and gave Plaintiff the option to inquire further about the opportunity.

62a

15.  Upon information and belief, both the Calls and the Text originated from a telephone number owned and operated by Defendant.

16.  Defendant sent the Calls and the Text using an automatic telephone dialing system ("ATDS") without obtaining Ms. Hawkins' prior express written consent.

17.  When Plaintiff answered Defendant's calls, she heard a momentary pause. Further, the Text was impersonal and generic. Both are hallmarks of an ATDS. According to the Federal Communications Commission and experts on telecommunications equipment, an ATDS has the inherent present capacity to both (1) store and dial a list of telephone numbers without human intervention, and (2) generate random or sequential telephone numbers and to then text those numbers.

18.  Prior to the calls and text messages at issue in this action, Ms. Hawkins had no contact with Defendant. She has never consented in writing, or otherwise, to receive autodialed or prerecorded calls or text messages from Defendant.

19.  Defendant has continued to make numerous calls and send numerous text messages to Plaintiff's landline telephone and cellular telephone.

20.  Upon information and belief, Defendant to made similar calls and sent similar text messages using the ATDS to a large number of consumers.

21.  Defendant knowingly sent (and continues to send) autodialed and prerecorded calls and text messages to the landline telephones and cellular telephones of consumers without the prior express written consent of the call and text recipients. In so doing, Defendant not only invaded the personal privacy of

63a

Plaintiff and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

## CLASS ACTION ALLEGATIONS

22.  Plaintiff brings this action on behalf of herself and all other persons similarly situated.

23.  Plaintiff proposes the following Class definition:

> All persons within the United States who (a) received a call on his or her landline telephone and/or cellular telephone; (b) received a text message on his or her cellular telephone; (c) made by or on behalf of Defendant; (d) without giving prior express written consent to Defendant; (e) at any time in the period that begins four years before the filing of the complaint in this action to the date that class notice is disseminated.

24.  Plaintiff represents, and is a member of, this proposed Class. Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, any Judge and/or Magistrate Judge to whom this action is assigned, and any member of such Judges' staffs and immediate families.

25.  Numerosity. Plaintiff does not know the exact number of members in the proposed Class, but reasonably believes, based on the scale of Defendant's business, that the Class is so numerous that individual joinder would be impracticable.

26.  Existence and predominance of common questions of law and fact. Plaintiff and all members of the proposed Class have been harmed by the acts of Defendant in the form of multiple involuntary

64a

telephone and electrical charges, the aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing calls and text messages, and violations of their statutory rights.

27.  The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a plethora of identical suits.

28.  The proposed Class can be easily identified through records maintained by Defendant.

29.  There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact involving the class claims predominate over questions which may affect individual members of the proposed class. Those common question of law and fact include, but are not limited to, the following:

   a. Whether Defendant made calls and sent text messages to Plaintiff and class members using an ATDS and/or an artificial or prerecorded call and text message without their prior express written consent;

   b. Whether Defendant's conduct was knowing and/or willful;

   c. Whether Defendant is liable for damages, and the amount of such damages; and

   d. Whether Defendant should be enjoined from engaging in such conduct in the future.

30.  Typicality. Plaintiff asserts claims that are typical of each member of the Class because they are all persons who received calls or text messages on their landline telephones or cellular telephones using an ATDS without their prior express written consent.

65a

Plaintiff will fairly and adequately represent and
protect the interests of the proposed class, and has no
interests which are antagonistic to any member of the
proposed class.

31. Adequacy of Representation. Plaintiff will fair-
ly and adequately represent and protect the interests
of the proposed class, and has no interests which are
antagonistic to any member of the proposed Class.

32. Plaintiff has retained counsel experienced in
handling class action claims involving violations of
federal and state consumer protection statutes.

33. Superiority. A class action is the superior
method for the fair and efficient adjudication of this
controversy.

34. Classwide relief is essential to compel Defend-
ant to comply with the TCPA.

35. The interest of the members of the proposed
Class in individually controlling the prosecution of
separate claims against Defendant is small because
the statutory damages in an individual action for
violation of the TCPA are relatively small.

36. Management of these claims is likely to pre-
sent significantly fewer difficulties than are presented
in many class claims because the calls and text
messages at issue are all automated and the members
of the Class, by definition, did not provide the prior
express written consent required under the statute
to authorize calls and text messages to their landline
telephones or cellular telephones.

37. Defendant has acted on grounds generally
applicable to the proposed Class, thereby making final
injunctive relief and corresponding declaratory relief

66a

with respect to the proposed Class as a whole appropriate.

38.   Moreover, upon information and belief, Plaintiff alleges that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

<u>FIRST CAUSE OF ACTION</u>

KNOWING AND/OR WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227, *et seq*.

39.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

40.   The foregoing acts and omissions of Defendant constitute knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq*.

41.   As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227 *et seq*., Plaintiff and members of the proposed Class are entitled to treble damages of up to $1,500.00 for each and every call or text message sent in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(C).

42.   Plaintiff and members of the proposed Class are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by Defendant in the future.

43.   Plaintiff and members of the proposed Classes are also entitled to an award of attorneys' fees and costs.

67a

## SECOND CAUSE OF ACTION

VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227, *et seq*.

44.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

45.   The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq*.

46.   As a result of Defendant's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and members of the proposed Classes are entitled to an award of $500.00 in statutory damages for each and every call or text message made in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

47.   Plaintiff and members of the proposed Classes are also entitled to, and do, seek injunctive relief prohibiting such conduct violating the TCPA by Defendant in the future.

48.   Plaintiff and members of the proposed Class are also entitled to an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed Class the following relief against Defendant:

   a.   Injunctive relief prohibiting such violations of the TCPA by Defendant in the future;

   b.   As a result of Defendant's willful and/or knowing violations of the TCPA, Plaintiff seeks for herself and each member of the proposed

68a

Class treble damages, as provided by statute, of up to $1,500.00 for each and every call or text message that violated the TCPA;

c.  As a result of Defendant's violations of the TCPA, Plaintiff seeks for herself and each member of the proposed Class $500.00 in statutory damages for each and every call or text message that violated the TCPA;

d.  An award of attorneys' fees and costs to counsel for Plaintiff and the proposed Class;

f.  An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing appropriate the Class, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firm representing Plaintiff as counsel for the Class;

g.  Such other relief as the Court deems just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: September 26, 2019

Respectfully submitted,

BURSOR & FISHER, P.A.
By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Joseph I. Marchese
Philip L. Fraietta
888 Seventh Ave.
New York, NY 10025

69a

Telephone: (646) 837-7142
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com
pfraietta@bursor.com

*Attorneys for Plaintiff*

70a

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

[Filed October 16, 2020]

———

Case No. 4:20-cv-00165-BSM

———

CHRIS OLSEN, on behalf of himself and all
others similarly situated,

*Plaintiff,*

vs.

DESERT LAKE GROUP, LLC, D/B/A FIRST CLASS HERB
TINCTURE, D/B/A FIRST CLASS HERBALIST CBD, D/B/A
HERBALIST OILS, D/B/A HERBALIST SILVER, D/B/A
HERBALIST SLEEP; SOCIALLITY LLC, D/B/A SOCIALLITY
ACCESSNOW HEALTH COMMUNITY, D/B/A SOCIALITY
GROUP; PETER GALLIC; EXPRESS REVENUE, INC; OFFER
SPACE, LLC, D/B/A DIAL RESPONSE, D/B/A FULFILL
PATH; TRAFFIC SPACE, LLC; and JOHN DOES 1-10,

*Defendants.*

———

JUDGE BRIAN S. MILLER
Magistrate Judge Kierney

JURY DEMAND CLASS ACTION

———

FIRST AMENDED CLASS ACTION COMPLAINT
FOR DAMAGES AND INJUNCTIVE RELIEF
UNDER THE TELEPHONE CONSUMER
PROTECTION ACT, 47 U.S.C. § 227, AND THE
ARKANSAS CIVIL ACTION BY CRIME VICTIMS
ACT, ARK CODE ANN. § 16-118-107.

71a

COMES now Chris Olsen, on behalf of himself and all other persons or entities similarly situated, as Representative Plaintiff, and files this Class Action Complaint against the Defendants Desert Lake Group, LLC, d/b/a First Class Herb Tincture, d/b/a First Class Herbalist CBD, d/b/a Herbalist Oils, d/b/a Herbalist Silver, d/b/a Herbalist Sleep, Sociallily LLC, d/b/a Sociallity AccessNow Health Community, d/b/a Sociallity Group, Peter Gallic, Express Revenue, Inc., Offer Space LLC, d/b/a Dial Response, d/b/a Fulfill Path, Traffic Space, LLC, and John Does 1-10 ("Defendants").[1] Representative Plaintiff brings this Class Action Complaint resulting from the illegal actions of Defendants in negligently, and/or willfully, sending unsolicited, autodialed text messages to the cellular telephones of Representative Plaintiff and others in the Class without their prior express consent, in violation of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 et seq., ("TCPA"), as well as illegally attempting to disguise the origin of Defendants' illegal calls through the criminal act of "spoofing" which is a felony in the State of Arkansas and which therefore renders Defendants further liable to the Class pursuant to Ark. Code Ann. § 16-118-107. Representative Plaintiff, for his Class Action Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief,

---

[1] As of the filing of this First Amended Class Action Complaint, the case is stayed against bankrupting defendant Desert Lake Group, LLC, d/b/a First Class Herb Tincture, d/b/a First Class Herbalist CBD, d/b/a Herbalist Oils, d/b/a Herbalist Silver, d/b/a Herbalist Sleep. *See* Dkt. 15. The Court lifted the stay as to non-bankrupting defendants. *See* Dkt. 18.

72a

including investigation conducted by his attorneys and would respectfully show the following:

1. The TCPA strictly forbids unsolicited text messages exactly like those alleged in this Complaint — intrusive text messages to private cellular phones, placed via autodialer technology to numbers obtained without the prior express consent of the recipients.

2. Further, Ark. Code Ann. § 16-118-107 provides Arkansans with an additional civil cause of action when the conduct employed against them by a Defendant constitutes a felony. The State of Arkansas has made abundantly clear that "spoofing" such as that employed by the Defendants in the case at bar, i.e. the illegal act of disguising the number from which a call to a cellular phone originates, is a felony in the State of Arkansas and will not be tolerated when employed here.

3. Defendants' violations caused Representative Plaintiff and the members of the Class as defined herein to experience both actual and statutorily recognized harm, including aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing text message calls, necessarily attaches to the deceptive and illegal act of spoofing, and is an unambiguous violation of their statutory rights.

4. Representative Plaintiff and members of the Class suffered a concrete injury in fact, whether tangible or intangible, that is directly traceable to Defendants' conduct, and is likely to be redressed by a favorable decision in this action.

5. Representative Plaintiff seeks an injunction stopping Defendants from sending unsolicited text

73a

messages in violation of the TCPA and prohibiting further illegal "spoofing" as defined by Arkansas law, as well as an award of statutory damages under the TCPA, together with an award of costs and reasonable attorneys' fees associated with the necessity of prosecuting this action against Defendants.

## PARTIES, JURISDICTION AND VENUE

6.  Representative Plaintiff Chris Olsen is an Arkansas citizen and resident of Russellville, Pope County, Arkansas. Hereinafter, Chris Olson will be referred to in his individual capacity as "Representative Plaintiff."

7.  Defendant Desert Lake Group, LLC, d/b/a First Class Herb Tincture, d/b/a First Class Herbalist CBD, d/b/a Herbalist Oils, d/b/a Herbalist Silver, d/b/a Herbalist Sleep ("Desert Lake Group") is a for-profit corporation in Utah, having an address of 6975 Union Park Avenue, Suite 600, Cottonwood Heights, UT 84047, and may be served through its registered agent, Darin Toone, at 6975 Union Park Avenue, Suite 600, Cottonwood Heights, UT 84047.

8.  Defendant Sociallilty LLC, d/b/a Sociality AccessNow Health Community, d/b/a Sociality Group ("Sociality") is a for-profit company incorporated in Delaware, and may be served through its registered agent at Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, DE 19958.

9.  Defendant Peter Gallic is a citizen and resident of New Jersey, who may be served at 44 Hillcrest Road, Warren, New Jersey 07059. Mr. Gallic is an officer of Sociality.

10.  Defendant Express Revenue, Inc. ("Express") is a for-profit company incorporated in Florida, and

74a

may be served through its registered agent, Kofsky Weinger PA, at 4010 Sheridan St, Hollywood, FL 33021. Express is a company engaged in the business of affiliate internet marketing, which is a service whereby one website or internet advertisement is used to drive internet traffic and customers to another website which is selling a product or service.

11. Defendant Offer Space LLC, d/b/a Dial Response, d/b/a Fulfill Path ("Offer Space") is a for-profit company incorporated in Utah, and may be served through its registered agent, Christopher Armstrong, at 1261 South 820 East, Suite 210, American Fork, UT 84003. Offer Space provides direct response marketing services, customer service and risk mitigation technology services.

12. Traffic Space, LLC ("Traffic Space") is a for-profit company incorporated in Utah and may be served through its registered agent, Anderson & Karrenberg, P.C., 50 W. Broadway, Suite 700, Salt Lake City, UT 84101. Traffic Space provides marketing and customer acquisition services.

13. Defendants John Does 1-10 represent those persons, corporations, or other legal entities that acted as agents, consultants, independent contractors or representatives of the persons or corporations, that were responsible for creating and causing to be sent the text messages received by Representative Plaintiff and the Class defined herein and whose identities at this time are unknown but will be substituted by amendment when ascertained.

14. The claims of the classes of persons represented by the Representative Plaintiff arise pursuant to the provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (hereinafter, "TCPA") and

75a

the Arkansas Civil Action by Crime Victims Act, Ark. Code Ann. § 16-118-107, respectively.

15. This Court has jurisdiction over this action pursuant to Ark. Code Ann. § 16-4-101 *et seq*. This Court has jurisdiction over the Defendants because at all relevant times they conducted business in Arkansas and the claims advanced by the Representative Plaintiff in this action arise directly and specifically from Defendants' illegal contacts with and into the State of Arkansas.

16. Venue is proper in Pope County both in that the Representative Plaintiff is a resident of this County and in that the conduct which forms the basis of this action was specifically directed by Defendants into and towards Pope County.

## NATURE OF THE ACTION

17. In 1991, Congress enacted the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA), in response to a growing number of consumer complaints regarding certain telemarketing practices.

18. The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers." Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. As recognized by the Federal Communications Commission ("FCC") and the Courts, a text message is a call under the TCPA. *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 955 (9th Cir. 2009).

19. According to findings by the FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited

76a

because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.

20.  The term "call" under the TCPA and its promulgating regulations includes text messages. *See* Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003) (2003 TCPA Order).

21.  One of the most bulk advertising methods employed by companies today involves the use of "Short Message Services" (or "SMS"), which is a system that allows for transmission and receipt of short text messages to and from wireless telephones.

22.  SMS text messages are directed to a wireless device through a telephone number assigned to the device. When an SMS text message is successfully transmitted, the recipient's wireless phone alerts the recipient that a message has been received. Because wireless telephones are carried on their owner's person, SMS text message are received virtually anywhere in the world.

23.  Unlike more conventional advertisements, SMS message advertisements can actually cost their recipients money because wireless phone users must pay their wireless service providers either for each text message they receive or incur a usage allocation deduction to their text messaging or data plan, regardless of whether the message is authorized.

77a

24.   Moreover, the transmission of an unsolicited SMS text message to a cellular device is distracting and aggravating to the recipient; intrudes upon the recipient's seclusion; wastes a quantifiable amount of available data on the recipient's cellular device, thereby reducing its data storage capacity; temporarily reduces the available computing power and application processing speed on the recipient's device; diminishes the available battery power which shortens the battery life; and requires expending a quantifiable amount of energy (electricity) to recoup the battery power lost as a result of receiving such a message.

25.   As of October 16, 2013, express written consent is required to make any such telemarketing calls of text messages to the telephones of consumer. The express written consent must be signed and be sufficient to show the consumer received clear and conspicuous disclosure of the significance of providing consent and must further unambiguously agree to receive future phone calls.

26.   Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendant to demonstrate that Representative Plaintiff provided express consent within the meaning of the statute.

27.   On July 10, 2015, the FCC released a Declaratory Ruling which clarified that a consumer who had previously provided "express consent" to receive automated calls or text messages has a right to revoke such consent. Under the Declaratory Ruling, consumers can revoke consent using any reasonable method, including orally or in writing, that clearly expresses his or her desire not to receive further calls. However, even before the release of the FCC Order finding

78a

that consent to receive a text message could be revoked, the Mobile Marketing Association declared in October 2012 in its U.S. Consumer Best Practices for Messaging that "[a] subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program . . ." and ". . . if the subscriber sent STOP or STOP ALL to the short code, they are opted out of all programs they were enrolled in on that short code. Moreover, the 2015 FCC Order regarding revocation of consent was upheld by the D.C. Circuit. *See ACA Intl v. Fed. Commc'ns Comm'n,* No. 15-1211, 2018 WL 1352922, at *1 (D.C. Cir. Mar. 16, 2018) ("We uphold the Commission's approach to revocation of consent, under which a party may revoke her consent through any reasonable means clearly expressing a desire to receive no further messages from the caller.")

28.  Finally, TCPA auto-dialer violations such as the those at issue are, in their most duplicitous form, almost always transmitted through the use of "spoofing" technology designed to hide the true identity of the senders responsible for these illegal transmissions. To address this inherently deceptive form of illegal marketing which has reached virtually epidemic levels in this State and beyond, the Arkansas Legislature made abundantly clear that it will be treated with zero tolerance in the State of Arkansas and, effective April 16, 2019, elevated each such "spoofed" transmission to the level of a Class D Felony. Ark. Code Ann. § 5-63-205.

## FACTUAL ALLEGATIONS

29.  Representative Plaintiff, a resident of Russellville, Pope County, Arkansas, has, and at all relevant times had, a cellular telephone with text messaging capabilities. Representative Plaintiff receives

79a

text messages ("texts") at the cell numbers associated with that cellular telephone.

30.   On October 26, 2019, Representative Plaintiff received on his cellular telephone the following text from telephone number +1 (657) 325-3495:

> "CHRIS, try these CBD Gummies! CBD has been medically proven to help support stress, anxiety and pain?
>
> cbd123.xyz/XHg3rfSrn
>
> Reply STOP to opt out."

31.   The link in the text message directs the recipient to a website called firstclassherbtincture.com, which sells and promotes products and services offered by the Defendants, including the CBD Gummies described in the body of the text message, membership in the Online Fitness Pro Trainer Online Bootcamp and Weight Loss System sponsored by O-Zone, and enrollment in the Sociallity AccessNow health community program.

32.   The telephone number from which the text message to Representative Plaintiff originated, +1 (657) 325-3495, is a non-functioning telephone number.

33.   The October 26, 2019 text is one of several texts received by the Representative Plaintiff during the class period from Defendants of identical and/or substantially similar character to that reproduced above and purporting to originate from the telephone number +1 (657) 3253495. It is expected that the list of illegal anonymous cell phone transmissions to the Representative Plaintiff and Class members may likely be supplemented as discovery progresses.

80a

34.   As described above, Defendants engaged in an illegal anonymous auto-dialer texting scheme designed to promote their commercially-available products and services. Specifically, upon information and belief, Defendants caused the sending of text messages to Representative Plaintiff and other individuals for the purpose of driving traffic to an online advertising network.

35.   To this end, upon information and belief, Defendants repeatedly used auto dialers to place text message calls to hundreds if not thousands of individuals in Arkansas and beyond. Specifically, Defendants amassed the names and phone numbers of the Class Members from unknown sources, and then placed unsolicited text messages in furtherance of their respective for-profit and commercial interests.

36.   In direct violation of Arkansas civil and criminal law, the anonymous texts falsely purported to originate from the "spoofed" number +1 (657) 325-3495 in an attempt to conceal the true identity of the Defendants. The forgoing is a currently nonfunctional number of which the Representative Plaintiff is currently aware, though it is expected that the list of illegal spoofed numbers utilized by Defendants against the members of the Class may likely be supplemented as discovery progresses.

37.   Defendants did not obtain any prior express consent, in writing or otherwise, from Representative Plaintiff or any of the Class Members before bombarding their cellular telephones with autodialed telemarketing texts.

38.   These unsolicited text message calls placed to Representative Plaintiff and the Class Members wireless telephone were placed, upon information and

81a

belief, via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(l) and by using "an artificial or prerecorded voice" system as prohibited by 47 U.S.C. § 227 (b)(1)(A), which had the capacity to produce or store numbers randomly or sequentially, to dial numbers, and to place text message calls to Representative Plaintiff and the Class Members' cellular telephones.

39.   The telephone number that Defendants called was assigned to Representative Plaintiff's cellular telephone pursuant to 47 U.S.C. § 227 (b)(1).

40.   Defendants, and/or their employees and/or its agents, created the offending texts, including the substance of the texts and had the capability to control the contents thereof.

41.   Defendants, and/or their employees and/or its agents, determined the telephone numbers to which the offending texts were sent to the Representative Plaintiff and the Class.

42.   These text message calls constitute calls that were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A)(i).

43.   Neither Representative Plaintiff nor the Class provided Defendants prior express consent to receive unsolicited text message calls pursuant to 47 U.S.C. § 227 (b)(1)(A).

44.   Representative Plaintiff further alleges that in each instance that a text messages was sent, Defendants did so willfully or knowingly.

45.   Representative Plaintiff further alleges on information and belief that in each instance Defendants had actual notice of participation, or a high degree of involvement, in a plan to transmit these

82a

unsolicited texts to cell phones by, for example, participating in preparing their content, providing or obtaining the cell phone numbers of Representative Plaintiff or other Class recipients, and knowing that Representative Plaintiff and other Class recipients had not authorized the texts to be sent by prior express invitation or permission.

46.   These text message calls by Defendants are in direct violation of 47 U.S.C. § 227(b)(1).

47.   By illegally contacting Representative Plaintiff and the other Class Members via their cellular telephone with the text messages at issue without their prior express consent, Defendants caused both actual and statutorily recognized harm. With regard to the Representative Plaintiff, this included invasion of privacy, causing him to incur reduced telephone time and capacity for which he had previously paid by having to retrieve or administer the Defendants' illegal text messages, as well as the aggravation, nuisance, worry, and harassment that necessarily accompanied his receipt of unsolicited serial text messages and the time involved in attempting to ascertain both the origin of the number from which he came to realize it had been criminally "spoofed" and how these unknown Defendants obtained his cell phone number.

CLASS ACTION ALLEGATIONS

48.   Representative Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and the following nationwide class (the "Spam Text Class") defined as follows:

> All individuals or entities in the United States who, from four years prior to the filing

83a

date of this Complaint through the filing date
thereof, received one or more text messages
that (1) purported to originate from the
telephone number +1 (657) 325-3495, and (2)
contains a link to firstclassherbtincture.com.

49.  Representative Plaintiff also brings this action
pursuant to Federal Rule of Civil Procedure 23(b)(2)
and 23(b)(3) on behalf of himself and the following
subclass of Arkansans (the "Spoofed Number Sub-
Class") defined as follows:

50.  All individuals or entities in the State of
Arkansas who, from four years prior to the
filing date of this Complaint through the
filing date thereof, received one or more
text messages that (1) purported to originate
from the telephone number +1 (657) 325-
3495, and (2) contains a link to firstclassherb
tincture.com.

Collectively, the Spam Text Class and the Spoofed
Number Sub-Class are referred to herein as "the
Class."

51.  Excluded from the Class are: (1) Defendants
and any entity in which Defendants have a control-
ling interest, and their legal representatives, officers,
directors, assignees, and successors, and any co-
conspirators; and (2) any judge or justice to whom
this action is assigned, together with any relative of
such judge or justice within the third degree of rela-
tionship, and the spouse of any such person.

52.  Upon information and belief, Representative
Plaintiff alleges that these unsolicited texts sent by
and/or on behalf of the Defendants have been trans-
mitted to the cellular telephones of hundreds and
potentially thousands of Class Members without their

84a

prior express consent through an intentional and persistent course of knowingly illegal and deceptive conduct. Each such transmission constitutes both a separate violation of the TCPA and a separate felony under Arkansas law. Because the Class members are believed to number in the hundreds if not thousands, individual joinder is impractical in satisfaction of Ark. R. Civ. P. 23(a)(1) as a matter of both fact and common sense. The disposition of the claims of the Class members in a single action clearly provide substantial benefits to all parties and to the Court and represents, and indeed is the textbook example of, a case meriting and requiring certification pursuant to Ark. R. Civ. P. 23.

53.    Representative Plaintiff's claims are typical of the claims of the Class, as required by Ark. R. Civ. P. 23(a)(3), in that Representative Plaintiff received an unsolicited text without his prior express consent from Defendants to promote their commercial products and services during the proposed Class Period.

54.    The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common cause of injury to Representative Plaintiff and the Class members.

55.    Numerous questions of law and fact are common to the Class and predominate over questions affecting only individual Class members, as required by Fed. R. Civ. P. 23(a)(2) and 23(b)(3). Such common questions including, but are not limited to:

      i.    Whether Defendants' conduct constitutes a violation of the TCPA;

      ii.    whether the equipment Defendants used to transmit the text messages in question was

85a

an automatic telephone dialing system as contemplated by the TCPA;

iii. whether Defendants obtained prior express consent to send the text messages in question;

iv. whether Class members are entitled to treble damages based on the willfulness of Defendants' conduct; and

v. whether the Defendants engaged in conduct that would constitute a felony under Arkansas law, for purposes of the corresponding civil remedies provided by Ark. Code Ann. § 16-118-107.

56. Representative Plaintiff's claims are typical of the claims of the Class because they arise from the same course of conduct by Defendants and the relief sought is common.

57. The Class is ascertainable, as the Class is defined using objective criteria easily identifiable based on existing telephone and other business records of the Defendants.

58. Representative Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Fed. R. Civ. P. 23(a)(4). Moreover, Representative Plaintiff has retained counsel with substantial experience in the prosecution of both nationwide and Arkansas specific consumer rights and individual privacy class actions. Representative Plaintiff and his counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.

86a

<u>COUNT 1</u>

NEGLIGENT VIOLATIONS OF THE TCPA,
47 USC §227 (ON BEHALF OF REPRESENTATIVE
PLAINTIFFS AND THE SPAM TEXT CLASS)

59.   Representative Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

60.   Defendants made unauthorized automated text message calls using an automatic telephone dialing system or prerecorded voice to the cellular telephone numbers of Representative Plaintiff and other members of the Class without the prior express written consent.

61.   These text message calls were made en masse using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. By using such equipment, Defendants were able to send thousands of text messages simultaneously to thousands of consumers' cellphones without human intervention. These text messages are analogous to a prerecorded voice made without the prior express consent of Representative Plaintiff.

62.   The foregoing acts and omissions of Defendants constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

63.   As a result of Defendants' negligent violations of 47 U.S.C. § 227 et seq., Representative Plaintiff and the Class are entitled to an award of $500.00 in

87a

statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

64.   Representative Plaintiff and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

<u>COUNT 2</u>

KNOWING AND/OR WILLFUL VIOLATIONS OF THE TCPA, 47 USC §227 (ON BEHALF OF REPRESENTATIVE PLAINTIFF AND THE SPAM TEXT CLASS)

65.   Representative Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

66.   Defendants made unauthorized automated text message calls using an automatic telephone dialing system or prerecorded voice to the cellular telephone numbers of Representative Plaintiff and other members of the Class without the prior express written consent.

67.   These text message calls were made en masse using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. By using such equipment, Defendants were able to send thousands of text messages simultaneously to thousands of consumers' cellphones without human intervention. These text messages are analogous to a prerecorded voice made without the prior express consent of Representative Plaintiff.

68.   The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful violations of the TCPA, including but

88a

not limited to each and every one of the above-cited provisions of 47 U.S.C. §§ 227 et seq.

69.   As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227 et seq., Representative Plaintiff and the Class are entitled to treble damages, as provided by statute, up to $1,500.00, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

70.   Representative Plaintiff and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## COUNT 3

CLAIM PURSUANT TO THE ARKANSAS
CIVIL ACTION BY CRIME VICTIMS ACT,
ARK CODE ANN. § 16-118-107 (ON BEHALF
OF REPRESENTATIVE PLAINTIFF AND
THE SPOOFED NUMBER SUB-CLASS)

71.   Representative Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint fully as if set forth herein.

72.   Arkansas Code Annotated section 16-118-107(a)(1) provides that "any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct."

73.   The conduct of Defendants as set forth herein constitute felonies under the strict anti-spoofing strictures of Ark. Code Ann. § 5-63-205.

74.   As a direct and proximate result of Defendants' conduct the Representative Plaintiff and the Class have suffered actual and statutory damages in excess of that required for Federal Diversity and CAFA

89a

jurisdiction and are entitled to an award thereof as well as their attorney fees and expenses pursuant to Ark. Code Ann. 16-18-107(a)(3).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Representative Plaintiff respectfully prays for the following relief:

a.   An Order certifying the claims of the Representative Plaintiff and all other persons similarly situated as defined above, and appointing Representative Plaintiff and his counsel as Class representative and Class counsel, respectively;

b.   An award of actual and statutory damages in an amount in excess of that required for Federal Diversity and CAFA jurisdiction, including the trebling of such damages as provided for by the TCPA;

c.   An injunction requiring Defendants to cease all unsolicited text message and/or spoofing activities in the State of Arkansas and otherwise protecting the interests of the Class;

d.   An award of attorneys' fees and costs;

e.   Trial by jury as to all issues so triable; and

f.   Such other and further relief as is just and equitable under the circumstances.

DATED: October 15, 2020

Respectfully submitted

<u>/s/ Joe P. Leniski, Jr.</u>
Joe P. Leniski, Jr.
BRANSTETTER, STRANCH
  & JENNINGS, PLLC
The Freedom Center
223 Rosa Parks Avenue,

90a

Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Email: joeyl@bsjfirm.com

James A. Streett
(ABA# 2007092)
STREETT LAW FIRM, P.A.
107 West Main Street
Russellville, AR 72801
Telephone: (479) 968-2030
Facsimile: (479) 968-6253
Email: James@StreettLaw.com

*Attorneys for Representative*
*Plaintiff and Putative Class*
*Counsel*

## CERTIFICATE OF SERVICE

**I** hereby certify that on this day, October 15th, 2020, I served a copy of the foregoing document on Counsel of Record via e-mail and U.S. Mail as follows:

Byron Jansen Walker
Rose Law Firm
120 East Fourth Street
Little Rock, AR 72201-2893
501-377-0351
Email: bwalker@roselawfirm.com

Joseph Christopher Hall
Rose Law Firm
Post Office Box 4800
Fayetteville, AR 72702
479-695-1330
Fax: 479-695-1332

/s/ Joe P. Leniski, Jr.
Joe P. Leniski, Jr.

91a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

————

Case No.:

————

KEVIN YASHTINSKY, on behalf of himself, and
all others similarly situated,

*Plaintiff*,

v.

WALMART, INC.,

*Defendant*.

————

CLASS ACTION

Jury Trial Demanded

————

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF PURSUANT TO THE
TELEPHONE CONSUMER PROTECTION ACT

INTRODUCTION

1.   Kevin Yashtinsky ("Plaintiff") brings this Class
Action Complaint and Demand for Jury Trial for
damages, injunctive relief, and any other available
legal or equitable remedies, resulting from the illegal
actions of Walmart Inc. ("Defendant" or "Walmart"),
in negligently, and/or willfully contacting Plaintiff
through text messages calls on his cellular telephone,
in violation of the Telephone Consumer Protection Act,
47 U.S.C. §§ 227 *et seq.*, ("TCPA"), thereby invading
his privacy. Plaintiff alleges as follows upon personal

92a

knowledge as to his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

2.   The TCPA strictly forbids unsolicited text messages exactly like those alleged in this Complaint – intrusive text messages to private cellular phones, placed to numbers obtained without the prior express consent of the recipients.

3.   Defendant's violations cause Plaintiff and members of the Class of consumers (defined below) to experience actual harm, including aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing text message calls, as well as the violation of their statutory rights.

4.   Plaintiff and members of the Class suffered a concrete injury in fact, whether tangible or intangible, that is directly traceable to Defendant's conduct, and is likely to be redressed by a favorable decision in this action.

5.   Plaintiff seeks an injunction stopping Defendant from sending unsolicited text messages, as well as an award of statutory damages under the TCPA, together with costs and reasonable attorneys' fees.

## JURISDICTION AND VENUE

6.   This Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under the Telephone Consumer Protection Act, 47 U.S.C. § 227, which is a federal statute. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 751-53 (2012).

93a

7. Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2) because Plaintiff seeks up to $1,500 in damages for each text message in violation of the TCPA, which, when aggregated among a proposed class number in the tens of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction. Further, Plaintiff alleges a national class, which will result in at least one class member belonging to a different state than that of the Defendant, providing jurisdiction under 28 U.S.C. § 1332(d)(2)(A). There-fore, both elements of diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

8. The Court has personal jurisdiction over Defendant and venue is proper in this District because Defendant transacts significant amounts of business within this District and because the Defendant is headquartered in this District.

## PARTIES

9. Plaintiff Kevin Yashtinsky is a natural person and a citizen of the State of Mississippi. He is, and at all times mentioned herein was a "person" as defined by 47 U.S.C. § 153 (39).

10. Defendant Walmart is a Delaware corporation and maintains its principal place of business at 708 SW 8th Street, Bentonville Arkansas 72716. Walmart is a "person" as defined by 47 U.S.C. § 153 (39).

Case 3:20-cv-00150-RNC   Document 103-1   Filed 12/17/21   Page 138 of 185



94a

## THE TELEPHONE CONSUMER
## PROTECTION ACT OF 1991

(TCPA), 47 U.S.C. §§ 227 *et seq.*

11.  In 1991, Congress enacted the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA),[1] in response to a growing number of consumer complaints regarding certain telemarketing practices.

12.  The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers." Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.[2] As recognized by the Federal Communications Commission ("FCC") and the Courts, a text message is a call under the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).

13.  According to findings by the FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls

---

[1]  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. §§ 201 *et seq.*

[2]  47 U.S.C. § 227(b)(1)(A)(iii).

95a

whether they pay in advance or after the minutes are used.[3]

14.   One of the most bulk advertising methods employed by companies today involves the use of "Short Message Services" (or "SMS"), which is a system that allows for transmission and receipt of short text messages to and from wireless telephones.

15.   SMS text messages are directed to a wireless device through a telephone number assigned to the device. When an SMS text message is successfully transmitted, the recipient's wireless phone alerts the recipient that a message has been received. Because wireless telephones are carried on their owner's person, SMS text message are received virtually anywhere in the world.

16.   Unlike more conventional advertisements, SMS message advertisements can actually cost their recipients money because wireless phone users must pay their wireless service providers either for each text message they receive or incur a usage allocation deduction to their text messaging or data plan, regardless of whether the message is authorized.

17.   Moreover, the transmission of an unsolicited SMS text message to a cellular device is distracting and aggravating to the recipient; intrudes upon the recipient's seclusion; wastes a quantifiable amount of available data on the recipient's cellular device, thereby reducing its data storage capacity; temporarily reduces the available computing power and application processing speed on the recipient's device; diminishes   the   available   battery   power   which

---

[3] *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003).

96a

shortens the battery life; and requires expending a quantifiable amount of energy (electricity) to recoup the battery power lost as a result of receiving such a message.

18. As of October 16, 2013, express written consent is required to make any such telemarketing calls of text messages to the telephones of consumer. The express written consent must be signed and be sufficient to show the consumer received clear and conspicuous disclosure of the significance of providing consent and must further unambiguously agree to receive future phone calls.[4]

19. Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendant to demonstrate that Plaintiff provided express consent within the meaning of the statute.

20. On July 10, 2015, the FCC released a Declaratory Ruling which clarified that a consumer who had previously provided "express consent" to receive automated calls or text messages has a right to revoke such consent. Under the Declaratory Ruling, consumers can revoke consent using any reasonable method, including orally or in writing, that clearly expresses his or her desire not to receive further calls. However, even before the release of the FCC Order finding that consent to receive a text message could be revoked, the Mobile Marketing Association declared in October 2012 in its *U.S. Consumer Best Practices for Messaging* that "[a] subscriber must be able to stop participating and receiving messages from

---

[4] *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 ¶ 33 (Feb. 15, 2012); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).

97a

any program by sending STOP to the short code used for that program . . ." and ". . . if the subscriber sent STOP or STOP ALL to the short code, they are opted out of all programs they were enrolled in on that short code. Moreover, the 2015 FCC Order regarding revocation of consent was upheld by the D.C. Circuit. *See ACA Int'l v. Fed. Commc'ns Comm'n*, No. 15-1211, 2018 WL 1352922, at *1 (D.C. Cir. Mar. 16, 2018) ("We uphold the Commission's approach to revocation of consent, under which a party may revoke her consent through any reasonable means clearly expressing a desire to receive no further messages from the caller.")

### FACTUAL ALLEGATIONS

21.  On April 10, 2019, Plaintiff Yashtinsky received a two-part text message call from Walmart to his wireless phone ending in the number 0599, for which Plaintiff provided no consent to call or text.

22.  Specifically, the text messages received by Plaintiff Yashtinsky stated as follows "WalmartRx – 1of 2 – REPLY NEEDED. TO begin receiving automated messages on your prescriptions, please reply YES. To decline reply STOP" "WalmartRX – 2of2 – Terms & Conditions at Walmart.com/alerterms Msg & data rates may apply. Reply HELP for help, STOP to unenroll"

23.  The incoming text message call from Defendant received by Plaintiff Yashtinsky emanate from the short code number 455-00, a number owned by Defendant.

24.  Plaintiff Yashtinsky is not a customer of a Walmart Pharmacy, has never received prescriptions from a Walmart Pharmacy and has never enrolled in Defendant's Prescription Messaging program.

98a

25.   Plaintiff Yashtinsky's cellular number has been included on the Do Not Call Registry since March 31, 2013.

26.   This unsolicited text message call placed to Plaintiff Yashtinsky's wireless telephone was placed via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(1) and by using "an artificial or prerecorded voice" system as prohibited by 47 U.S.C. § 227 (b)(1)(A), which had the capacity to produce or store numbers randomly or sequentially, and to dial such numbers, to place text message calls to Plaintiff Yashtinsky's cellular telephone.

27.   The telephone number that Defendant, or its agents, called was assigned to a cellular telephone service for which Plaintiff Yashtinsky incurred a charge for incoming calls pursuant to 47 U.S.C. § 227 (b)(1).

28.   These text message calls constitute calls that were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A)(i).

29.   Plaintiff Yashtinsky did not provide Defendant or its agents prior express consent to receive unsolicited text message calls pursuant to 47 U.S.C. § 227 (b)(1)(A).

30.   These text message calls by Defendant or its agents therefore violated 47 U.S.C. § 227(b)(1).

CLASS ACTION ALLEGATIONS

31.   Plaintiff bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a class of similarly situated individuals ("the Class") defined as follows:

99a

All persons in the United States who: (1) were sent a text message call placed by Defendant or its agents; (2) on his or her cellular telephone number; (3) through the use of any automatic telephone dialing system or artificial or pre-recorded voice system as set forth in 47 U.S.C. § 227(b)(1)(A)(3); (4) without consent; (5) from four years prior to the filing of this Complaint through the filing of Final Approval.

32.   Defendant and its employees or agents are excluded from the Class.

33.   Plaintiff does not know the number of members in the Class, but believe the Class members are in the hundreds of thousands, if not more. Thus, this matter should be certified as a Class action to assist in the expeditious litigation of this matter.

34.   Plaintiff and members of the Class were harmed by the acts of Defendant in at least the following ways: Defendant, either directly or through its agents, illegally contacted Plaintiff and the Class members via their cellular telephones by using unsolicited text message calls, thereby causing Plaintiff and the Class members to incur certain cellular telephone charges or reduce cellular telephone time for which Plaintiff and the Class members previously paid, and invading the privacy of said Plaintiff and the Class members. Plaintiff and the Class members were damaged thereby.

35.   This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of the Class and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the

100a

Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

36.   The joinder of the Class members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the Court. The Class can be identified through Defendant's records or Defendant's agents' records.

37.   There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the Class predominate over questions which may affect individual Class members, including the following:

   a.   Whether, between four year prior to the filing of this Complaint to the disposition of this case, Defendant or its agents placed text message calls without the recipients' prior express consent (other than a text message call made for emergency purposes or made with the prior express consent of the called party) to a Class member using any automatic telephone dialing system or an artificial or pre-recorded voice system, to any telephone number assigned to a cellular telephone service;

   b.   Whether the equipment Defendant, or its agents, used to make the text message calls in question was an automatic telephone dialing system as contemplated by the TCPA;

   c.   Whether Defendant, or its agents, text message calls can be considered an artificial or pre-recorded voice;

101a

d. Whether Defendant, or its agents, systemati-
cally made text message calls to persons who
did not previously provide Defendant with their
prior express consent to receive such text
message calls;

e. Whether Plaintiff and the Class members were
damaged thereby, and the extent of damages for
such violation; and

f. Whether Defendant and its agents should be
enjoined from engaging in such conduct in the
future.

38.    As a person that received at least one unsolic-
ited text message call to his cell phone without his
prior express written consent, Plaintiff is asserting
claims that are typical of the Class. Plaintiff will fairly
and adequately represent and protect the interests
of the Class in that Plaintiff has no interest antagonis-
tic to any member of the Class.

39.    Plaintiff and the members of the Class have
all suffered irreparable harm as a result of the
Defendant's unlawful and wrongful conduct. Absent a
class action, the Class will continue to face the
potential for irreparable harm. In addition, these
violations of law will be allowed to proceed without
remedy and Defendant will likely continue such illegal
conduct. Because of the size of the individual Class
member's claims, few, if any, Class members could
afford to individually seek legal redress for the wrongs
complained of herein.

40.    Plaintiff has retained counsel experienced in
handling class action claims and claims involving
violations of the Telephone Consumer Protection Act.

102a

41.   A class action is a superior method for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Class-wide damages are essential to induce Defendant to comply with federal law. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the maximum statutory damages in an individual action for violation of privacy are minimal, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured by prosecuting Plaintiff's claims as a class action.

42.   Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

103a

FIRST CAUSE OF ACTION

NEGLIGENT VIOLATIONS OF THE TELEPHONE
CONSUMER PROTECTION ACT 47 U.S.C. §§ 227 *ET SEQ.*

43.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

44.   Defendant made unauthorized automated text message calls using an automatic telephone dialing system or prerecorded voice to the cellular telephone numbers of Plaintiff and other members of the Class without the prior express written consent.

45.   These text message calls were made *en masse* using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. By using such equipment, Defendant was able to send thousands of text messages simultaneously to thousands of consumers' cellphones without human intervention. These text messages are analogous to a prerecorded voice made without the prior express consent of Plaintiff.

46.   The foregoing acts and omissions of Defendant and its agents constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

47.   As a result of Defendant's, and Defendant's agents', negligent violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and the Class are entitled to an award of $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

104a

48.   Plaintiff and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

SECOND CAUSE OF ACTION
KNOWING AND/OR WILLFUL VIOLATIONS OF THE
TELEPHONE CONSUMER PROTECTION ACT
47 U.S.C. §§ 227 *ET SEQ.*

49.   Plaintiff incorporates by reference paragraphs 1-42 of this Complaint as though fully stated herein.

50.   Defendant made unauthorized automated text message calls using an automatic telephone dialing system or prerecorded voice to the cellular telephone numbers of Plaintiff and other members of the Class without the prior express written consent.

51.   These text message calls were made *en masse* using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. By using such equipment, Defendant was able to send thousands of text messages simultaneously to thousands of consumers' cellphones without human intervention. These text messages are analogous to a prerecorded voice made without the prior express consent of Plaintiff.

52.   The foregoing acts and omissions of Defendant constitutes numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. §§ 227 *et seq*.

53.   As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and the Class are entitled to treble damages, as

105a

provided by statute, up to $1,500.00, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

54.   Plaintiff and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests the Court to grant Plaintiff and the Class members the following relief against Defendant:

### FIRST CAUSE OF ACTION FOR NEGLIGENT VIOLATION OF THE TCPA, 47 U.S.C. §§ 227 *ET SEQ.*

55.   As a result of Defendant's, and Defendant's agents', negligent violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks for himself and each Class member $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

56.   Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

57.   Any other relief the Court may deem just and proper.

### SECOND CAUSE OF ACTION FOR KNOWING AND/OR WILLFUL VIOLATION OF THE TCPA, 47 U.S.C. §§ 227 *ET SEQ.*

58.   As a result of Defendant's, and Defendant's agents', willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks for himself and each Class member treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

106a

59.   Pursuant to 47 U.S.C. § 227(b)(3)(A), injunc-tive relief prohibiting such conduct in the future.

60.   Any other relief the Court may deem just and proper.

JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 29, 2019

Respectfully submitted,

_/s/ James A. Streett_
STREETT LAW FIRM, P.A.
James A. Streett,
ABA#2007092
James@StreettLaw.com
107 West Main Street
Russellville, AR 72801
Tel: (479) 968-2030
Fax: (479)968-6253

BRANSTETTER, STRANCH
   & JENNINGS, PLLC
Joe P. Leniski, Jr.
(*Pro Hac Vice to be filed*)
joeyl@bsjfirm.com
The Freedom Center
223 Rosa Parks Avenue,
   Suite 200
Nashville, Tennessee 37203
Tel: (615) 254-8801
Fax: (615) 255-5419

107a

LAW OFFICES OF
  RONALD A. MARRON
Ronald A. Marron
(*Pro Hac Vice to be filed*)
ron@consumersadvocates.com
Alexis M. Wood
(*Pro Hac Vice to be filed*)
alexis@consumersadvocates.com
Kas L. Gallucci
(*Pro Hac Vice to be filed*)
kas@consumersadvocates.com
651 Arroyo Drive
San Diego, CA 92103
Tel: (619) 696-9006
Fax: (619) 564-6665

*Attorneys for Plaintiff and the
Proposed Class*

108a

**APPENDIX C**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
100 East Fifth Street, Room 540
Potter Stewart U.S. Courthouse
Cincinnati, Ohio 45202-3988
Tel. (513) 564-7000
www.ca6.uscourts.gov

Deborah S. Hun,                    Filed September 9, 2021
Clerk

Mr. David Joseph Carey
American Civil Liberties Union of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, OH 43206

Ms. Katrina Carroll Carlson Lynch
111 W. Washington Street, Suite 1240
Chicago, IL 60602

Mr. Shay Dvoretzky
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

Ms. Jessica Lynn Ellsworth
Hogan Lovells
555 13th Street, N.W.
Washington, DC 20004

Mr. Thomas Molnar Fisher
Office of the Attorney General of Indiana
302 W. Washington Street Fifth Floor
Indianapolis, IN 46204

Paul A. Grammatico
Kabat Chapman & Ozmer
333 S. Grand Avenue, Suite 2225
Los Angeles, CA 90071

109a

Mr. Matthew A. Keilson
Kabat Chapman & Ozmer
171 17th Street, N.W. Suite 1550
Atlanta, GA 30363

Mr. Roman Martinez
Latham & Watkins
555 11th Street, N.W. Suite 1000
Washington, DC 20004

Mr. Scott Lawrence Nelson
Public Citizen Litigation Group
1600 Twentieth Street, N.W.
Washington, DC 20009

Ms. Leah Marie Nicholls
Public Justice
1620 L. Street, N.W. Suite 630
Washington, DC 20036

Ellen L. Noble
Public Justice
1620 L. Street, N.W., Suite 630
Washington, DC 20036

Ms. Lindsey Powell
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 7226
Washington, DC 20530

Mr. Michael H. Pryor
Brownstein, Hyatt, Farber & Schreck
1155 F Street, N.W., Suite 1200
Washington, DC 20004

Mr. Parker Andrew Rider-Longmaid
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

110a

Mr. Adam T. Savett
Law Office
2764 Carole Lane
Allentown, PA 18104

Ms. Tara A. Twomey
National Consumer Law Center
Seven Winthrop Square, Fouth Floor
Boston, MA 02110

Mr. Ryan Watstein
Kabat Chapman & Ozmer
171 17th Street, N.W. Suite 1550
Atlanta, GA 30363

Ms. Allison M. Zieve
Public Citizen Litigation Group
1600 Twentieth Street, N.W.
Washington, DC 20009

Re:    Case No. 20-4252, *Roberta Lindenbaum v.
       Realgy, LLC, et al* Originating Case No.:
       1:19-cv-02862

Dear Counsel,

   The Court issued the enclosed order today in this
case.

                              Sincerely yours,

                              s/ Cathryn Lovely
                              Opinions Deputy

cc: Ms. Sandy Opacich
Enclosure

111a

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

No. 20-4252

_____

ROBERTA LINDENBAUM,

*Plaintiff-Appellant*,

UNITED STATES OF AMERICA,

*Intervenor*

v.

REALGY, LLC, *et al.*,

*Defendants-Appellees.*

_____

ORDER

Before:  GIBBONS, STRANCH, and BUSH,
    Circuit Judges.

After briefing and oral argument were completed, Realgy, LLC filed a motion for recusal of Judge Stranch pursuant to 28 U.S.C. § 455(a). Realgy questions Judge Stranch's impartiality because she has family members who work at a law firm that has two active Telephone Consumer Protection Act robocall cases, including a case in the Sixth Circuit, and because the firm may have more cases involving that statute in the future. Roberta Lindenbaum opposes the motion.

28 U.S.C. § 455(a) requires any judge to "disqualify [herself or] himself in any proceeding in which [her or] his impartiality might reasonably be questioned." Impartiality is determined through the eyes of "a reasonable, objective person, knowing all of the

112a

circumstances." *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 354 (6th Cir. 2007). "The burden is on the moving party to justify disqualification." *Burley v. Gagacki*, 834 F.3d 606, 616 (6th Cir. 2016). Furthermore, "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." *Scott*, 234 F. App'x at 354 (citing *Laird v. Tatum*, 409 U.S. 824, 837 (1972)).

Realgy has not met its burden. The facts Realgy alleges would not lead a reasonable, objective observer to question impartiality. Judge Stranch's relatives have no connection to the case before us. Furthermore, they are not listed as party or counsel to any pending cases to which Realgy points, nor are they listed on the law firm's website as attorneys actively soliciting robocall cases. Realgy acknowledges, as a general matter, that it would be "inappropriate" for a judge to recuse where the judge's relatives work at a firm that does legal work in the same subject area as the suit before the judge. *See* Mot. Seeking Recusal at 3 ("Appellee does not seek recusal here because a judge's distant relatives work at a firm that dabbles in the type of legal work at issue in an appeal—which would be inappropriate."). But Realgy does not offer any sufficient reason not to apply that same general principle here. Realgy also does not cite to any analogous cases requiring recusal under 28 U.S.C. § 455(a). Realgy's position would seem to require that no judge would be allowed to hear a case involving an area of practice in which an attorney who is the judge's relative practices. That is not required by 28 U.S.C. § 455(a).

Realgy attempts to analogize to 28 U.S.C. § 455(b)(4), by arguing that two of the relatives are partners at the law firm and therefore have a financial interest.

113a

But 28 U.S.C. § 455(b)(4) requires *direct* financial interest—not remote, indirect, contingent, or speculative interest. *See Scott*, 234 F. App'x at 357 (citing *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000)). As noted, none of the relatives are parties or counsel to a party in this case and none of the relatives will receive direct financial benefit from this court's ruling. *See, e.g.*, *Hall v. City of Williamsburg,* 768 F. App'x 366, 372 (6th Cir. 2019) (affirming the denial of a motion for recusal based partially on the fact that "[n]either the district judge's sister nor nephew worked on [plaintiff's] case").

Because a reasonable, objective person would not question Judge Stranch's impartiality based on the facts alleged, we decline to address the timeliness of the motion.

The motion seeking recusal is DENIED.

ENTERED BY ORDER
OF THE COURT

/s/ Deborah S. Hunt
Deborah S. Hunt, Clerk

114a

**APPENDIX D**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
100 East Fifth Street, Room 540
Potter Stewart U.S. Courthouse
Cincinnati, Ohio 45202-3988
Tel. (513) 564-7000
www.ca6.uscourts.gov

Deborah S. Hunt,                    Filed September 9, 2021
Clerk

Mr. David Joseph Carey
American Civil Liberties Union of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, OH 43206

Ms. Katrina Carroll Carlson Lynch
111 W. Washington Street, Suite 1240
Chicago, IL 60602

Mr. Shay Dvoretzky
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

Ms. Jessica Lynn Ellsworth
Hogan Lovells
555 13th Street, N.W.
Washington, DC 20004

Mr. Thomas Molnar Fisher
Office of the Attorney General of Indiana
302 W. Washington Street Fifth Floor
Indianapolis, IN 46204

Paul A. Grammatico
Kabat Chapman & Ozmer
333 S. Grand Avenue, Suite 2225
Los Angeles, CA 90071

115a

Mr. Matthew A. Keilson
Kabat Chapman & Ozmer
171 17th Street, N.W. Suite 1550
Atlanta, GA 30363

Mr. Roman Martinez
Latham & Watkins
555 11th Street, N.W. Suite 1000
Washington, DC 20004

Mr. Scott Lawrence Nelson
Public Citizen Litigation Group
1600 Twentieth Street, N.W.
Washington, DC 20009

Ms. Leah Marie Nicholls
Public Justice
1620 L. Street, N.W. Suite 630
Washington, DC 20036

Ellen L. Noble
Public Justice
1620 L. Street, N.W., Suite 630
Washington, DC 20036

Ms. Lindsey Powell
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 7226
Washington, DC 20530

Mr. Michael H. Pryor
Brownstein, Hyatt, Farber & Schreck
1155 F Street, N.W., Suite 1200
Washington, DC 20004

Mr. Parker Andrew Rider-Longmaid
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

116a

Mr. Adam T. Savett
Law Office
2764 Carole Lane
Allentown, PA 18104

Ms. Tara A. Twomey
National Consumer Law Center
Seven Winthrop Square, Fouth Floor
Boston, MA 02110

Mr. Ryan Watstein
Kabat Chapman & Ozmer
171 17th Street, N.W., Suite 1550
Atlanta, GA 30363

Ms. Allison M. Zieve
Public Citizen Litigation Group
1600 Twentieth Street, N.W.
Washington, DC 20009

Re:    Case No. 20-4252*, Roberta Lindenbaum v. Realgy, LLC, et al* Originating Case No.: 1:19-cv-02862

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Sandy Opacich

Enclosures
Mandate to issue.

117a

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0213p.06

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————

No. 20-4252

————

ROBERTA LINDENBAUM, individually and on
behalf of all others similarly situated,

*Plaintiff-Appellant*,

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

v.

REALGY, LLC, a Connecticut limited liability
company, dba Realgy Energy Services,

*Defendant-Appellee*.

————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cv-02862—Patricia A. Gaughan,
Chief District Judge.

Argued: July 29, 2021
Decided and Filed: September 9, 2021

Before: GIBBONS, STRANCH, and BUSH,
Circuit Judges.

————

118a

COUNSEL

ARGUED: Ellen Noble, PUBLIC JUSTICE, PC, Washington, D.C., for Appellant. Lindsey Powell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. Ryan D. Watstein, KABAT CHAPMAN & OZMER LLP, Atlanta, Georgia, for Appellee.

ON BRIEF: Ellen Noble, Leah Nicholls, PUBLIC JUSTICE, PC, Washington, D.C., Katrina Carroll, CARLSON LYNCH LLP, Chicago, Illinois, Adam T. Savett, SAVETT LAW OFFICES LLC, Allentown, Pennsylvania, for Appellant. Lindsey Powell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. Ryan D. Watstein, Matthew A. Keilson, KABAT CHAPMAN & OZMER LLP, Atlanta, Georgia, Paul A. Grammatico, KABAT CHAPMAN & OZMER LLP, Los Angeles, California, for Appellee. Scott L. Nelson, Allison M. Zieve, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., Thomas M. Fisher, OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana, Tara Twomey, NATIONAL CONSUMER LAW CENTER, Boston, Massachusetts, David J. Carey, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, Columbus, Ohio, Jessica L. Ellsworth, HOGAN LOVELLS US LLP, Washington, D.C., Roman Martinez, LATHAM & WATKINS LLP, Washington, D.C., Michael H. Pryor, BROWNSTEIN HYATT FARBER SCHRECK, LLP, Washington, D.C., Shay Dvoretzky, Parker A. Rider-Longmaid, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Amici Curiae.

119a

OPINION

JOHN K. BUSH, Circuit Judge. Courts do not rewrite, amend, or strike down statutes. We only "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The district court held that a court conducting severability analysis defies that time-honored rule and instead "eliminat[es]" part of a statute. *Lindenbaum v. Realgy, LLC*, 497 F. Supp. 3d 290, 297 (N.D. Ohio 2020). It does not. We therefore reverse.

I.

In 1991, Congress prohibited almost all robocalls to cell phones and landlines. *Barr v. Am. Ass'n of Pol. Consultants, Inc. (AAPC)*, 140 S. Ct. 2335, 2344 (2020) (plurality opinion); 47 U.S.C. § 227(b)(1)(B). That seemed to change in 2015, when Congress attempted to enact an amendment to those broad prohibitions to allow robocalls if they were made "solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii), (b)(1)(B).

The amendment, however, was unconstitutional. So held the Supreme Court in *AAPC*. The Court determined that adding the exemption for government-debt robocalls would cause impermissible content discrimination. *AAPC*, 140 S. Ct. at 2347 (plurality opinion); *id.* at 2357 (Sotomayor, J., concurring in the judgment); *id.* at 2363 (Gorsuch, J., concurring in part and dissenting in part). The Court also held that the exception was severable from the rest of the restriction, leaving the general prohibition intact. *Id.* at 2356 (plurality opinion); *id.* at 2357 (Sotomayor, J., concurring in the judgment); *id.* at 2363 (Breyer, J., concurring in part and dissenting in part). During its severability analysis, the three-justice plurality

120a

offered a brief footnote musing on the liability of
parties who made robocalls between the exception's
enactment and the Court's *AAPC* decision. *Id.* at 2355
n.12 (plurality opinion). Those justices thought that
"no one should be penalized or held liable for making
robocalls to collect government debt after the effective
date of the 2015 government-debt exception," but
that their decision "does not negate the liability of
parties who made robocalls covered by the robocall
restriction."[1] *Id.*

In late 2019 and early 2020, Roberta Lindenbaum
received two robocalls from Realgy, LLC advertising
its electricity services. She sued, alleging violations
of the robocall restriction. After the Supreme Court
decided *AAPC*, Realgy moved to dismiss the case for
lack of subject-matter jurisdiction. The district court
granted the motion. It reasoned that severability is a
remedy that operates only prospectively, so the robo-
call restriction was unconstitutional and therefore
"void" for the period the exception was on the books.
*Lindenbaum*, 497 F. Supp. 3d at 298–99. Because it
was "void," the district court believed, it could not
provide a basis for federal-question jurisdiction. *Id.* at
299. Lindenbaum timely appealed. The United States
intervened in support of Lindenbaum to defend its
statute.

## II.

Realgy moved to dismiss for lack of subject-matter
jurisdiction under Federal Rule of Civil Procedure
12(b)(1), but its motion "is more accurately considered

---

[1] No other justice indicated agreement with that dictum, so it
is relevant only to the extent of its power to persuade. *See Fed.
Express Corp. v. Tenn. Pub. Serv. Comm'n*, 925 F.2d 962, 966 n.2
(6th Cir. 1991) ("[A] concurring opinion has no binding authority.").

121a

a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Orion Marine Constr., Inc. v. Carroll*, 918 F.3d 1323, 1330 (11th Cir. 2019); *cf. Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (treating a motion to dismiss as a motion for summary judgment). After all, a district court has jurisdiction when "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)). That is the case here. If Lindenbaum's arguments about the continuing vitality of the robocall restriction from 2015 to 2020 are correct, she is entitled to relief. So we will treat the district court's dismissal as one under Rule 12(b)(6) and review it de novo, assuming all facts in the complaint to be true. *West v. Ky. Horse Racing Comm'n*, 972 F.3d 881, 886 (6th Cir. 2020).

## III.

On the merits, Realgy contends that severability is a remedy that fixes an unconstitutional statute, such that it can only apply prospectively. As a fallback, it argues that if it can be held liable for the period from 2015 to 2020, but government-debt collectors who lacked fair notice of the unlawfulness of their actions cannot, it would recreate the same First Amendment violation the Court recognized in *AAPC*. Neither argument has merit.

### A. SEVERABILITY

The judicial power is the "power . . . to decide" cases through "dispositive judgments." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995) (cleaned up). When making those judgments, we must determine

122a

the legal rule that applies to the parties before us. That requires us to "say what the law is." *Marbury*, 5 U.S. at 177. And to say what the law is, we must exercise "the negative power to disregard an unconstitutional enactment." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). After disregarding unconstitutional enactments, we then determine what (if anything) the statute means in their absence—what is now called "severability" analysis. *See Tilton v. Richardson*, 403 U.S. 672, 684 (1971). But those steps are all part of explaining what the statute "has meant continuously since the date when it became law" and applying that meaning to the parties before us. *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 n.12 (1994). Courts do not change statutes.

Instead, as the Supreme Court has made clear in recognizing the power of judicial review, the Constitution itself displaces unconstitutional enactments: "a legislative act contrary to the constitution is not law" at all. *Marbury*, 5 U.S. at 177; *see also Ex parte Siebold*, 100 U.S. 371, 376 (1879). This foundational principle of law is far from the "legal fiction" Realgy argues it to be—the Court continues to reaffirm that principle to this day. *See Collins v. Yellen*, 141 S. Ct. 1761, 1788–89 (2021) ("[T]he Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment . . .").[2]

---

[2] This principle makes the severability inquiry clearer in the case of an unconstitutional amendment. Because it is "a nullity," it is "powerless to work any change in the existing statute"; the original statute "must stand as the only valid expression of the legislative intent." *Frost v. Corp. Comm'n*, 278 U.S. 515, 526–27 (1929); *see also Truax v. Corrigan*, 257 U.S. 312, 342 (1921); *Eberle v. Michigan*, 232 U.S. 700, 705 (1914).

123a

Because unconstitutional enactments are not law at all, it follows that a court conducting severability analysis is interpreting what, if anything, the statute has meant from the start in the absence of the always-impermissible provision. *See Tilton*, 403 U.S. at 684 (citing *Champlin Ref. Co. v. Corp. Comm'n*, 286 U.S. 210, 234 (1932)). The Court's standard for severability questions supports that understanding. It looks to Congress's intent, a hallmark of any federal statutory interpretive endeavor. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018). And when assessing the severability of state statutes, the court looks to the intent of the state legislature. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). If severability were a remedy for violation of the federal constitution, then federal courts could do it without reference to state law; because it is interpretive, federal courts must apply the state's law of severability.

Therefore, like any judicial interpretation, a court's severability analysis is subject to the "fundamental rule of 'retrospective operation' that has governed '[j]udicial decisions . . . for near a thousand years.'" *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 94 (1993) (alterations in original) (quoting *Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372 (1910) (Holmes, J., dissenting)).

Realgy's argument that severance is instead a remedy misconstrues the nature of remedies. Remedies consist of "an injunction, declaration, or damages." *See AAPC*, 140 S. Ct. at 2351 n.8 (plurality opinion).[3]

---

[3] The Court has, at times, described severance as a "remedy." *See, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2207 (2020); *United States v. Booker*, 543 U.S. 220, 245 (2005). But it still applied the rule its severability analysis generated to "all cases on direct review." *Booker*, 543 U.S. at 268.

124a

Further, that "[t]he relief the complaining party requests does not circumscribe" the severability inquiry also demonstrates that it cannot be a remedy. *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 427 (2010); *see also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 n.29 (2017) ("That Morales-Santana did not seek this outcome does not restrain the Court's judgment. The issue turns on what the legislature would have willed."). In *AAPC*, the Court severed the exception in a way that gave AAPC none of the relief it sought. 140 S. Ct. at 2344 (plurality opinion); *id.* at 2365–66 (Gorsuch, J., concurring in part and dissenting in part) (criticizing that outcome). That cannot have been a remedy.

Because severance is not a remedy, it would have to be a legislative act in order to operate prospectively only. One district court that accepted arguments like Realgy's forthrightly acknowledged that premise, explaining that "a severability decision is quasi-legislative, and thereby prospective." *Cunningham v. Matrix Fin. Servs., LLC*, No. 4:19-CV-896, 2021 WL 1226618, at *6 (E.D. Tex. Mar. 31, 2021). Realgy is less candid, but the cases on which it relies make the necessity of that premise equally clear. *Grayned v. City of Rockford*, for example, rejected an argument that a subsequent legislative amendment affected the "facial constitutionality of the ordinance in effect when appellant was arrested and convicted." 408 U.S. 104, 107 n.2 (1972); *see also Morales-Santana*, 137 S. Ct. at 1699 n.24 (describing *Grayned* as showing that

---

So the term "remedy" was used—admittedly confusingly—as shorthand for the interpretation Congress would have wanted had it known of the statute's constitutional problem, not in the traditional sense of a true remedy granted in a single case to make a party whole. *Id.* at 246.

125a

"a defendant convicted under a law classifying on an impermissible basis may assail his conviction without regard to the manner in which the legislature might subsequently cure the infirmity"). Similarly, *Landgraf v. USI Film Products* dealt with the question whether a legislative enactment applies retroactively. 511 U.S. 244, 265 (1994). Neither has any bearing on this case. "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." *United States v. Rutherford*, 442 U.S. 544, 555 (1979). In short, severance is interpretation, not legislation.

To sum up, the district court erred in concluding that, in *AAPC*, the Supreme Court offered "a remedy in the form of eliminating the content-based restriction" from the TCPA. *Lindenbaum*, 497 F. Supp. 3d at 297. Instead, the Court recognized only that the Constitution had "automatically displace[d]" the government-debt-collector exception from the start, then interpreted what the statute has always meant in its absence. *See Collins*, 141 S. Ct. at 1788. That legal determination applies retroactively. *Harper*, 509 U.S. at 94.

B. First Amendment

There are exceptions to the general rule that judicial decisions apply retroactively. Sometimes, "a previously existing, independent legal basis (having nothing to do with retroactivity)" will preclude the application of a newly recognized rule. *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995). Realgy argues that the First Amendment provides one such basis here. As a premise, it contends that government-debt collectors have a due-process defense to liability because they did not have fair notice of their actions' unlawfulness. If that is so, Realgy claims, then holding

126a

private-debt collectors liable would create the same content-discriminatory system that the Court held unconstitutional in *AAPC*: it would be liable, and government-debt collectors would not. We need not decide whether Realgy is correct about government-debt collectors because this case does not present the issue. Even assuming that it is correct, that does not create a First Amendment problem.

The First Amendment limits government regulation of speech. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In *AAPC*, it applied because the robocall restriction regulated speech. 140 S. Ct. at 2346 (plurality opinion). Here, by contrast, the centuries-old rule that the government cannot subject someone to punishment without fair notice is not tied to speech. *See, e.g., Landgraf*, 511 U.S. at 282–83 (discussing that principle with regard to employer liability under Title VII); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17–18 (1976) (same for retroactive liability for mining-based illnesses). Whether a debt collector had fair notice that it faced punishment for making robocalls turns on whether it reasonably believed that the statute expressly permitted its conduct. That, in turn, will likely depend in part on whether the debt collector used robocalls to collect government debt or non-government debt. But applying the speech-neutral fair-notice defense in the speech context does not transform it into a speech restriction.

## IV.

In 1982, the Supreme Court considered "[t]he principle that statutes operate only prospectively, while judicial decisions operate retrospectively" so obvious as to be "familiar to every law student." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982). Today, we clarify that severability is no exception. We reverse.

127a

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

[Filed September 9, 2021]

————

No. 20-4252

————

ROBERTA LINDENBAUM, individually and on
behalf of all others similarly situated,

*Plaintiff-Appellant*,

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

v.

REALGY, LLC, a Connecticut limited liability
company, dba Realgy Energy Services,

*Defendant-Appellee*.

————

Before: GIBBONS, STRANCH, and BUSH,
Circuit Judges.

————

JUDGMENT

On Appeal from the United States District Court for
the Northern District of Ohio at Cleveland.

THIS CAUSE was heard on the record from the
district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED
that the judgment of the district court is REVERSED.

ENTERED BY ORDER
OF THE COURT

/s/Deborah S. Hunt
Deborah S. Hunt, Clerk

128a

## APPENDIX E

**United States Code Annotated Title 47.
Telecommunications (Refs & Annos)
Chapter 5. Wire or Radio Communication
(Refs & Annos)
Subchapter II. Common Carriers
(Refs & Annos)
Part I. Common Carrier Regulation**

**47 U.S.C.A. § 227.  Restrictions on use of telephone equipment**

(a)   Definitions

As used in this section—

(1)   The term "automatic telephone dialing system" means equipment which has the capacity—

(A)   to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B)   to dial such numbers.

(2)   The term "established business relationship", for purposes only of subsection (b)(1)(C)(i), shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003, except that—

(A)  such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

129a

(B) an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G)).[1]

(3) The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(4) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

(5) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

(b) Restrictions on use of automated telephone equipment

---

[1] So in original. The second closing parenthesis probably should not appear. 47 U.S.C.A. § 227, 47 USCA § 227

Current through PL 117-55.

130a

(1)  Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A)  to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i)  to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii)  to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii)  to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

(B)  to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

131a

(C)   to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

  (i)   the unsolicited advertisement is from a sender with an established business relationship with the recipient;

  (ii)   the sender obtained the number of the telephone facsimile machine through—

    (I)   the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

    (II)   a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution, except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

  (iii)   the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D), except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

132a

(D)  to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(2)  Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

(A)  shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B)  may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i)  calls that are not made for a commercial purpose; and

(ii)  such classes or categories of calls made for commercial purposes as the Commission determines—

(I)  will not adversely affect the privacy rights that this section is intended to protect; and

(II)  do not include the transmission of any unsolicited advertisement;

(C)  may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the

133a

Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

(D)   shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if—

(i)   the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

(ii)   the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii)   the notice sets forth the requirements for a request under subparagraph (E);

(iv)   the notice includes—

(I)   a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

(II)   a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are

134a

unduly burdensome given the revenues generated by such small businesses;

(v)   the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

(vi)   the notice complies with the requirements of subsection (d);

(E)   shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(i)   the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(ii)   the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

(iii)   the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

(F)   may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, allow professional or trade associations that are tax-exempt nonprofit organizations to

135a

send unsolicited advertisements to their members in furtherance of the association's tax-exempt purpose that do not contain the notice required by paragraph (1)(C)(iii), except that the Commission may take action under this subparagraph only—

(i)   by regulation issued after public notice and opportunity for public comment; and

(ii)   if the Commission determines that such notice required by paragraph (1)(C)(iii) is not necessary to protect the ability of the members of such associations to stop such associations from sending any future unsolicited advertisements;

(G)(i)   may, consistent with clause (ii), limit the duration of the existence of an established business relationship, however, before establishing any such limits, the Commission shall—

(I)   determine whether the existence of the exception under paragraph (1)(C) relating to an established business relationship has resulted in a significant number of complaints to the Commission regarding the sending of unsolicited advertisements to telephone facsimile machines;

(II)   determine whether a significant number of any such complaints involve unsolicited advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

136a

(III)   evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the benefits to recipients of establishing a limitation on such established business relationship; and

(IV)   determine whether with respect to small businesses, the costs would not be unduly burdensome; and

(ii)   may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005;

(H) may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States; and

(I)   shall ensure that any exemption under subparagraph (B) or (C) contains requirements for calls made in reliance on the exemption with respect to—

(i)   the classes of parties that may make such calls;

(ii)   the classes of parties that may be called; and

(iii)   the number of such calls that a calling party may make to a particular called party.

137a

(3)  Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A)  an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B)  an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C)  both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

\* \* \*

138a

## APPENDIX F

**United States Code Annotated**
**Title 28.  Judiciary and Judicial Procedure**
**(Refs & Annos)**
**Part I.  Organization of Courts (Refs & Annos)**
**Chapter 21.  General Provisions**
**Applicable to Courts and Judges**

**28 U.S.C.A. § 455.  Disqualification of justice, judge, or magistrate judge**

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter

139a

in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

140a

(i)  Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii)  An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii)  The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv)  Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e)  No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

(f)  Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be

141a

substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.